UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JAMES ELMER SHAW,<br><br>Plaintiff,<br><br>vs.<br><br>DENNIS KAEMINGK, Secretary of Corrections, Sued in his Official and Individual Capacities;<br>ROBERT DOOLEY, Director of Prison Operations, Sued in his Official and Individual Capacities;<br>DARIN YOUNG, Warden, Sued in his Official and Individual Capacities;<br>JENNIFER DRIESKE, Deputy Warden, Sued in her Official and Individual Capacities;<br>JENNIFER STANWICK-KLEMIK, Deputy Warden, Sued in her Official and Individual Capacities;<br>TROY PONTO, Associate Warden, Sued in his Official and Individual Capacities;<br>ARTHOR ALCOCK, Associate Warden, Sued in his Official and Individual Capacities;<br>DAVID LENTSCH, Unit Manager, Sued in his Official and Individual Capacities;<br>DERRICK BIEBER, Unit Manager, Sued in his Official and Individual Capacities;<br>AL MADSON, Unit Manager, Sued in his Official and Individual Capacities;<br>JOSH KEMINK Unit Manager, Sued in his Official and Individual Capacities;<br>TAMMI MERTINS-JONES, Cultural Activities Coordinator, Sued in her Official and Individual Capacities;<br>ELIZABETH VITETTA, Unit Coordinator, Sued in her Official and Individual Capacities;<br>BRITINEY ULMER, Unit Coordinator, Sued in her Official and Individual | 4:17-CV-04116-KES<br><br><br>ORDER GRANTING MOTION TO PROCEED IN FORMA PAUPERIS, DISMISSING COMPLAINT IN PART AND DIRECTING SERVICE |

Capacities;

MELISSA MATURAN, Administrative Remedy Coordinator, Sued in her Official and Individual Capacities;

STEVE BAKER, Major, Sued in his Official and Individual Capacity;

LINDA MILLER-HUNHOFF, Mail Supervisor, Sued in her Official and Individual Capacity;

SHARRON KEIMAN, Mailroom, Sued in her Official and Individual Capacity;

JORDAN STOREVIK, Mailroom, Sued in his Official and Individual Capacity;

DEREK ANDERSON, Correctional Officer, Sued in his Official and Individual Capacity;

PRESTON PERRETT, Correctional Officer, Sued in his Official and Individual Capacity;

JUDY PLOOSTER-JACOBS, Correctional Officer, Sued in her Official and Individual Capacity;

LISA FRASIER, Correctional Officer, Sued in her Official and Individual Capacity;

NICK REDDMAN, Teacher, Sued in his Official and Individual Capacity;

DR. MARY CARPENTER, MD, Sued in her Official and Individual Capacity;

ER REGIER, MD, Sued in his Official and Individual Capacity;

BRAD ADAMS, PA-C; Sued in his Official and Individual Capacity;

JESSICA SCHREURS, RN; Sued in her Official and Individual Capacity;

HEATHER BOWERS, RN; Sued in her Official and Individual Capacity;

UNKNOWN DEPARTMENT OF HEALTH/CORRECTIONAL HEALTH SERVICE (DOH/CHS) EMPLOYEES, Sued in their Official and Individual Capacity;

YANKTON MEDICAL CLINICAL, P.C., Sued in its Official and Individual Capacity;

| | |
|---|---|
| BRENT ADAMS, MD; Sued in his Official and Individual Capacity; CBM CORRECTIONAL FOOD SERVICES, Sued in its Official and Individual Capacity; JOHN TWEIRWEILLER, CBM District Manager, Sued in his Official and Individual Capacity; UNKNOWN CBM EMPLOYEES, Sued in their Official and Individual Capacity; DELMER WALTER, Contracted DOC Attorney, Sued in his Official and Individual Capacity; CATHERINE SCHLIMGEN, Contracted DOC Attorney, Sued in her Official and Individual Capacity; MARK BIDNEY, Contracted DOC Paralegal. Sued in his Official and Individual Capacity; AND GLOBAL TEL*LINK, GTL; Sued in its Official and Individual Capacity; | |
| Defendants. | |

## INTRODUCTION

Plaintiff, James Elmer Shaw, is an inmate at Mike Durfee State Prison (MDSP) in Springfield, South Dakota. Shaw filed a pro se civil rights lawsuit under 42 U.S.C. § 1983 and requested leave to proceed in forma pauperis under 28 U.S.C. § 1915. Docket 1; Docket 3. For the following reasons, the court grants Shaw's motion to proceed in forma pauperis, dismisses Shaw's complaint in part, and directs service.

## FACTS

Shaw was housed as an inmate at the South Dakota State Penitentiary (SDSP) until he was transferred to the MDSP in April 2017. Shaw alleges

several violations of his civil rights occurring at both SDSP and MDSP. Docket 1 ¶ 44. In part, Shaw's claims concern his ability to practice his religion and defendants' alleged failures to recognize and accommodate Shaw's practice. Docket 1. Shaw also makes claims involving his prisoner trust account, medical accommodations, prison policy, and access to the courts. *Id.* Shaw also claims he suffered retaliation before his transfer for litigating, filing grievances, and attempting to get his religion recognized by one or more defendants. *Id.* ¶ 45.

Shaw contends that he has exhausted all available administrative remedies, except when he was denied access to the grievance process. *Id.* ¶ 50. Before Shaw's transfer, he was deprived of most of his legal papers by one or more of the defendants. *Id.* ¶ 47.

The facts as alleged in the complaint are:

**Religious Land Use and Institutionalized Persons Act (RLUIPA)**

Shaw identifies his religion as Dorcha Cosàn. *Id.* ¶ 57. Dorcha Cosàn requires Shaw to strictly adhere to The Nine Laws of Dorcha Cosàn in order "to keep his geise and for Shaw to reach his ultimate goal of attaining Godhood." *Id.* ¶ 53. Shaw's beliefs are sincerely held. *Id.* ¶ 55.

Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones refused to recognize Dorcha Cosàn and denied Shaw's requests for accommodations. *Id.* ¶ 55. These defendants created or accepted the "operation memorandums, policies, procedures, rules and regulations, both written and unwritten" that burdened Shaw's practice of Dorcha Cosàn. *Id.*

¶ 62. They required Shaw to prove that his requests were mandated by Dorcha Cosàn and then they waited four months before they considered his requests without providing an answer to Shaw. *Id.*

Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones allowed Shaw's religion to be taken away from him for minor rule infractions. *Id.* They forced Shaw to wait one year to celebrate a single religious holiday when Shaw was mandated to celebrate eight Sabbats and thirteen Esbats throughout the year. *Id.* And these defendants only allowed Shaw one day a week for group worship even though Shaw was mandated to worship three times a week plus holidays. *Id.* And these defendants forced Shaw to allow at least two sex offenders and non-members to attend his religious ceremonies and rituals in violation of Dorcha Cosàn. *Id.*

These defendants only allowed Shaw two religious books when Dorcha Cosàn mandates that he have access to thousands at any given time. *Id.* And these defendants approved mainstream religions' requests and denied the same requests for Shaw. *Id.*

Shaw stopped Dooley, Young, Drieske, and Bieber in front of his cell to explain that his religion requests are mandated by his religion. *Id.* ¶ 63. Shaw stated his intent to sue. *Id.* And Drieske replied, " '[G]o ahead and sue us, I'll claim all your requests are a security threat.' " *Id.* ¶ 64. Dooley and Young failed to manage Drieske and failed to remedy this wrong. *Id.* ¶ 65.

When Shaw arrived at MDSP, he spoke with Stanwick-Klemik. *Id.* ¶ 66. Stanwick-Klemik told Shaw, " 'Dorcha Cosàn will not be approved as a

recognized religion' and Shaw was told, 'you should consider signing up for another religious service[] that [is] already established here at Mike Durfee.' " *Id.* Signing up for another religious service is an ethical violation of Shaw's obligations to Dorcha Cosàn. *Id.*

Dooley, Young, Drieske, and Stanwick-Klemik denied several of Shaw's requests. *Id.* ¶ 67. They denied Shaw the ability to take three ancestry DNA tests "to determine his origins mandated by Shaw's religion so that Shaw can study the Gods and Goddesses of his ancestors." *Id.* Shaw must spend time researching ancestry and chart findings on a genogram, but Shaw was denied the opportunity to do this research. *Id.*

Dooley, Young, Drieske, and Stanwick-Klemik denied Shaw "the ability to keep his geise with the Goddesses Brid and Hera." *Id.* And these defendants denied Shaw a "Gleini na Droedh," "Geise ring," "ritual tools," and "the first 85 texts and their companions of study." *Id.* Drieske said Shaw "can not have any of the artistic texts or text companions because they 'might have nudity[.]' " *Id.* And Drieske eliminated sixty-five of the first mandated text or companions with no penological justification other than "a porn policy." *Id.*

Dooley, Young, Drieske, and Stanwick-Klemik have denied Shaw the ability to choose a specific order of accention, to be reborn, to seek guides and helpers, to choose his Branch of Destiny, to acquire mandated texts and companions and to take correspondence course. *Id.* They denied Shaw a classroom setting to set up a computer, art work stations, and a library for those practicing Dorcha Cosàn. *Id.* And these defendants denied Shaw a

"Group Book of Shadows," and "a personal Book of Shadows[.]" *Id.* The
"requests within Law I are of no cost to Defendants." *Id.* And "[e]verything
needed for Shaw to adhere to Law I will be purchased by DC through approved
venders." *Id.* ¶ 68.

Drieske, Stanwick-Klemik, Mertens-Jones, CBM, Unknown CBM
employees, and Tweirweiller denied Shaw the ability to follow his religious diet
requirements. *Id.* ¶ 69. And when Shaw inquired about the denial of special
diets for Dorcha Cosàn members, an unknown CBM employee stated, " 'if you
don't like it don't eat anymore.' " *Id.* ¶ 70. CBM served no food complaint with
his religious diet requirements. *Id.* ¶ 73. Shaw "believes he is defiling himself
by doing something that is completely forbidden by his religion." *Id.* ¶ 71.

Drieske, Stanwick-Klemik, Mertens-Jones, CBM, Unknown CBM
employees, and Tweirweiller denied Shaw the ability to celebrate holy days
with "Ritual and Feast" as mandated by Law II of Dorcha Cosàn. *Id.* ¶ 74. And
Drieske denied Shaw's requests for all other mandated aspects of Law II. *Id.* ¶
75.

Unknown CHS employees and Drieske denied Shaw all-natural remedies
to replace his currently prescribed pharmaceuticals. *Id.* ¶ 76. All-natural
remedies are necessary for Shaw to adhere to Law II of Dorcha Cosàn. *Id.*

Alcock, Lentsch, Bieber, and Klemik forced Shaw "to live and dine with
non-believers of [Dorcha Cosàn], other races, religions or people who live by a
different creed." *Id.* ¶ 77. There is a "high probability of confrontation between

Shaw and his cell mates." *Id.* ¶ 78. These defendants allow other religions, races, and gangs to live together if requested. *Id.* ¶ 79.

Drieske and Stanwick-Klemik denied Shaw the ability to adhere to Law III of Dorcha Cosàn. *Id.* ¶ 80. And Drieske, through Martens-Jones, told Shaw to "switch to Buddha." *Id.*

Drieske, Stanwick-Klemik, and Mertens-Jones denied Shaw the ability to adhere to Law IV of Dorcha Cosàn by denying him "ritual and divination tools mandated by Dorcha Cosàn." *Id.* ¶ 81. These deprivations are "the equivalent of taking a digit or limb from Shaw for each ritual tool denied." *Id.* ¶82. Ritual tools are "partners and aids in Magick and can not be regulated as being props that can be easily denied or discarded." *Id.* ¶83. The ritual tools are sacred and "are among the outer aspects of Wicca." *Id.* ¶¶ 84-85.

Drieske and Stanwick-Klemik denied Shaw the ability to adhere to Laws V and VI. *Id.* ¶ 87. Law VI that mandates Shaw "worship and celebrate the 'Sun' throughout the 'Wheel of the Year' (WOY) and Dorcha Cosàn's Zodiac system, by giving thanks, sending daily offerings, and having 'outdoor-cook-outs' followed by 'outdoor-ritual-and feast' ceremonies on the day before or the day of the Eight Sabbats." *Id.* ¶ 88.

Drieske and Stanwick-Klemik denied Shaw the ability to adhere to all aspects of Law VIII, which mandates Shaw "worship and celebrate the 'Moon' throughout the 'Tree Calendar,' by giving thanks, sending daily offerings, and having 'outdoor-cook-outs' followed by 'outdoor-ritual-feasts' ceremonies on

the day before or day of the Thirteen Esbats." *Id.* ¶ 89. And these defendants denied Shaw the ability to adhere to Law IX. *Id.* ¶ 90.

**Free Exercise**

One or more defendants denied recognition of Dorcha Cosàn and have placed substantial burden on Shaw's observation of Dorcha Cosàn. *Id.* ¶ 92. Kaemingk, Dooley, Young, Drieske, Stanwick, Mertens-Jones, Lentsch and Bieber allow religious accommodations for other religions but deny the same to Shaw. *Id.* ¶ 93. The denials forced Shaw to significantly modify his practice and "render[ed] Shaw's religious exercise effectively impractical." *Id.* ¶¶ 93-95.

CBM, unknown CBM employees and Tweirweiller denied Shaw the diet religiously mandated by Dorcha Cosàn. *Id.* ¶ 96. But these defendants allow mainstream religions diets in accordance with their religious mandates. *Id.*

CBM denied Shaw the ability to receive care packs from friends and family because he is an indigent inmate. *Id.* ¶ 97. GTL denied Shaw the ability to receive music, books and games on a tablet because he is an indigent inmate. *Id.* ¶ 98.

Reddman and Jacobs denied Shaw the ability to use the law computer in the school at SDSP when trying to prepare this complaint and "typing his DJS." *Id.* ¶ 100. Reddman and Jacobs "labeled" this conduct a rule infraction. *Id.* Shaw was never written up for a rule infraction but was sanctioned for this conduct. *Id.* ¶ 103. Jacobs "stated, 'My Christian Faith does not allow me to let Shaw's "Devil Worship Group" sue my employers.' " *Id.* ¶ 101. Dorcha Cosàn does not believe in or worship the devil. *Id.*

Shaw was banned from all computers to prevent him from preparing this complaint. *Id.* ¶ 102. Reddman denied Shaw employment in the school because Shaw is banned from all computers. *Id.* Shaw alleges that Fraiser imposed these sanctions to prevent Shaw from preparing religious complaints and project applications. But Frazier, Jacobs, and Reddman allow Christian, Jewish, and Native American groups to prepare their complaints and project applications on the law library computers. *Id.* ¶ 104.

**Equal Protection**

Every aspect of the Nine Laws of Dorcha Cosàn and requested accommodation has been approved for similarly situated inmates and mainstream religious groups. *Id.* ¶ 105. Defendants Kaemingk, Dooley, Young, Drieske, Stanwick-Kemik, and Mertens-Jones approved requests for similarly situated inmates and mainstream religious groups. *Id.* ¶ 106. Shaw received different treatment. *Id.* ¶ 107.

Drieske, Stanwick-Klemik, and CBM allowed other religious groups to buy and receive donations from outside approved venders, other than CBM, for religious or cultural gatherings. *Id.* ¶ 108. But they deny the same to Shaw. *Id.* Shaw can only purchase foods for religious gatherings and celebrations through CBM. But CBM refused to allow Shaw to adhere to DC's strict dietary requirements. *Id.*

CBM provided Shaw celebratory meals. *Id.* ¶ 110 But these meals are the same as the main line meals. *Id.* And CBM raised the prices for a meal

that is otherwise free. *Id.* CBM provided free special meals for mainstream religions on religious holidays. *Id.* ¶ 111. But CBM denied the same to Shaw.

CBM, Tweirweiller, and unknown CBM employees falsely advertised that their commissary products complied with Shaw's religious requests and that their commissary products were a particular name-brand, price, and quantity. *Id.* ¶ 112. CBM employees replaced the name-brand products with cheaper, generic, smaller quantity, non-compliant products without posting the changes. *Id.* ¶ 113. And Shaw did not receive notice of the changes until the order was delivered. *Id.* ¶ 114. CBM employees refused to reimburse Shaw. *Id.*

The price of food outside of prison has decreased for the past two years. *Id.* ¶ 115. But in October 2016, CBM "raised their commissary prices on over 300 items by an average of 18% on food items alone." *Id.* ¶ 116. CBM replaced brand name items with cheaper, imitation, less quantity items. *Id.*

Kaemingk, Dooley, and unknown CBM Employees allowed other religions to purchase foods, commissary, and religious items from vendors other than CBM. *Id.* ¶ 117. But these defendants denied Shaw the same option. *Id.* Shaw is a captive consumer. *Id.* ¶ 118.

CBM has a food contract. *Id.* ¶ 120. This contract allows CBM to force Shaw to buy his commissary at CBM. *Id.* ¶ 121. And Shaw buys CBM commissary "because of hunger." *Id.*

CBM refused to provide Shaw with his religious dietary needs. *Id.* ¶ 112. And CBM refused to carry commissary products that would allow Shaw to adhere to his religion. *Id.*

On December 21, 2016, Shaw canceled the Yule Sabbat feast and celebration because CBM and Drieske refused to allow Shaw to order "all natural" foods from Hy-Vee. *Id.* ¶¶ 124-26. Hy-Vee is an approved vender for the DOC. *Id.* ¶ 126. Hy-Vee has catered Buddhist, Jewish, and Muslim group meals. *Id.* ¶ 127. Drieske approved this differential treatment. *Id.* ¶ 128.

One or more defendants own stocks or shares in CBM. *Id.* ¶ 129. And this motivates Kaemingk to allow CBM to create a monopoly to violate Shaw's constitutional rights. *Id.*

**First Amendment Right to Receive Mail**

Drieske, Baker, Miller-Hunhoff, Reimann, and Storvick rejected or refused to deliver over 200 magazines that were mailed to Shaw based on prison concerns. *Id.* ¶ 131. The rejected magazines are art magazines. *Id.* ¶ 132. And the magazines are "necessary reference materials for Shaw's religion . . . to develop [his] artistic-magickal mind [sic]." *Id.* These rejections place a substantial burden on Shaw. *Id.* ¶ 133. Most of the rejections are based on a single, small picture within an entire magazine. *Id.* ¶ 134. And when the magazines are rejected, Shaw is indigent and unable to send the rejected magazines out. *Id.* ¶ 135. Shaw has suffered over $1,000.00 in monetary loss. *Id.*

Drieske and Baker rejected Shaw's magazines. *Id.* ¶136. And the same defendants rejected Shaw's magazines again during the grievance process. *Id.* Shaw alleges that Drieske stated, " 'they might have nudity in them.' " *Id.* ¶ 138.

**Due Process**

Kaemingk, Dooley, and Young promulgated policies that deprived Shaw of personal property and moneys. *Id.* ¶ 139. These policies did not provide sufficient procedural safeguards to avoid "erroneous deprivations of Shaw's protected life, liberty or property interest[.]"*Id.* ¶140. The current policy requires Shaw to "sign away his due process rights to receive money or buy property or he is unable to purchase personal property or receive money from friends or family." *Id.* ¶ 143. The current policy allows for DOC officials to "lose [sic], take or destroy Shaw's personal property without any liability[.]"*Id.* ¶ 144. The current policy requires Shaw to "(1) sign the return inventory sheet and forfeit his missing property or (2) refuse to sign the return inventory sheet and lose all of plaintiff's property." *Id.* ¶ 145.

Shaw receives money from outside sources that are deposited into his institutional account. *Id.* ¶ 139. And the current DOC policy allows for up to 95% of Shaw's incoming money. *Id.* ¶ 141.

Some of Shaw's incoming money was taken without any procedural due process. *Id.* ¶ 139. On two occasions significant portions of his property were missing. *Id.* ¶ 145. Defendants confiscated $140.00 out of his inmate account without notifying Shaw or giving him an opportunity to state his objection to the confiscation. *Id.* ¶ 147.

Shaw has not received a pre-deprivation hearing before his money was confiscated. *Id.* ¶ 142. The current administrative remedy policy allowed UM Bieber to decide both stages of the grievance process. *Id.* ¶ 146. This insured

that Shaw did not get his property back. *Id.* On October 31, 2016 at 1:30 p.m., there was a small claims hearing on I.T.V. against UM Bieber and Young. Docket 1 ¶193.

Current DOC policy allows one or more defendants to take Shaw's incoming money and place it in a frozen account. Once in the frozen account, the DOC holds it forever without Shaw's permission, against Shaw's will, and without having power of attorney. *Id.* ¶ 148. The current policy allows the DOC to earn interest off of Shaw's incoming money and deprive him of that interest. *Id.* ¶ 149.

**The Americans with Disabilities Act**

Shaw is disabled. *Id.* ¶ 153. He "has been diagnosed with an osteochondroma of the right proximal fibula, has no ALL's in his knees, needs full knee replacements which he can not receive until he is at least 60 years of age, wears metal knee braces, has low back pain due to his bottom three (3) vertebrae having no fluid in them and has arthritis in his knees and lower back." *Id.* Shaw experiences "pain and suffering when caring for himself, performing manual tasks such as walking, sitting or even standing too long[.]"*Id.* ¶ 154. Shaw experiences restlessness, trouble sleeping, and depression. *Id.* ¶ 155. Shaw's knees pop out of their sockets causing more permanent injury to his knees and lower back. *Id.* 157.

Dooley, Young, Ponto, Lentsch, Klemik, Dr. Regier, PA Adams, RN Bowers, RN Schreurs, and unknown CHS Employees "refuse[d] to provide Shaw with a medical order for a medical bunk (a handicap bed), [and] refused

to give Shaw a handicap accessible room when other handicap individuals received these accommodations." *Id.* ¶ 156. Shaw personally asked each of these defendants for medical accommodations and was denied. *Id.* ¶ 158.

Shaw asked Dooley for help with his medical issues in the barracks but Dooley refused to help. *Id.* ¶ 159. Shaw "later asked Dooley for a medical bunk[.]" *Id.* ¶ 160. Dooley refused and "threatened to place Shaw back in the barracks so Shaw could enjoy the heat." *Id.* On both of these occasions, Shaw showed Dooley the bruises on his knees. *Id.* ¶ 161.

Dr. Regier and PA Adams refuse to prescribe medication to relieve Shaw's pain. *Id.* ¶ 162. Shaw refused to eat and drink water for up to thirteen days as an attempt to get a medical order for a handicap cell and medical bunk. *Id.* ¶ 163. Shaw has made numerous sick calls. *Id.* These denials are punishment by Dr. Regier and PA Adams for Shaw's engagement in protected activities such as filing grievances and a lawsuit challenging the conditions of confinement. *Id.* ¶ 164.

**Denial of Medical Care / Deliberate Indifference**

Kaemingk, Dooley, Young, Bieber, Lentsch, Klemik, Carpenter, Dr. Regier, PA Adams, Schreurs, Bowers, and Unknown CHS Employees "have promulgated operations memorandums, policies, procedures, rules and regulations, both written and unwritten, or have been accepted or used by one or more defendants to declare medical treatments are 'comfort care' and not necessary to deny Shaw medical care." *Id.* ¶ 165. These policies allow medical personal to delegate medical decisions to non-medical personal, such as unit

staff, to decide if Shaw can receive medical treatments to relieve Shaw's pain. *Id.* ¶ 166. DOC Unit Staff claim that Shaw must have a medical order from CHS. *Id.* ¶ 167. This creates a "perpetual loop that the DOC and CHS send Shaw back and forth claiming Shaw must get med orders from the other." *Id.* This "allows the DOC and CHS to deny Shaw medical treatment[.]"*Id.* ¶ 168.

Dooley and Dr. Carpenter sent outside doctors a list detailing what procedures and treatments they can and cannot recommend for Shaw. *Id.* ¶ 169. This procedure insures that Shaw will not receive the "surgeries he needs, medical shoes, and or pain medication[.]"*Id.* ¶170.

In June of 2017, Dr. Brent Adams saw Shaw at the Yankton Medical Clinic. *Id.* ¶ 171. Dr. Adams informed Shaw of a gel injection for his knees that could help relieve Shaw's pain and suffering. But Dr. Adams said the DOC will not pay for the injections and Dr. Adams was instructed not to prescribe the injections. *Id.* ¶ 172. Dr. Adams told Shaw that Shaw is too poor to pay for them himself. *Id.* Shaw believes that Dr. Adams "has an ethical obligation to prescribe medications and or recommend treatments that will alleviate Shaw's pain and suffering regardless of the cost or DOH / CHS / DOC interference." *Id.* ¶ 173.

An unknown CHS defendant removed all of Shaw's medical orders when Shaw was placed in the SHU. *Id.* ¶ 177. Shaw claims he is "unable to wear his medically necessary knee braces and medical shoes with his prescribed heel wedges as well as his prescribed head of bed wedge that helps Shaw battle

severe acid reflux." *Id.* ¶ 178. This causes Shaw extreme pain, suffering, and torture. *Id.* ¶ 179.

**Access to the Courts**

Allock, Ponto, Bieber, Lentsch, Klemik, Vitetta, Maturan, and Ulmer prevented Shaw from filing grievances about the conditions of his confinement by denying him the grievances, refusing to take his grievances once completed, not answering the grievances placed in a defendant's box or under their door, and retaliating against Shaw for trying to grieve the conditions of his confinement by punishing Shaw. *Id.* ¶ 180.

Bieber is involved in both stages of the administrative remedies process. *Id.* ¶ 181. Bieber lied to his superiors to prevent Shaw from challenging the conditions of confinement. *Id.* Shaw told Ponto about Bieber's conduct and Ponto did nothing. *Id.* ¶ 182. Shaw told Young about Bieber's conduct and Young did nothing. *Id.* ¶ 183.

Shaw filed a grievance about his conditions of confinement. *Id.* ¶ 184. Maturan denied Shaw's administrative remedies for "exaggerated reasons to prevent Shaw from getting his claim to court." *Id.*

Vitetta and Bieber prevented Shaw from creating and mailing legal papers by withholding necessary resources and materials. *Id.* ¶ 185. Vitetta denied Shaw the ability to send legal mail. *Id.* ¶ 186. This prevented Shaw from arguing key elements of his small claims case because he was unable to send his response to Defendants Answer to opposing counsel Schlimglen. *Id.* ¶ 186. As a result, the judge would not allow Shaw to argue his due process

claim. *Id.* Shaw's due process claim was not frivolous. *Id.* ¶ 187. Shaw told Baker that Vitetta refused to allow Shaw to send legal mail and Baker did nothing. *Id.* ¶ 192.

Shaw is banned from the law library. *Id.* ¶ 188. Attorney Delmar "Sonny" Walter and paralegal Mark Binde's "inadequacies hindered Shaw's efforts to proceed with a civil rights action claiming Plaintiff's constitutional due process rights were violated." *Id.* Their insufficient legal assistance resulted in one of Shaw's complaints being dismissed "for failure to meet a technical requirement that Shaw could not have known." *Id.* ¶ 189. If Shaw had access to the law library or if attorney Walter and Binde would have helped Shaw prepare his complaint, Shaw would have won his claims. *Id.* ¶ 190. Walter and Binde refused to help Shaw. *Id.* ¶ 191.

On October 31, 2016, at 1:30 p.m., Shaw had a small claims court hearing on I.T.V. against Bieber and Young. Docket 1 ¶ 193. Attorney Schlimgen represented Bieber and Young. *Id.* During the hearing, Schlimgen gave perjured testimony on two occasions to prevent Shaw from winning. *Id.* ¶ 194. Schlimgen testified that check no. 201009 was deposited in Shaw's institutional account and that it was not check no. 201295. *Id.* ¶ 195. This was untrue and prevented Shaw from recovering his money. *Id.* ¶ 196.

**Retaliation in Violation of the First and Fourteenth Amendments**

Shaw filed numerous grievances and a a § 1983 action against Anderson in October of 2016. *Id.* ¶ 197. Then Anderson caused Shaw's cell to be searched. *Id.* Shaw's personal property and legal papers were taken. *Id.* ¶ 198.

Anderson also took the table out of Shaw's cell to prevent Shaw from filing grievances and litigating. *Id.* ¶ 199. Shaw is now the only inmate in East Hall without a table in his cell. *Id.* ¶ 200.

Bieber denied the return of Shaw's legal work and personal property. *Id.* ¶ 201. And Bieber prevented Shaw from using the grievance process by involving himself in both stages of the grievance process and giving false information to his superiors. *Id.* Bieber did this in retaliation for filing grievances and litigating against Bieber. *Id.* Shaw confronted Bieber and Bieber said, " ' Prove it.' " *Id.* ¶ 202.

On September 8, 2016, Bieber told Shaw that "since he likes to file grievances he was being denied access to the law library." *Id.* ¶ 203. Bieber also told Shaw "his officers could write him up for everything and his punishment would be no library, no computers, no legal work, and no religious services." *Id.* ¶ 204. Bieber said, " 'We can both go out of our way to cause problems.' " *Id.* ¶ 205.

In April of 2016, Bieber, in retaliation for Shaw's grievances and lawsuit against him, threw thirty-one project applications in the trash that Shaw had filled out for religious accommodations. *Id.* ¶ 206. Shaw was forced to wait an additional three months to turn in his project applications. *Id.* ¶ 207.

Bieber denied Shaw medical orders and treatments because Shaw filed grievances and lawsuit against him. *Id.* ¶ 208. This denial caused Shaw pain and suffering. *Id.* ¶ 209. Bieber placed mentally ill inmates and inmates of

rival gang members in a cell with Shaw to cause physical and mental harm to Shaw. *Id.* ¶ 210.

Lentsch took Shaw's handicap cell status away. *Id.* ¶ 211. Lentsch placed Shaw in a three-man cell to punish Shaw for refusing a transfer and filing grievances. *Id.* This placement caused Shaw extreme pain and suffering. *Id.* ¶ 212. Shaw could not sit up in bed. *Id.* Getting in and out of a three-man bunk bed was "an impossible task for a person with extreme low back pain and a person with no ACL's and extreme degenerative disease in his knees and low back." *Id.* Shaw was unable to use his head-of-bed wedge to elevate his upper body to prevent him from throwing up acid and vomiting in his sleep from acid reflux. *Id.* ¶ 213. If Shaw used his wedge, his head would be pressed against the middle bunk. *Id.* ¶ 214. Shaw's symptoms woke him up on several occasions. *Id.* ¶ 215. Lentsch denied Shaw medical ice and a pillow to treat his swollen bruised knees. *Id.* ¶ 216.

Lentsch knows Shaw cannot live with other races or gang members due to his religion and knows Shaw could be assaulted. *Id.* ¶ 217. But Lentsch forced Shaw to live with a black inmate. *Id.* When Shaw and the black inmate told Lentsch there was going to be a fight if they were forced to live together, Lentsch encouraged an assault by responding, " '[D]o what you gotta do[.]' " *Id.* ¶ 218.

Lentsch took personal property and legal work from Shaw, because Shaw attempted to file grievances and refused transfer from SDSP to MDSP. *Id.* ¶ 219. Lentsch threatened additional retaliation if Shaw continued to file

grievances and law suits. Lentsch stated, " 'I can take more of your legal work and your TV can jump off the locker box and break.' " *Id.* ¶ 220.

When Shaw was in the SHU for refusing transfer, Madson told Shaw " 'I've been waiting a long time to punish you.' " *Id.* ¶ 221. Madson then imposed an excessive sanction on Shaw. *Id.* The sanction consisted of ten days in the SHU and six months loss of recreation, visits, phone, commissary and loss of care packages. *Id.* Madson responded, " '[B]et you won't sue me again.' " *Id.* ¶ 222. Shaw told Madson that retaliation is illegal. Madson responded, " 'so sue me' and then he laughed" *Id.* ¶ 223.

In September 2016, Jacobs informed Shaw that because she is a Christian she could not ethically allow Shaw to sue her employer over his Wiccan religion. *Id.* ¶ 224. Jacobs and Reddman removed Shaw and banned him from the law library and law computers for engaging in a protected activity. *Id.* ¶ 225. Shaw was not written up for any rule infractions. *Id.* ¶ 226. Shaw was punished for preparing his complaint. *Id.*

On October 11, 2016, at 8:00 a.m., an inmate asked Jacobs, " 'Why was Shaw banned from the law library,' an[d] Jacobs responded, 'someone saved on the computer, I don't know who so Shaw's the fall guy since he is a "Witch." I don't want him over here anymore.' " *Id.* ¶ 227.

In May of 2016, Perret retaliated against Shaw for filing grievances and litigating against him. *Id.* ¶ 228. Shaw's mentally ill cellmate told Perret that Shaw refused to let him in the cell. *Id.* ¶ 229. Without investigating or asking Shaw if the allegations were true, Perret placed Shaw in the SHU for a major

rule violation. *Id.* ¶ 230. Later that day, the mentally ill cellmate was placed in "special needs" because he was hallucinating. *Id.* ¶ 231. Perret used this incident to "rifle through" Shaw's property for three days. *Id.* ¶ 232. Normally, "pack-ups take less than an hour." *Id.* Perret took legal documents from Shaw. *Id.* ¶ 233. Shaw never received a DHO hearing and never pleaded guilty. *Id.* ¶ 234. But Shaw was convicted of the major rule violation. *Id.* Shaw approached Bieber about Perret. *Id.* ¶ 235. Bieber responded, " '[P]rove it.' " *Id.*

**Illegal Promulgation of DOC Rules, Policies and Operations Memorandoms**

Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, Mertens-Jones, Carpenter, Unknown CHS employees, CBM, and GTL promulgated "both written and unwritten, rules, regulations, policies and operations memorandums . . . ." *Id.* ¶ 237. These defendants are operating under a policy that was adopted illegally. *Id.* ¶ 238.

## LEGAL STANDARD

The court must accept the well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). Civil rights and pro se complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted); *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Even with this construction, "a pro se complaint must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985); *Ellis v. City of Minneapolis*, 518 F. App'x 502, 504

(8th Cir. 2013). Civil rights complaints cannot be merely conclusory. *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993); *Parker v. Porter*, 221 F. App'x 481, 482 (8th Cir. 2007).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "If a plaintiff cannot make the requisite showing, dismissal is appropriate." *Abdullah v. Minnesota*, 261 F. App'x 926, 927 (8th Cir. 2008); *Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985). Under 28 U.S.C. § 1915A, the court must screen prisoner complaints and dismiss them if they are "(1) frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

## DISCUSSION

### I. Motion to Proceed In Forma Pauperis

Under the Prison Litigation Reform Act (PLRA), a prisoner who "brings a civil action or files an appeal in forma pauperis . . . shall be required to pay the full amount of a filing fee." 28 U.S.C. § 1915(b)(1). The court may, however, accept partial payment of the initial filing fee where appropriate. Therefore, " '[w]hen an inmate seeks pauper status, the only issue is whether the inmate pays the entire fee at the initiation of the proceedings or over a period of time under an installment plan.' " *Henderson v. Norris*, 129 F.3d 481, 483 (8th Cir. 1997) (quoting *McGore v. Wrigglesworth*, 114 F.3d 601, 604 (6th Cir. 1997)).

The initial partial filing fee that accompanies an installment plan is calculated according to 28 U.S.C. § 1915(b)(1), which requires a payment of 20 percent of the greater of: "(A) the average monthly deposits to the prisoner's account; or (B) the average monthly balance in the prisoner's account for the 6-month period immediately preceding the filing of the complaint or notice of appeal."

Plaintiff has reported average monthly deposits to his prisoner trust account of $0 and an average monthly balance of *negative* $185.81. Docket 5. Based on this information, the court grants Shaw leave to proceed in forma pauperis and waives the initial partial filing fee. *See* 28 U.S.C. § 1915(b)(4) ("In no event shall a prisoner be prohibited from bringing a civil action . . . for the reason that the prisoner has no assets and no means by which to pay the initial partial filing fee.").

In order to pay his filing fee, Shaw must "make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account." 28 U.S.C. § 1915(b)(2). The statute places the burden on the prisoner's institution to collect the additional monthly payments and forward them to the court as follows:

> After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account. The agency having custody of the prisoner shall forward payments from the prisoner's account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.

28 U.S.C. § 1915(b)(2). The installments will be collected pursuant to this procedure.

The clerk of the court will send a copy of this order to the appropriate financial official at Shaw's institution. Shaw remains responsible for the entire filing fee, as long as he is a prisoner, even though the case is dismissed. *See In re Tyler*, 110 F.3d 528, 529–30 (8th Cir. 1997).

**II. Screening Pursuant to § 1915A**

**A. Count I : RLUIPA**

In Count I, Shaw asserts Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, Allcock, Lentsch, Mertens-Jones, Bieber, CBM, Unknown CBM employees, Tweirweiller, and Klemik have substantially burdened his right to the free exercise of his religion in violation of RLUIPA. "RLUIPA protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief[.]' " *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (quoting § 2000cc–5(7)(A)). "[A] prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation," and the prison policy must substantially burden the prisoner's exercise of religion. *Id.*

To establish a prima facie case under RLUIPA, a plaintiff must show "1) that he engaged in a religious exercise, and 2) that the religious exercise was substantially burdened." *Smith v. Allen*, 502 F.3d 1255, 1276 (11th Cir. 2007) (abrogated on other grounds by *Sossamon v. Texas*, 563 U.S. 277 (2011)); *see also* 42 U.S.C. § 2000cc–1(a). If the plaintiff succeeds in making a prima facie showing, the defendant bears the burden to prove that the challenged regulation is the least restrictive means of furthering a compelling governmental interest. *Allen*, 502 F.3d at 1276. If the plaintiff fails to put forth

a prima facie case the court need not inquire further. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004).

Shaw asserts that he practices Dorcha Cosàn. Docket 1 ¶ 57. Shaw alleges these defendants substantially burdened his exercise of Dorcha Cosàn in several ways: taking away his practice as punishment for rule infractions, requiring him to wait one year to celebrate mandated holidays, allowing two sex offenders and non-members to attend group worship, permitting only one day a week for group worship, limiting Shaw to two religious texts, denying Shaw the ability to complete his mandated curriculum, denying Shaw the ability to take three Ancestry DNA tests and complete his genealogical research, denying or confiscating Shaw's various religious property, denying correspondence courses, denying a classroom setting for computer and art stations, denying certain religious texts, denying Shaw the ability to follow his religious diet requirements, denying all-natural remedies needed to replace pharmaceuticals, forcing Shaw to live and dine with non-members, and denying Shaw ritual tools. *Id.* ¶¶ 62-90.

After reviewing Shaw's complaint, the court concludes that Shaw's RLUIPA claim is sufficiently pleaded to survive initial review under 28 U.S.C. § 1915.

## B. Claim II – Free Exercise Clause of the First and Fourteenth Amendments

Shaw asserts that Dooley, Young, Drieske, Stanwick-Klemik, Jacobs, Frasier, Reddman, CBM, Tweirweiller, unknown CBM Employees, and GTL

have substantially burdened his right to the free exercise of his religion in violation of the First and Fourteenth Amendments.

In order to state a First Amendment claim, Shaw must allege facts tending to show that prison officials have substantially burdened the free exercise of his religion. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). Substantially burdening one's free exercise of religion means that the regulation must significantly inhibit or constrain conduct or expression that manifests some central tenet of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 988 (8th Cir. 2004) (quotation and alterations omitted). The Court of Appeals for the Eighth Circuit observed in *Weir v. Nix*, 114 F.3d 817, 821 (8th Cir. 1997), that an inmate's free exercise rights may be substantially burdened when his "sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own[.]" (citing *SapaNajin v. Gunter*, 857 F.2d 463, 464 (8th Cir. 1988)). Under RLUIPA, prison officials may justify the burdensome regulation or decision if it serves a compelling interest achieved by the least restrictive means. 42 U.S.C. § 2000cc-1(a). Under § 1983, prison officials may overcome Shaw's free exercise clause claim if the burden is reasonably related to a legitimate penological interest under the balancing test in *Turner v. Safley*, 482 U.S. 78, 87 (1987).

There are several components to Shaw's First Amendment free exercise claim. First, he alleges that defendants refused to recognize his religion and denied him accommodations the recognized religions received "rendering Shaw's religious exercise effectively impractical." Docket 1 ¶¶ 92-96. Second, Shaw alleges that defendants deny him receipt of religious materials from family and friends because he is poor. *Id.* ¶¶ 97-98. Third, he seeks to have access to the law computer in the school at SDSP. *Id.* ¶¶ 100-104. After reviewing Shaw's complaint, the court concludes that Shaw's § 1983 free exercise claim is sufficiently pleaded to survive initial review under 28 U.S.C. § 1915.

## C. Claim III – Equal Protection Clause of Fourteenth Amendment

Shaw alleges that Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, Mertens-Jones, CBM, Tweirweiller, and unknown CBM employees denied him equal protection of the laws in violation of the Fourteenth Amendment.

In order to establish an equal protection claim, a prisoner must show that he is treated differently from similarly situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008). To assert an equal protection claim based on religion, an inmate must show that he is "denied a reasonable opportunity to pursue [his] faith as compared to inmates of other religions." *Runningbird v. Weber*, 198 F.App'x. 576, 578 (8th Cir. 2006). "[P]rison officials may restrict the religious practices of inmates only if such deprivation is necessary to further legitimate

penological interests." *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999)[citations omitted]. Nevertheless, "in prison cases, courts will ordinarily defer to the expert judgment of prison authorities, due to the difficulty of running a prison and the commitment of the task to the responsibility of the legislative and executive branches." *Id.*

After reviewing Shaw's complaint, the court concludes that Shaw's equal protection claim based on religion is sufficiently pleaded to survive initial review under 28 U.S.C. § 1915.

### D. Claim IV – First Amendment Right to Receive Mail

Shaw alleges that Drieske, Baker, Miller-Hunhoff, Reimann, and Storvick denied Shaw his right to receive mail. In *Turner*, the Supreme Court held that prison rules are constitutional if they are "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 98. The Court provided four factors to determine whether the prison rule withstands scrutiny:

> (1) whether there is a valid rational connection between the regulation and the legitimate government interest it purports to further; (2) whether the inmate has an alternative means of exercising his constitutional right; (3) the impact that accommodation of the inmate's right would have upon others, including inmates as well as non-inmates; and (4) the absence of a ready alternative to the regulation.

*Thongvanh v. Thalacker*, 17 F.3d 256, 259 (8th Cir. 1994). The *Turner* standard applies to both incoming and outgoing mail. *Id.*

"While prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights because of the needs of the penal system." *Kaden v. Slykhuis*, 651 F.3d 966, 968 (8th Cir. 2011) (citing *Turner,*

482 U.S. at 84-85). "[P]rison officials may lawfully censor prison mail that is detrimental to the security, good order and discipline of the institution." *Id.* (citing *Thornburgh v. Abbott*, 490 U.S. 401, 404 (1989)). To decide whether a prison policy advances "a legitimate penological interest," the court must consider the four *Turner* factors above. *Id.* (quoting *Turner*, 482 U.S. at 89-90).

In *Kaden*, an inmate at SDSP alleged that the prison mailroom's rejection of his magazine violated his rights under the First Amendment. The complaint was dismissed by the district court under § 1915A. *Id.* at 968. The Eighth Circuit Court of Appeals stated, "[I]f a valid prison regulation is applied to particular mail items in such a way as to negate the legitimate penological interest, the regulation may be unconstitutional as applied to those items. Before censoring materials, prison authorities must review the content of each particular item received." *Id.* at 969 (citing *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 986 (8th Cir. 2004)). The Eighth Circuit accepted Kaden's allegations as true on appeal and found them "sufficient to plausibly state a claim under § 1983." *Id.* at 969. The Eighth Circuit pointed out that at the "extremely early stage of the litigation" before defendants "were required to answer the complaint," there was "a reasonable inference that SDSP's policy was unconstitutionally applied to the censored publication." *Id.* at 969.

The same is true here. Shaw alleges that Drieske, Baker, Miller-Hunhoff, Reimann, and Storvick violated his rights under the First Amendment by rejecting his magazines because they contained sexually explicit material. Docket 1 ¶¶130-38. Shaw alleges that the magazine was not sexually explicit

and that the rejection was not procedurally sound. *Id.* Therefore, Shaw states a claim against Drieske, Baker, Miller-Hunhoff, Reimann, and Storvick that is sufficiently pleaded to survive initial review under 28 U.S.C. § 1915.

### E. Claim V – Procedural Due Process

Shaw alleges that Kaemink, Dooley, and Young denied Shaw due process of law. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Inmates have a property interest in money received from outside sources. *Mahers v. Halford*, 76 F.3d 951, 954 (8th Cir. 1996). "Although the inmates' private interest in their personal funds is apparent, inmates are not entitled to complete control over their money while in prison." *Mahers*, 76 F.3d at 954.

> Admittedly, prisoners do not shed all constitutional rights at the prison gate, but [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.

*Sandin v. Conner*, 515 U.S. 472, 485 (1995) (internal quotation marks and citations omitted).

The United States Supreme Court has held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). A meaningful post

deprivation remedy includes state common law remedies. *Id.* But whether Due Process requires a pre deprivation hearing or instead only a post deprivation remedy depends upon whether the deprivation was pursuant to an established state procedure (i.e., a jail regulation) or instead was an unauthorized act by the jailer. *Walters v. Wolf*, 660 F.3d 307, 313–14 (8th Cir. 2011). Shaw alleges that he did not receive a pre deprivation hearing. Docket 1 ¶ 142. After reviewing Shaw's complaint, the court concludes that Shaw's § 1983 deprivation of his personal property claim is sufficiently pleaded to survive initial review under 28 U.S.C. § 1915.

### F. Claim 6 – Title II of the Americans with Disabilities Act (ADA)

Shaw claims that Dooley, Young, Ponto, Lentscsh, Bieber, Klemik, Dr. Regier, PA Adams, RN Bowers, RN Screurs, and unknown CHS Employees violated his rights under the ADA by failing to make reasonable accommodations for his knee conditions, low back conditions, acid reflux, and depression. Docket 1 ¶¶ 153-64. "The ADA consists of three titles addressing discrimination against the disabled in different contexts." *Gorman v. Bartch*, 152 F.3d 907, 911 (8th Cir. 1998).

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *Mason v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 886 (8th Cir. 2009). In order to state a claim under Title II of the ADA, Shaw must allege:

(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefits of the [prison's] services, programs, or activities, or was otherwise subjected to discrimination by the [prison]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability.

*Baribeau v. City of Minneapolis*, 596 F.3d 465, 484 (8th Cir. 2010).

Shaw alleges that he was subjected to discrimination when he was denied a medical order for a medical bunk when other handicap individuals received such accommodations. Docket 1 ¶¶ 153-64. Shaw alleges that Dr. Regier's and PA Adams's denial of a handicap cell, medications and treatments are punishment for Shaw engaging in a protected activity. *Id.* ¶ 164. This, however, fails to satisfy the third element of a Title II claim. Shaw must show that the denial was "by reason of his disability." *Baribeau*, 596 F.3d at 484. Therefore, Shaw fails to state a claim under Title II of the ADA.

### G. Claim 7 – Denial of Medical Care / Deliberate Indifference

Shaw alleges that Kaemingk, Dooley, Young, Bieber, Lentsch, Klemik, Dr. Carpenter, Dr. Regier, PA Adams, Schreurs, Bowers, Yankton Medical Clinic, Dr. Adams, and Unknown CHS Employees were deliberately indifferent to his serious medical needs. The Eighth Amendment prohibits cruel and unusual punishment including prison officials' deliberate indifference to the medical needs of inmates. *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015). "[D]eliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg*

*v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05.

To state an Eighth Amendment claim, Shaw must show "a substantial risk of serious harm to the victim," and "that the prison official was deliberately indifferent to that risk of harm . . . ." *Letterman v. Does*, 789 F.3d 856, 861-62 (8th Cir. 2015) (citing *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Shaw alleges that his injuries have caused him extreme pain and other problems such as physical disability and a diminished mental state. Docket 1 ¶¶ 165-179. Thus, Shaw satisfies the first prong under *Letterman*.

Shaw must also show that defendants were deliberately indifferent to this harm. "The deliberate indifference element has two components: an actor must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety.' " *Letterman*, 789 F.3d at 862 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To show that defendants knew of the substantial risk of serious harm, Shaw does not need to show actual knowledge, the court "can infer knowledge if the risk was obvious." *Id.* It is enough to show that the defendant "had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* (quoting *Farmer*, 511 U.S. at 842).

Shaw alleges that defendants knew of the risk of harm. As medical personnel at the prison, Dr. Regier, Dr. Carpenter, PA Adams, Schreurs, and

Bowers were all made aware of Shaw's injuries when he requested treatment for these injuries. Further, medical professionals outside the prison also affirmed this risk in their examinations and recommendations for treatment. Shaw also made some of the non-medical prison officers aware of the risk of harm. He requested accommodations for his injuries from DOC Unit Staff. The only DOC Unit Staff Members that Shaw names in this claim are Bieber, Lentsch, and Klemik. Shaw also alleges that he showed Dooley his bruised knees when asking for a medical bunk. *Id.* ¶ 161. But Shaw fails to demonstrate that Kaemingk and Young were aware of the risk of harm. *Id.* ¶ 167. Thus, Shaw fails to state a claim against Kaemingk and Young.

Shaw also "must show the official 'knew that their conduct was inappropriate in light of' the risk to the prisoner." *Letterman*, 789 F.3d at 862 (quoting *Krout v. Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009)). "Knew" in this context means more than negligence and is "akin to the criminal rule of 'recklessness.'" *Id.* (quoting *Farmer*, 511 U.S. at 839-40). "Generally, the actor manifests deliberate indifference by 'intentionally denying or delaying access to medical care, or intentionally interfering with treatment or medication that has been prescribed.'" *Id.* (quoting *Krout*, 583 F.3d at 567).

Shaw alleges that the denials of treatment by both medical and non-medical prison personnel were intentional either because they did not believe he should receive treatment when he clearly should or because they wanted to retaliate. Shaw fails to show that outside medical personnel acted intentionally. Instead, Shaw alleges that outside personnel merely relayed to

35

Shaw the requirements placed on them by Dooley and Dr. Carpenter. Docket 1 ¶ 172. Thus, to the extent that Shaw claims the Yankton Medical Clinic, P.C. and Dr. Brent Adams, MD were deliberately indifferent to his serious medical needs, Shaw fails to state a claim. But Shaw sufficiently alleges that Dooley, Bieber, Lentsch, Klemik, Dr. Carpenter, Dr. Regier, PA Adams, Schreurs, Bowers, and unknown CHS Employees denied him treatment when he clearly should have received treatment. Shaw sufficiently pleaded his Eighth Amendment deliberate indifference claim against Dooley, Bieber, Lentsch, Klemik, Dr. Carpenter, Dr. Regier, PA Adams, Schreurs, Bowers, and unknown CHS Employees to survive initial review under §§ 1915 and 1915A.

### H. Claim 8 – Denial of Access to the Courts

Shaw raises three claims of denial of access to the courts. The first claim involves filing grievances. The second involves legal papers and legal mail. The third involves access to the law library, the adequacy of prison legal assistance, and legal papers.

### 1. Grievances

Shaw alleges that Allock, Ponto, Bieber, Lentsch, Klemik, Vitetta, Maturan, and Ulmer denied Shaw access to the courts by preventing Shaw from filing grievances about the conditions of his confinement. Docket 1 ¶ 180. Defendants denied access by (1) denying Shaw grievance forms, (2) refusing to take Shaw's grievances form once acquired and completed, (3) not answering grievances placed in defendants' boxes or placed under their door, and (4)

retaliating against Shaw for trying to grieve the conditions of his confinement by punishing Shaw. *Id.*

Filing prison grievances is protected First Amendment activity. *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007) (citing *Dixon v. Brown*, 38 F.3d 379, 379 (8th Cir. 1994)). "The Constitution guarantees prisoners a right to access the courts." *White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007). To show a violation of this right, Shaw "must establish the state has not provided an opportunity to litigate . . . conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *Id.* at 680. Shaw alleges that he has been prevented from filing grievances regarding several conditions of his confinement. Docket 1 ¶¶ 180-84. Thus, Shaw states a claim of denial of access to the courts.

### 2. Legal Mail

Shaw also alleges that UC Vitetta, and UM Bieber denied Shaw the ability to create and send out his legal mail. Shaw alleges he told Baker that Vitetta refused to allow Shaw to send legal mail and Baker did nothing. *Id.* ¶ 192. To show a violation of his right of access to the courts, Shaw " 'must establish the state has not provided an opportunity to litigate a claim challenging the prisoner's sentence or conditions of confinement in a court of law, which resulted in actual injury, that is, the hindrance of a nonfrivolous and arguably meritorious underlying legal claim.' " *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008) (quoting *White v. Kautzky*, 494 F.3d 677, 680

(8th Cir. 2007)). In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court decided that meaningful access to the courts meant that "indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." *Id.* at 824–25.

Shaw alleges that Vitetta and Bieber prevented Shaw from creating and mailing legal papers by withholding necessary resources and materials. *Id.* ¶ 185. This prevented Shaw from arguing key elements of his small claims court case because he was unable to send his response to Defendants Answer to opposing counsel Schlimglen. *Id.* ¶ 186. As a result, the judge would not allow Shaw to argue his due process claim. *Id.* Shaw's due process claim was not frivolous. *Id* ¶ 187. This is sufficient to state a claim of denial of access to the courts. Therefore, the court finds that Shaw states a claim that UC Vitetta and UM Bieber violated his First Amendment right to access the court by preventing Shaw from creating and mailing his legal mail.

Shaw fails to state a claim against Baker. Shaw alleges that Baker failed to supervise Vitetta. *Id.* ¶¶ 192. "[V]icarious liability is inapplicable to § 1983 suits[.]" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). A supervisor's liability must be based on his or her own "deliberate indifference or tacit authorization." *Grayson v. Ross*, 454 F.3d 802, 811 (8th Cir. 2006) (quoting *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994)). To the extent that

Shaw alleges Baker violated his constitutional rights *solely* because Baker supervised Vitetta who allegedly violated his rights, Shaw fails to state a claim upon which relief may be granted, and these claims are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

### 3. Law Libraries, Legal Assistance & Legal Papers

Shaw claims that Attorney Walter, Binde, Schlimgen, Bieber, and Young denied him access to the courts by denying him access to the law library and legal assistance. To show a denial of access to the courts, Shaw must show actual injury as a result of the alleged inadequacy of the legal assistance office. *See White*, 494 F.3d at 680. The actual injury threshold is high. *See Hartsfield*, 511 F.3d at 831(explaining that being actually prevented from filing a complaint or having a complaint dismissed for "lack of legal adequacy" constitutes actual injury); *Klinger v. Dep't of Corr.*, 107 F.3d 609, 617 (8th Cir. 1997) (A claim of "complete and systemic denial of access to a law library or legal assistance" failed because none of the inmates "suffered actual injury or prejudice as a result of that denial of access"); *Sabers v. Delano*, 100 F.3d 82, 83 (8th Cir. 1996) (same).

The Eighth Circuit Court of Appeals has found that an inmate could show actual injury when he was denied relief under a state habeas petition because he was prevented from obtaining meaningful access to the law library to prepare a reply brief. *McCauley v. Dormire*, 245 F. App'x 565, 566 (8th Cir. 2007). As support, the Court cited the Seventh Circuit Court of Appeals decision in *Marshall v. Knight*, 445 F.3d 965, 968-69 (7th Cir. 2006), which

found actual injury when an inmate was denied access to the prison library, and as a result, he lost good time credits because he was unable to research and prepare for his court hearing. *Id.*

Shaw claims the denial caused him to lose a non-frivolous legal claim in his small claims court proceeding and to have a case dismissed for failure to comply with a deadline. Shaw states a claim against Binde, Walter, and Vitetta. Shaw fails to state a claim against attorney Schlimgen and Young. Shaw alleges that attorney Schlimgen perjured herself during the small claims case where she represented Young and Bieber. *Id.* ¶¶ 193-996. This fails to state a claim against attorney Schlimgen upon which relief can be granted. Shaw alleges that Young failed to supervise Bieber. *Id.* ¶183. To the extent that Shaw alleges Young violated his constitutional rights *solely* because Young supervised Bieber who allegedly violated his rights, Shaw fails to state a claim upon which relief may be granted, and these claims are dismissed under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

## I. Claim 9 – Retaliation in Violation of the First and Fourteenth Amendments

Shaw alleges that Anderson, Bieber, Lentsch, Madson, Jacobs, and Perrett retaliated against him when he exercised his constitutional rights. To succeed on his § 1983 retaliation claim, Shaw must prove that he engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against Shaw that would chill a person of ordinary

firmness from engaging in that activity. *See Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).

Shaw alleges he engaged in a protected activity when he filed numerous grievances and a § 1983 action against Anderson. *Id.* ¶ 197. Shaw alleges Anderson then retaliated by searching Shaw's cell, taking Shaw's personal property and legal papers, and removing Shaw's cell table. *Id.* ¶¶ 197-99.

Shaw alleges he engaged in a protected activity when he filed grievances and a lawsuit against Bieber. Shaw alleges that Bieber retaliated by involving himself in both stages of the grievance process and giving false information to his superiors. *Id.* ¶ 201. Shaw confronted Bieber and Bieber said, " ' Prove it.' " *Id.* ¶ 202. Shaw also alleges that he was banned from the law library by Bieber in retaliation for filing grievances. *Id.* ¶ 203. Shaw alleges that Bieber retaliated by throwing away thirty-one project applications that Shaw filled out requesting religious accommodations. *Id.* ¶ 206. Bieber denied Shaw's medical orders and treatments because Shaw filed grievances and a lawsuit against him. *Id.* ¶ 208. And Bieber placed mentally ill inmates and inmates of rival gang members in a cell with Shaw to cause physical and mental harm to Shaw. *Id.* ¶ 210.

Shaw alleges he engaged in a protected activity by attempting to file grievances against Lentsch. *Id.* ¶ 219. In retaliation, Lentsch took personal property and legal work from Shaw. *Id.* And Lentsch took Shaw's handicap cell status away and placed Shaw in a three-man cell with incompatible roommates. *Id.* ¶ 211.

Shaw alleges he engaged in a protected activity by suing Madson. Shaw alleges Madson retaliated by imposing excessive sanctions on Shaw after he refused transfer. *Id.* ¶ 221. Madson allegedly responded, " '[B]et you won't sue me again." ' *Id.* ¶ 222. Shaw told Madson retaliation is illegal. Madson allegedly responded, " 'so sue me' and then he laughed." *Id.* ¶ 223.

Shaw alleges he engaged in a protected activity of preparing a legal complaint. *Id.* ¶ 226. Jacobs retaliated by saying she is a Christian and could not ethically allow Shaw to sue her employer over his Wiccan religion. *Id.* ¶ 224. Jacobs and Reddman allegedly removed Shaw and banned him from the law library and law computers for engaging in a protected activity. *Id.* ¶ 225. Shaw was not written up for any rule infractions, but Shaw was punished for preparing his complaint. *Id.*

Shaw alleges that he engaged in a protected activity of filing grievances and litigating against Perret. *Id.* ¶ 228. Perret allegedly retaliated against Shaw by placing Shaw in the SHU over uninvestigated allegations by Shaw's mentally ill cellmate. *Id.* ¶¶ 229-30. Perret allegedly used this incident to "rifle through" Shaw's property for three days. *Id.* ¶ 232. And Perret allegedly took legal documents from Shaw. *Id.* ¶ 233. Shaw claims he never received a DHO hearing and never pleaded guilty. *Id.* ¶ 234. But Shaw was convicted of the major rule violation. *Id.*

Shaw states a claim against Anderson, Bieber, Lentsch, Madson, Jacobs, and Perrett. As alleged, their actions would chill a person of ordinary firmness from filing grievances and lawsuits. *See Revels*, 382 F.3d at 876.

Shaw's § 1983 retaliation claim is sufficiently pleaded to survive initial review under 28 U.S.C. § 1915.

### J. Claim 10 – Illegal Promulgation of DOC Rules, Policies, and Operating Memorandums

Shaw alleges that Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, Mertens-Jones, Dr. Carpenter, unknown CHS Employees, CBM, and GTL have promulgated both written and unwritten, rules, regulations, policies and operations memorandums that violate Shaw's federally protected constitutional rights.

Shaw argues that the policies adopted by the DOC are inconsistent with South Dakota laws. Docket 1 ¶¶ 237-247. These arguments, however, address only state law concerns and, therefore, do not support plaintiff's claims for relief under the federal civil rights statutes. *See generally Nilson v. Layton City*, 45 F.3d 369, 372 (10th Cir.1995) ("Mere allegations that an official failed to abide by state law will not suffice to state a constitutional claim."); *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir.1995) ("Section 1983 created a federal cause of action for damages to vindicate alleged violations of federal law."). Therefore, all claims alleging a violation of state law are dismissed under to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

Thus, it is ORDERED

1.    Shaw's motion for leave to proceed in forma pauperis (Docket 3) is granted.

2. Shaw's institution will collect the additional monthly payments in the manner set forth in 28 U.S.C. § 1915(b)(2), quoted above, and will forward those installments to the court until the $350 filing fee is paid in full.

3. The clerk of the court is directed to send a copy of this order to the appropriate official at plaintiff's institution.

4. Shaw's claims under the Americans with Disabilities Act and Illegal Promulgation of DOC Rules, Policies and Operations Memorandum are dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim upon which relief may be granted.

5. Shaw fails to state a claim against the Yankton Medical Clinic, P.C., Dr. Brent Adams, and Catherine Schlimgen, and they are dismissed without prejudice as defendants.

6. Shaw's RLUIPA claim against Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, Allock, Lentsch, Bieber, Klemik, Mertens-Jones, unknown CHS Employees, CBM, Tweirweiller, and unknown CBM employees survives screening under 28 U.S.C. § 1915A.

7. Shaw's First Amendment Free Exercise claim against Dooley, Young, Drieske, Stanwick-Klemik, Jacobs, Frasier, Reddman, CBM, Tweirweiller, unknown CBM employees, and GTL survives screening under 28 U.S.C. § 1915A.

8. Shaw's Equal Protection claim against Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, Mertens-Jones, CBM, Tweirweiller, and unknown CBM employees survives screening under 28 U.S.C. § 1915A.

9. Shaw's First Amendment right to receive mail claim against Drieske, Baker, Miller-Hunhoff, Reimann, and Storvick survives screening under 28 U.S.C. § 1915A.

10. Shaw's Fourteenth Amendment Due Process claim against Kaemingk, Dooley, and Young survives screening under 28 U.S.C. § 1915A.

11. Shaw's Eighth Amendment deliberate indifference claim against Dooley, Lentsch, Bieber, Klemik, Dr. Carpenter, Dr. Regier, PA Adams, Schreurs, Bowers, and Unknown CHS Employees survives screening under 28 U.S.C. § 1915A.

12. Shaw's Eighth Amendment deliberate indifference claim against Kaemingk, Young, Dr. Brent Adams, and the Yankton Medical Clinic, P.C. is dismissed without prejudice under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim upon which relief may be granted.

13. Shaw's access to the courts claim against Ponto, Allcock, Lentsch, Bieber, Klemik, Vitetta, Ulmer, Matturan, Walter, and Binde survives screening under 28 U.S.C. § 1915A.

14. Shaw's access to the courts claims against Baker, Schlimgen, and Young are dismissed without prejudice under 28 U.S.C. §§

1915(e)(2)(B)(ii) and 1915A(b)(1) for failure to state a claim upon which relief may be granted.

15.    Shaw's retaliation claim against Lentsch, Bieber, Madson, Jacobs, Anderson and Perrett survives screening under 28 U.S.C. § 1915A.

16.    The Clerk shall send blank summons forms to Shaw so he may cause the summons and complaint to be served upon the defendants.

17.    Shaw shall complete and send the Clerk of Courts a separate summons and USM-285 form for each defendant. Upon receipt of the completed summons and USM-285 forms, the Clerk of Court will issue the summonses. If the completed summonses and USM-285 forms are not submitted as directed, the complaint may be dismissed.

18.    The United States Marshal shall serve a copy of the complaint (Docket 1), Summons, and this Order upon defendants as directed by Shaw. All costs of service shall be advanced by the United States.

19.    Defendants will serve and file an answer or responsive pleading to the remaining claims in the complaint on or before 21 days following the date of service or 60 days if the Defendants fall under Fed. R. Civ. P. 12(a)(2) or (3).

20.    Shaw will serve upon defendants, or, if appearance has been entered by counsel, upon their counsel, a copy of every further pleading or other document submitted for consideration by the court. He will include with the original paper to be filed with the clerk of court a certificate stating

the date and that a true and correct copy of any document was mailed to defendants or their counsel.

21.    Shaw will keep the court informed of his current address at all times. All parties are bound by the Federal Rules of Civil Procedure and by the court's Local Rules while this case is pending.

DATED November 28, 2017.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE