# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## SOUTHERN DIVISION

| | |
|---|---|
| JAMES ELMER SHAW,<br><br>        Plaintiff,<br><br>vs.<br><br>DENNIS KAEMINGK, SECRETARY OF CORRECTIONS; INDIVIDUAL AND OFFICIAL CAPACITY; ROBERT DOOLEY, DIRECTOR OF PRISON OPERATIONS; INDIVIDUAL AND OFFICIAL CAPACITY; DARIN YOUNG, WARDEN; INDIVIDUAL AND OFFICIAL CAPACITY; JENNIFER DRIESKE, DEPUTY WARDEN; INDIVIDUAL AND OFFICIAL CAPACITY; JENNIFER STANWICK-KLEMIK, DEPUTY WARDEN; INDIVIDUAL AND OFFICIAL CAPACITY; TROY PONTO, ASSOCIATE WARDEN; INDIVIDUAL AND OFFICIAL CAPACITY; ARTHOR ALLCOCK, ASSOCIATE WARDEN; INDIVIDUAL AND OFFICIAL CAPACITY; DAVID LENTSCH, UNIT MANAGER; INDIVIDUAL AND OFFICIAL CAPACITY; DERRICK BIEBER, UNIT MANAGER; INDIVIDUAL AND OFFICIAL CAPACITY; AL MADSEN, UNIT MANAGER; INDIVIDUAL AND OFFICIAL CAPACITY; JOSH KLEMIK, UNIT MANAGER; INDIVIDUAL AND OFFICIAL CAPACITY; TAMMI MERTINS-JONES, CULTURAL ACTIVITIES COORDINATOR; INDIVIDUAL AND OFFICIAL CAPACITY; ELIZABETH EFFLING, UNIT COORDINATOR; INDIVIDUAL AND OFFICIAL CAPACITY; BRITNEY ULMER, UNIT COORDINATOR; | 4:17-CV-04116-KES<br><br><br>ORDER GRANTING IN PART AND DENYING IN PART STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING MISCELLANEOUS OTHER MOTIONS |

INDIVIDUAL AND OFFICIAL CAPACITY;
MELISSA MATURAN, ADMINISTRATIVE
REMEDY COORDINATOR; INDIVIDUAL
AND OFFICIAL CAPACITY; STEVE
BAKER, MAJOR; INDIVIDUAL AND
OFFICIAL CAPACITY; LINDA MILLER-
HUNHOFF, MAIL SUPERVISOR;
INDIVIDUAL AND OFFICIAL CAPACITY;
SHARRON REIMANN, MAILROOM;
INDIVIDUAL AND OFFICIAL CAPACITY;
JORDAN STOREVIK, MAILROOM;
INDIVIDUAL AND OFFICIAL CAPACITY;
NICK ANDERSON, CORRECTIONAL
OFFICER, SDSP; PRESTON PERRETT,
CORRECTIONAL OFFICER;
INDIVIDUAL AND OFFICIAL CAPACITY;
JUDY JACOBS, CORRECTIONAL
OFFICER; INDIVIDUAL AND OFFICIAL
CAPACITY; LISA FRASIER,
CORRECTIONAL OFFICER;
INDIVIDUAL AND OFFICIAL CAPACITY;
NICK REDDMAN, TEACHER;
INDIVIDUAL AND OFFICIAL CAPACITY;
DR. MARY CARPENTER, MD;
INDIVIDUAL AND OFFICIAL CAPACITY;
ER REGIER, MD; INDIVIDUAL AND
OFFICIAL CAPACITY; BRAD ADAMS,
PA-C; INDIVIDUAL AND OFFICIAL
CAPACITY; JESSICA SCHREURS, RN;
INDIVIDUAL AND OFFICIAL CAPACITY;
HEATHER BOWERS, RN; INDIVIDUAL
AND OFFICIAL CAPACITY;  UNKNOWN
DEPARTMENT OF
HEALTH/CORRECTIONAL HEALTH
SERVICE (DOH/CHS) EMPLOYEES,
INDIVIDUAL AND OFFICIAL
CAPACITIES;  CBM CORRECTIONAL
FOOD SERVICES, INDIVIDUAL AND
OFFICIAL CAPACITIES; JOHN
TWEIRWEILLER, CBM DISTRICT
MANAGER; INDIVIDUAL AND OFFICIAL
CAPACITY;  UNKNOWN CBM
EMPLOYEES, INDIVIDUAL AND
OFFICIAL CAPACITIES; DELMER
WALTER, CONTRACTED DOC

ATTORNEY; INDIVIDUAL AND
OFFICIAL CAPACITY; AND MARK
BIDNEY, CONTRACTED DOC
PARALEGAL; INDIVIDUAL AND
OFFICIAL CAPACITY;

Defendants.

## INTRODUCTION

Plaintiff, James Elmer Shaw, is an inmate at the South Dakota State

Penitentiary (SDSP) in Sioux Falls. Shaw filed a pro se civil rights lawsuit under

42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act

(RLUIPA). Docket 1. The court screened Shaw's complaint under 28 U.S.C.

§ 1915A and directed service. Docket 7. The court then stayed discovery

pending a determination of qualified immunity. Docket 67. The state

defendants now move for summary judgment based on qualified immunity.

Docket 86. [1] [2] Shaw resists the motion for summary judgment. Docket 120.

Shaw also filed several other motions. Dockets 69, 73, 74, 117, and 132.

## FACTUAL BACKGROUND

The facts, viewed in the light most favorable to Shaw, are as follows:

Shaw was an inmate at the Mike Durfee State Prison (MDSP) in

Springfield, South Dakota from approximately April 2017 to June 2018.

---

[1] The state defendants do not include PA Brad Adams, CBM Correctional Food
Services, John Tweirweiller or Unknown CBM Employees.

[2] Shaw also names Judy Jacobs, Mark Bidney and Sharon Reimann as
defendants. These defendants have not been served and do not move for
summary judgment.

Docket 1 ¶ 44; Docket 66. Prior to April 2017 and after June 2018, Shaw was and continues to be incarcerated at the SDSP. *Id.*

**RLUIPA**

Shaw's religion, Dorcha Cosàn (DC), follows a strict code of ethics called "The Nine Laws of Dorcha Cosàn" (NLDC). Docket 1 ¶ 57. By adhering to the NLDC, Shaw can attain Godhood, connect with the source of his spiritual path, and perform "true Magick." *Id.* ¶¶ 58-60. DC is Gaelic for dark path and "[i]t represents modern day Wiccans." Docket 2 at 1 n.1.

DC is a Wiccan religion. Docket 109 ¶ 9. Shaw describes DC as within the "tradition of Wicca" and refers to DC's rituals as "among the outer aspects of Wicca by which Shaw defines his religion." Docket 1 ¶¶ 85, 105. The adherence to the NLDC differentiates DC from Wicca. Docket 121 at 3.

Both MDSP and the SDSP have a recognized Wiccan group. Docket 109 ¶ 25. Although MDSP and SDSP have inmates that identify as DC, there is no recognized DC group. Docket 121 at 10.[3] Wicca, but not DC, is listed in the Inmate Religious and Cultural Activities policy. *See* Docket 88-1.

Defendants have denied Shaw's requests for accommodations separate from Wicca. Docket 1 ¶ 55; *see also* Docket 109 ¶ 22. Defendants require religious groups to meet as one group if they do not have a volunteer from outside the prison to lead the group worship and study time. Docket 88 ¶ 20. Several non-Christian groups are made up of different sects, but all sects meet

---

[3] Shaw states that there are five DC members at SDSP and two members at MDSP.

as one group. *Id.* Shaw argues this requirement is not always followed. Docket 121 at 6-7. According to the SDSP Cultural Activities Sign-Up form, with the last printed date of October 2017, the Jewish and Messianic groups meet separately. Docket 122-1 at 4. Defendants maintain that, if a volunteer is located to lead a DC group and completes the requisite background check and training, the DOC would allow and encourage that. Docket 88 ¶ 21 (citing Docket 88-1 at 1).

Shaw identifies several ways he claims defendants have substantially burdened his religious exercises. Docket 1 ¶¶ 62, 67. Shaw contends that all requests could be accommodated at no cost to defendants. *Id.* ¶ 68. DC could purchase everything through approved vendors. *Id.*

First, Shaw alleges that Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones require Shaw to provide proof that his religious requests are mandated by his religion. *Id.* ¶ 62(a). As evidence, Shaw offers the "Request for Religious or Alternative Diet" form that asks, "Explain in detail how the diet relates to your religion, why it is mandated, and list books or authorities that support your request." Docket 122-1 at 2-3. Defendants maintain that the DOC does not require proof that requests are mandated. Docket 88 ¶ 12. Defendants only inquire about the basis of the request. *Id.*

Second, Shaw alleges that Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones allow Shaw's religion to be taken away from him for up to thirty days for a rule infraction. Docket 1 ¶ 62(b). Shaw provides the following account of events,

> Shaw was written-up for a minor rule violation on a Saturday. On Monday morning Shaw received three (3) days cell restriction. Inmates start their cell restriction the day after the sanction. Therefore, Shaw was on cell restriction for Tue, Wed, and Thur. Wicca is held on Tuesday and Thursday nights. Because Shaw was not on cell restriction for a full week or longer, he was not allowed to attend Wicca. The following week Shaw experienced the exact same scenario. Because Shaw missed two consecutive weekly meetings, he was forced to miss an additional thirty (30) days of Wicca.

Docket 121 at 4. Defendants dispute that they "take away" an inmate's religion. Docket 109 ¶ 15. If an inmate is placed on cell restriction for a full week or more, the inmate can attend one religious group meeting. *Id.* Inmates are automatically prevented from attending their religious group meeting if they miss group two times in a row. Docket 122-1 at 3. The SDSP Cultural Activities Sign-Up form includes the following:

> IMPORTANT NOTE: if you miss any activity two (2) times in a row, or you leave before the activity is over, your name will automatically be removed from the list and you will be placed on a removal list for thirty (30) days. Once the thirty (30) days have passed, you may submit a new sign-up to be placed on the activity list again.

*Id.*

Third, Shaw claims Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones caused him to wait four months for religious requests to be considered and he did not always receive a response. Docket 1 ¶ 62(c). Defendants dispute that Shaw had to wait four months, because they review applications quarterly. Docket 88 ¶ 15. None of the applications Shaw submitted as exhibits were returned more than twenty-five days after submission. *See* Docket 122-1. Shaw does not identify or describe any of the applications defendants failed to return. *See* Dockets 1 and 121.

6

Fourth, Shaw claims Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones forced Shaw to wait an entire year to celebrate a single religious holiday when he is mandated to celebrate many, including eight Sabbats and thirteen Ebats. Docket 1 ¶ 62(d). And Drieske, Stanwick-Klemik and Mertens-Jones have denied Shaw the ability to celebrate the Sabbats and Esbats with Ritual and Feast. *Id.* ¶ 74. The Wiccan group celebrates Sabbats and Esbats during the year at their regularly scheduled meetings. Docket 88 ¶ 23. The Wiccan group also has annual ceremonial meals for Yule and Samhein. *Id.* The project applications Shaw submitted on behalf of the Hill Wiccan group show that defendants approved a ceremonial meal for Yule and Samhein. *See* Docket 122-1 at 22-23. Defendants also approved cake and ale for Sabbats and Esbats. *See Id.* at 18-21, 24; Docket 122-3 at 1.

Fifth, Shaw claims Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones only allow him one day a week for group worship when he is mandated to meet three times a week with additional time for holidays. Docket 1 ¶ 62(f). The Wiccan group at MDSP is allowed one, three-hour meeting time per week to meet as a religious group for worship and study time. *Id.* The Wiccan group at SDSP that Shaw can attend is allowed two ninety-minute meetings per week to meet as a religious group for worship and study time. *Id.* There are 100 religious group activities each week at the SDSP. Docket 109 ¶ 26. These meetings are limited by available time and space. *Id.* Holiday celebrations often occur in addition to normal schedule and require additional time, space and staff. *Id.*

Sixth, Shaw claims Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones forced him to allow at least two sex offenders and non-DC-members to attend his religious worship time in violation of Shaw's beliefs. Docket 1 ¶¶ 62(e), (g). Drieske and Stanwick-Klemik denied Shaw the ability to perform DC rituals with only DC-members. Docket 1 ¶ 86. Defendants do not choose who attends religious groups. Docket 109 ¶ 29. If an inmate identifies with the religion and signs up to attend the meeting or ceremonies, defendants do not intervene. *Id.*

Seventh, Shaw alleges that Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones limit him to two religious books when Shaw's beliefs require him to have access to thousands at any given time. Docket 1 ¶¶ 62(h), 67(h). Defendants explain the rules permit Shaw to have ten softcover books and an additional two hardcover religious books, if they were acquired before the rule prohibiting hardcover books was adopted, in his cell. Docket 109 ¶ 30; Docket 88-2 at 20. The number of books an inmate may possess in their cell is due to the limited storage space in a cell. Docket 109 ¶ 31. Each member of a religious group can have ten additional religious books stored in a group locker box. *Id.* ¶ 30. Given the current membership number, Shaw claims this system would provide access to ninety-four books. Docket 121 at 11.

Eighth, Dooley, Young, Drieske, and Stanwick-Klimek denied Shaw the following ritual tools: small beads and small stones, geise ring, group book of shadows, personal group of shadows, altar, altar clothes, altar plate, altar tile,

amulet, athame, Asperger, bell, besom, birthstone pendant, boline or white handled knife, bottles, bowls, candles, cast iron cookwear, cauldron, prayer rug, censer, ceramic ring, chalice, cloth bags, clothing, cords, crane bag, 200mm crystal ball with stand or cushion, crystals, stones, gems, metals and minerals, curved ash catcher, drum, fans, flags, fire pit rotisserie, small stones, goblets, god and goddess images, herbs, horn with stand, incense cones or sticks, ogham sticks and stones, oils, oil diffusers, oil boxes and herb boxes, plates, pendulum and mat, pentacle, pitcher, runes, mortar and pestle, salt, satchel, sacred pipe and tobacco, scrying mirror and holder, shield, staff, statutes, storage shed, talisman, tarot decks and books, virtual reality and video games, wands, and wind chimes. Docket 1 ¶¶ 67(c),(f),(k), 81; Docket 2 ¶¶ 19, 234-97. Currently, Wiccan inmates can possess the following religious property in their cell: very small pebbles, sheets of parchment paper, individual book of shadows, and tarot cards. Docket 88-2 at 22. Wiccan inmates can also possess the following group property items: athame (sword of cardboard, 24 inches), candles, candleholders, wand (wood or cardboard), pentacles, chalice, bowl, feather fan, altar top, bell, small drum, mortar and pestle, group book of shadows, tarot cards, salt shaker, and cauldron. *Id.* at 24-25. There is also a list of approved oils and botanicals available for an inmate purchase. *Id.* at 27, 31.

Ninth, Drieske, and Stanwick-Klemik have denied Shaw the ability to build an outside nematon and vision mound. Docket 1 ¶ 87. DC requires all rituals, worship, spells, and celebrations be practiced outdoors in a nematon or

vision mound. Docket 2 ¶ 330. Shaw provides an illustration and detailed
explanation of a nematon. *Id.* ¶¶ 343-52. It requires 56 square feet of outdoor
space, a seven-foot oak staff, brick foundations, fire pit, water feature, marble
slabs, gardens, and stone paths. *Id.* The vision mound "is similar to the Finnish
sauna or Native American sweat lodge." *Id.* ¶ 353. Without an outside space,
Drieske and Stanwick-Klemik have denied Shaw the ability to "worship and
celebrate the 'Sun' throughout the 'Wheel of the Year' (WOY) and Dorcha
Cosàn's Zodiac system, by giving thanks, sending daily offerings, and having
'outdoor-cook-outs' followed by 'outdoor-ritual-and feast' ceremonies on the
day before or the day of the Eight Sabbats." Docket 1 ¶ 88. And they have
denied Shaw the ability to "worship and celebrate the 'Moon' throughout the
'Tree Calendar,' by giving thanks, sending daily offerings, and having 'outdoor-
cook-outs' followed by 'outdoor-ritual-feasts' ceremonies on the day before or
day of the Thirteen Esbats." *Id.* ¶ 89; *see also* Docket 122-1 at 5, 10.  Shaw
emphasizes that DC is an earth-based religion and worship must occur
outside. Docket 121 at 22.

Two religious groups currently worship outside. First, the Native
American group has a sweat lodge outside. Docket 109 ¶ 54. Second, the
Jewish groups are allowed a sukkah. Docket 130 at 5. For eight days, a
temporary tent like structure is set up and inmates are allowed two hours and
juice and bread for the ceremony. *Id.* Defendants say there is a lack of outdoor
space to allow inmates to worship outside. Docket 109 ¶ 55.

Tenth, Shaw alleges that Dooley, Young, Drieske and Stanwick-Klimek denied Shaw the ability to take his mandated curriculum of study. Docket 1 ¶¶ 67(a), (i). Shaw desires access to online correspondence courses, three Ancestry DNA tests, the ability to research his ancestry online, and to study and learn genealogy online. *Id.* ¶ 67(b)-(c). Shaw needs a classroom to set up a computer, art stations, and library. *Id.* ¶ 67(j). Defendants allow religious groups to contact groups outside the prison and request worship and study materials. Docket 109 ¶ 34. Shaw can study whatever topics he wishes in his cell during free time or during the three hour weekly religious group meetings. *Id.* Defendants assert that DNA tests are not allowed under the current circumstances, but Shaw can study genealogy and ancestry. *Id.* ¶ 35. Inmates are not allowed to use the internet. *Id.* ¶ 36.[4] Internet access provides opportunities for illegal activity and there is insufficient staff to monitor use. *Id.* ¶ 37.

Eleventh, Drieske, Stanwick-Klemik, and Mertens-Jones have denied Shaw the ability to adhere to his religious diet. Docket 1 ¶ 69. Shaw "must purify [his] body by eating all natural, farm fresh, organic fruits and vegetables (they must be consumed raw, boiled, stewed or juiced), and grass fed, no growth hormone meats four (4) times daily (and between meals)." Docket 2 ¶ 164. Shaw cannot consume "any foods with chemical or artificial additives."

---

[4] Shaw claims that GTL provides internet to their tablets. Shaw also says inmates have access to the internet for Braille, GED tests, and online correspondence courses. Docket 121 at 15.

*Id.* ¶ 165. The same applies to drinks. *Id.* ¶ 169. Shaw must eat at 5:30 a.m., 10:30 a.m., 3:30 p.m., and 8:30 p.m. *Id.* ¶ 174. "All food and beverages must be prepared and cooked by a member of DC . . . . This person takes 5 years of culinary courses." *Id.* ¶ 176. Defendants, through CBM, offer a religious diet tray that they believe complies with all religious groups' requirements. Docket 109 ¶ 66. Defendants offer religious feasts and ceremonial meals to religious groups. *Id.* ¶ 67. Groups can choose from different items and the cost of the meals are the same for each group. *Id.* The only exception is the Jewish kosher for Passover daily meals, which are more expensive. *Id.* All food orders go through CBM. *Id.* ¶ 69. Hy-Vee only provides food for the prison by way of CBM. *Id.* CBM does not have an all-natural food option due to the higher cost and logistical issues in obtaining all-natural foods. Docket 89 ¶ 3.

Twelfth, Unknown CHS employees and Drieske have denied Shaw all-natural herbal remedies to replace his currently prescribed pharmaceuticals. Docket 1 ¶¶ 75-76; Docket 2 ¶ 213. Shaw has a prescription for vitamin D, liquid antacid and petroleum jelly. Docket 109 ¶ 6.

Thirteenth, Drieske, Allcock, Lentsch, Bieber, and Klemik forced Shaw to live and dine with non-DC members knowing there is a high risk of confrontation while allowing other religious inmates to live together if they request it. Docket 1 ¶¶ 75, 77-79; Docket 2 ¶ 214. Shaw wants to eat in his cell and claims other religions are allowed to eat in their cell. Docket 121 at 21. DOC does not make housing decisions based on religion. Docket 109 ¶ 51. Shaw can request to live with a DC member. *Id.* If the DOC determines that the

inmates can live safely with each other, unit staff will try to accommodate that request. *Id.* Inmates cannot choose where they sit and who they sit with at meal times. *Id.* ¶ 50. The next inmate in line takes the next available seat. *Id.* It is a security issue to allow inmates to choose their seats because gangs could congregate. *Id.*

**Free Exercise**

Kaemingk, Dooley, Young, Drieske, Stanwick, Mertens-Jones, Lentsch and Bieber allow religious accommodations for other religions but deny the same accommodations for DC. Docket 1 ¶ 93. The denials forced Shaw to significantly modify his practice and "render[ed] Shaw's religious exercise effectively impractical." *Id.* ¶¶ 93-95.

Redmond denied Shaw the ability to use a law computer in the school at SDSP when trying to prepare this complaint and declaration. *Id.* ¶ 100. Shaw is banned from using the law library computers. Docket 92 ¶¶ 2-4. On September 9, 2016, Redmond was auditing the law library computers. Docket 96 ¶ 7. Redmond found documents saved by an inmate. *Id.* Using the time and date of the saved file, Redmond determined that the document was saved by Shaw. *Id.* ¶ 9. The files all related to Wicca. *Id.* ¶ 10. Inmates can only use law library computers to complete legal work, and they cannot save or store any documents on the computers. *Id.* ¶ 8. Redmond prepared a write up and attached the documents he found. *See* Docket 93-1.

Shaw was denied employment in the school. Docket 1 ¶ 102. Redmond, as GED instructor at SDSP, hires inmates to work in the school as tutors or

librarians. Docket 93 ¶¶ 1, 3. These inmates wear green shirts and have special privileges such as moving between units and accessing special computers. *Id.* ¶¶ 3-4. Redmond reviews inmate's disciplinary records before hiring. *Id.* ¶ 5. Redmond denied Shaw employment due to his disciplinary record. *See* Docket 93-1 at 1.

**Equal Protection**

Shaw has requested many accommodations from Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones. Docket 1 ¶ 105. Shaw's requests were denied but the same requests were approved for similarly situated inmates in more mainstream religious groups. *Id.* ¶¶ 106-07.

Drieske and Stanwick-Klemik allow other religious groups to receive donations from outside approved vendors for religious or cultural gatherings. *Id.* ¶ 108; *see also* Docket 88 ¶ 64. Shaw claims that DC has been denied the ability to receive donations. Docket 1 ¶ 108. Defendants assert that if the Wiccan group can identify an outside Wiccan organization that is willing to donate to that group, the DOC would work with that organization to facilitate donations if the items are not a risk to safety and security. Docket 88 ¶ 65.

Shaw has not been allowed to buy from vendors other than CBM. Docket 1 ¶¶ 108, 118. CBM does not offer food that complies with DC's strict dietary requirements. *Id.* ¶ 109. On December 21, 2016, Shaw canceled the Yule Sabbat feast and celebration because Drieske refused to allow Shaw to order "all natural" foods from Hy-Vee. *Id.* ¶¶ 124-26. Hy-Vee is an approved vendor for the DOC. *Id.* ¶ 126. Hy-Vee has catered Buddhist, Jewish, and Muslim

14

group meals. *Id.* ¶ 127. Shaw alleges that Drieske approved different treatment for their religions. *Id.* ¶ 128. Defendants maintain that all food orders go through CBM, including ordering food from Hy-Vee. Docket 88 ¶ 69.

**First Amendment Right to Receive Mail**

Drieske, Baker, Miller-Hunhoff, Reimann, and Storevick rejected or refused to deliver over 200 magazines that were mailed to Shaw. *Id.* ¶ 131; Docket 122-3; 122-4. Shaw provided twenty-seven Mailroom Correspondence Rejection forms dated from March 15, 2015 to October 6, 2017. Docket 122-3 at 15-30; Docket 122-4 at 1-14. The rejected magazines include Inked, Urban Inked, Freshly Inked, Tattoo, Skin & Ink, Rebel Ink, Maxim, and Fangoria. *Id.* All but four were rejected for violation of the prison porn policy. *Id.* Inked Volume 5 Issue 2, Freshly Inked November 2015, Tattoo November/December 2015, Urban Ink May 2016 were rejected, at least in part, for containing a hand gang sign. Docket 122-3 at 24; Docket 122-4 at 1-2, 7. Tattoo January 2016 was rejected because it contained a calendar. Docket 122-3 at 28.

Shaw claims most of the rejections are based on a single, small picture within an entire magazine. Docket 1 ¶ 134. Shaw maintains that these are art magazines and "necessary reference materials for Shaw's religion . . . to develop [his] artistic-magickal mind [sic]." *Id.* ¶ 132.

Shaw filed grievances regarding the rejected magazines. *See* Docket 122-4. In almost all grievances, Shaw argues that the rejected magazines were not adult only and can be sold to minors. *Id.* Drieske and Baker denied Shaw's grievances. Docket 1 ¶136. Shaw alleges that Drieske stated, " 'they might have

nudity in them.' " *Id.* ¶ 138. When the magazines are rejected, Shaw is indigent and unable to send the rejected magazines out. *Id.* ¶ 135. Shaw has suffered over $1,000.00 in monetary loss. *Id.*

The DOC has a pornography policy (Policy 1.3.C.8—Pornography) that was last revised on May 23, 2016. Docket 88-3. The policy "prohibits the purchase, possession, attempted possession and manufacturing of pornographic materials by inmates." *Id.* Section III of the policy contains the definitions of pornographic material, nudity and sexually explicit:

**Pornographic Material**:
Includes books, articles, pamphlets, magazines, periodicals, publications or materials that feature nudity or "sexually explicit" conduct. Pornographic material may include books, pamphlets, magazines, periodicals, or other publication material that features or includes photographs, drawings, etchings, paintings, or other graphic depictions of nudity or sexually explicit material.

**Nudity**:
"Nudity" means a pictorial or other graphic depiction where male or female genitalia, pubic area, buttocks, or female breasts are exposed. Published material containing nudity illustrative of medical, educational or anthropological content may be excluded from this definition.

**Sexually explicit**:
"Sexually explicit" includes written and/or pictorial, graphic depiction of actual or simulated sexual acts, including but not limited to sexual intercourse, oral sex or masturbation. Sexually explicit material also includes individual pictures, photographs, drawings, etchings, writings or paintings of nudity or sexually explicit conduct that are not part of a book, pamphlet, magazine, periodical or other publication.

*Id.* Section IV of the policy contains the procedures regarding the purchase, possession and/or attempted possession of pornographic material. It first

establishes that any pornographic material is contraband and an inmate that violates this policy may be subject to disciplinary action. *Id.* at 1-2.

> A. Each institution's Warden or Superintendent will ensure procedures are in place to prevent pornographic material from being brought into an institution(s) under their authority. Such procedures will encompass at a minimum:
>
>> 1. Prevention of the introduction or movement of pornographic material through correspondence or visits (See DOC policies 1.5.D. 1 Inmate visiting, 1.5.D.2 Juvenile Visitation and Telephone Contact and 1.5.D.3 Offender Correspondence).
>>
>>> a. All incoming and outgoing correspondence or publications depicting pornography or containing pornographic material will be rejected (See DOC policy 1.5.D.3 Offender Correspondence).
>>
>> 2. Each facility shall identify staff that has the authority to determine if a particular item meets the definition of pornographic material, as described within policy.
>
> B. If an inmate disagrees with a decision that a particular item meets the policy definition of pornographic material, the inmate may appeal the decision through the administrative remedy process (See DOC facility (See DOC policy 1.3.A.10 Restrictions on Electronic Equipment)

*Id.* at 2. Section VI contains a revision log that shows only minor changes to the policy during the time Shaw's magazines were rejected. *Id.* at 3. There were no changes to the definitions section during the time Shaw's magazines were rejected. *Id.*

**Due Process**

Shaw alleges that his personal property and money were taken without due process on several occasions. On two occasions significant portions of his property were missing. Docket 1 ¶ 145. Shaw was then forced to "(1) sign the return inventory sheet and forfeit his missing property or (2) refuse to sign the

return inventory sheet and lose all of plaintiff's property." *Id.* Shaw does not identify when the taking occurred or what personal property was missing.

Shaw filed two separate actions in Minnehaha County Small Claims Court. Docket 109 ¶ 257. Shaw named Young as the defendant in one action and Bieber in the other. *Id.* On October 31, 2016, Shaw appeared by ITV for a hearing on both files. *Id.* ¶ 258. Both cases were dismissed. *Id.* ¶ 259.

Shaw claims defendants confiscated $140.00 out of his inmate account without notifying Shaw or giving him an opportunity to state his objection to the confiscation. Docket 1 ¶ 147. Shaw claims that DOC policy allowed for up to 95% of Shaw's incoming money to be taken without due process or held forever in a frozen account. *Id.* ¶¶ 139-48.

Defendants explain that during intake inmates can sign a power of attorney (POA) form that allows the prison to accept money from outside the prison and deposit that money into an inmate's account. Docket 95 ¶ 9. If the inmate revokes the POA, the inmate cannot receive money from outside sources. *Id.* ¶ 10. But, revoking does not opt the inmate out of the inmate banking system. *Id.* ¶ 11. Shaw revoked his POA on May 15, 2015. *Id.* ¶ 12.

Defendants explain the process for when an inmate receives money. *See* Docket 95. Money is first deposited into a frozen account. *Id.* ¶ 3. Any monies owed to the prison for an outstanding credit obligation or the Prison Litigation Reform Act will be paid first. *Id.* ¶¶ 5-6. Then five percent will go into an inmate savings account, up to a maximum balance of $300. *Id.* ¶ 7. The remainder goes to an inmate spending/commissary account. *Id.* ¶ 4. The total monthly

deposits into this account cannot exceed $160. *Id.* If the deposit brought an inmate over $160, up to 40% of that deposit is applied to fixed obligations, such as cost of incarceration and restitution. *Id.* ¶ 8. Inmates are responsible for checking their account statements for accuracy. *Id.* ¶ 14. If an inmate believes that an error has occurred, it is the inmate's responsibility to notify staff. *Id.*

**Denial of Medical Care / Deliberate Indifference**

Shaw has had ongoing medical problems with his lower back, both knees, and acid reflux during his incarceration at SDSP and MDSP. Docket 1 ¶¶ 172-179; Docket 109 ¶¶ 128-130. Between November 8, 2012 and July 17, 2018, Dr. Carpenter authorized off-site treatment for Shaw thirty-five times. *See* Docket 96 ¶ 9. The approved treatments include orthopedic consults, knee surgeries, knee braces, physical therapy, lumbar injections, lumbar epidurals, knee injections, and synvisc knee injections. *Id.* Shaw also has been prescribed a no-stair order, a head of bed wedge, knee braces, and a low bunk order. Docket 122-5 at 6, 9.

In May of 2016, Shaw claims defendants denied him his knee braces, medical shoes, and head of bed wedge when he was in the SHU. Docket 1 ¶ 178; *see also* Docket 122-9. Shaw alleges that an unknown CHS defendant removed all of Shaw's medical orders when Shaw was placed in the SHU. *Id.* ¶ 177. Defendants say medical orders remain active regardless of what unit an inmate is in. Docket 98 ¶ 8.

In June of 2017, Shaw claims Dr. Adams said DOC would not approve a gel injection for Shaw's knees. Docket 1 ¶ 171. Shaw's medical records show that Dr. Carpenter approved a May 1, 2017 request for Synvisc knee injections. Docket 122-5 at 10; *see also* Docket 96 ¶ 9.

Shaw claims he was denied a low bed in a two-man bunk, an extra pillow, ice, and shoes. *Id.* ¶¶ 170-178. Shaw submitted some of his medical records. *See* Docket 122-5. On March 10, 2017, Shaw went to Health Services and asked for insoles, a two-man bunk, head of bed wedge, extra pillow, and ice. *Id.* Medical records show, "Patient was informed that he has been sized for his [shoes][,] Spoke with Clinical Supervising staff, and these are comfort items offered by DOC." *Id.* at 1. A later entry the same day states,

> Emailed UM D. Lentsch at request of Nurse performing NSC on 3/10, patient was complaining that if he is in 2nd bunk of 3 man cell he doesn't have enough room for HOB wedge. Patient advised that cell placement is a housing issue managed by DOC. Answer from UM D. Lentsch states patient is single celled.

*Id.* at 2.

On March 22, 2017, Shaw again went to Health Services for knee pain. Medical records show, "Pt understands DOH will not give the pillow order at this time. *Id.* at 3. Dr. Regier has reviewed with the patient and will not reclassify him for low bunk (will need to work with DOC for use of HOBWedge as recommended by DOH)[.] Shoe issue with orthotics is noted and understands he will need to take the issue with DOC." *Id.*

On April 25, 2017, Shaw went to Health Services for sick call complaining of continued knee pain, back pain, and acid reflux. *Id.* at 6.

Medical records show, "PLAN: Will discuss with charge nurse re housing, extra pillow and shoes. These issues are ultimately DOC concerns." *Id.* at 5.

On May 1, 4, 5 and 10 of 2017, Shaw went to Health Services for sick call and requested to be in a two-man bunk. *Id.* at 9-17. Shaw was informed that "medical does not specify the bottom bunk order to be a 2 man or 3 man bunk." *Id.* at 15. Shaw then explained that he was informed otherwise by Foley. *Id.* [5]

Shaw claims Kaemingk, Dooley, Young, Bieber, Lentsch, Klemik, Dr. Carpenter, Dr. Regier, Schreurs, Bowers, and Unknown CHS Employees designed policies that delegate medical decisions to non-medical personnel. Docket 1 ¶¶ 165-66; Docket 122-4. Shaw relies on a memo dated February 24, 2014. *See* Docket 122-4. The memo states,

> It is the duty of SDDOH Health Services to provide medical treatment, however this responsibility does not include providing for comfort items and custodial issues. These comfort items are not necessary for good medical care. The only possible exception to this is a lower or middle bunk, stair restrictions and legitimate work restrictions due to medical diagnosis. Health Services will not address requests for comfort items or custodial issues.

*Id.* Defendants maintain, "CHS retains autonomy for clinical decisions. The DOC does not make clinical decisions." Docket 109 ¶ 147. Medical housing classifications, including bunk assignments and handicap classifications, are determined by Doctors, Physician Assistants, and Certified Nurse Practitioners. *Id.* ¶ 148. Defendants also state, "Collaboration between the two departments

---

[5] Foley is a DOC employee.

will occur regarding clinical decisions that may interfere with the security of the institution with the goal of meeting the patient's medical needs and maintaining the security of the institution." *Id.* ¶ 147.

As medical Director for CHS, Dr. Carpenter claims she is not involved in the decisions to grant or deny a handicap cell, specific bunk assignment, medical ice, or extra pillows. Docket 96 ¶ 13. Dr. Carpenter signed the memo delegating comfort care items to DOC. *See* Docket 122-4.

In his affidavit, Dr. Regier stated that he does not believe a handicap cell is necessary for Shaw. Docket 96 ¶ 4. But Shaw does have a low bunk order. *See* Docket 122-5 at 9.

On June 13, 2016, Young provided a response to Shaw's Administrative Remedy. In part, Young stated that "[e]xtra pillows are comfort items and needs to be discussed with DOC. Ice is provided for acute issues on a short-term basis." Docket 122-9.

On September 6, 2016, Shaw submitted an Informal Resolution Request requesting an extra pillow and ice. *Id.* at 1. Shaw stated,

> I have been complaining to UM Bieber since May that I need an extra pillow order and a med ice order. I've told Bieber face to face and through kites all he has to do is call Health Bowers and she will confirm I need them. This is a clear case of Deliberate Indifference.

*Id.* In response, UC Mary Burgraaf wrote, "I have reviewed your Informal Resolution Request regarding an extra pillow order and med ice order. I contacted the medical staff and they report that you were recently seen by the

medical provider and no recommendation was made for an extra pillow or med ice." *Id.* at 2.

**Access to the Courts**

Allock, Ponto, Bieber, Lentsch, Klemik, Effling, Maturan, and Ulmer prevented Shaw from filing grievances about the conditions of his confinement by denying him the grievance forms, refusing to take his grievances once completed, not answering the grievances placed in a defendant's box or under their door, and retaliating against Shaw for trying to grieve the conditions of his confinement by punishing Shaw. Docket 1 ¶ 180. Shaw claims Bieber was involved in both stages of the administrative remedies process and lied to his superiors to prevent Shaw from challenging the conditions of confinement. *Id.* ¶ 181. Shaw told Ponto and Young about Bieber's conduct and claims they did nothing. *Id.* ¶¶ 182-83. Shaw claims Maturan denied Shaw's administrative remedies for "exaggerated reasons to prevent Shaw from getting his claim to court." *Id.* ¶ 184.

Defendants describe the process for filing a grievance. Docket 109 ¶ 172. An inmate first must file an Informal Resolution Request (IRR) and submit the completed IRR to the Unit Coordinator (UC). *Id.* The UC will investigate by talking to the named parties and provide the inmate a response. *Id.* If unsatisfied, an inmate may then submit a Request for Administrative Remedy (AR) to the UC. *Id.* ¶ 173. The UC will forward the AR to the Administrative Remedy Coordinator. *Id.* The Coordinator will investigate by contacting the named parties and provide the inmate a response. *Id.* ¶ 174. Bieber was

involved in both stages of the grievance process because he was a named party and he was asked to provide his recollection of events. Docket 101 ¶ 7.

Next, Shaw claims Effling and Bieber prevented him from creating and mailing legal papers for his small claims cases by withholding necessary resources and materials. Docket 1 ¶¶ 185-86; *see also* Docket 122-7 at 1-8. Shaw told Baker that Effling refused to allow Shaw to send legal mail and Baker did nothing. *Id.* ¶ 192. In a Request for Administrative Remedy, Shaw states,

> I sent several kites to U.C. [Effling] over several days. On Sept 07, I sent several officers, I pushed the button, I talked to Major Baker all in an attempt to send out legal mail. Even after showing UM Bieber and UC [Effling] I had a deadline I was denied the opportunity to send out legal mail. I want [Effling] repremanded [sic] for making me miss my deadline and denying me access to the court.

Docket 122-9 at 11. In response to Shaw's grievance, UC Mary Burggraff stated,

> I reviewed your Informal Resolution Request wherein you state that Unit Coordinator Vitetta refused to mail out your legal mail. I spoke with Ms. Vltetta and she stated that she had not recieved any kites from you requesting to mail out legal mail. She stated that officers had told her that you had pressed your call light to be called down to mail out legal mail and she told them that since that was an inappropriate use of the call light she was not going to call you down. In the future, send a kite to be called down and plan so that you don't miss a deadline.

*Id.* at 97-2.

Indigent inmates get thirty pages of paper per month to use for legal documents, but more paper is routinely provided. Docket 105 ¶ 5. Inmates also can spend $10 per month for postage. *Id.* ¶ 6. A pen or pencil will be provided.

*Id.* ¶ 5. When an inmate needs to mail a document, they kite the UC and the UC will search the paperwork for contraband and seal the envelope. Docket 109 ¶ 195. The UC marks it as legal mail and add postage. *Id.* The UC then mails out the document. *Id.* Defendants maintain that they have never denied these things. *Id.* ¶ 176.

Shaw claims his access to the court was further hindered by being banned from the law library and being provided inadequate legal services by Attorney Walter and paralegal Bidney. Docket 1 ¶ 188. Shaw claims Bieber banned him from the law library. *Id.* ¶ 203. Shaw filed a grievance on September 8, 2016. Shaw stated,

> UM Bieber is retaliated against me for filing grievances and lawsuits against him by denying me law library time and shoes. While at my cell front UM Bieber told me since I do not go to rec he is going to put me on cell restriction so I can not go to the law library, use the computers to do legal work. UM Bieber said at the cell front of cell N-20 has gone out of his way to retaliate against me, threaten me, antagonize me all because, in his words, "We can both go out of our ways to cause problems." I have pending cases and have scheduled times to use the library and computers to do legal work and UM Bieber is retaliating against me by preventing me from doing my legal work I need to use the law library and computer to do legal work during my regular scheduled times and at 10:00 so I can meet deadlines. I want the camera footage for the last 10 days saved for evidence (camera facing cell 20)[.]

Docket 122-9 at 5. In a response to Shaw's grievance, UC Burggraaf stated,

> I reviewed your Informal Resolution Request wherein you state that Unit Manager Bieber has denied you law library time. I spoke with Unit Manager Bieber and he stated that one day he did deny you extra time at the law library because you were on the unit when you were suppose to be at the law library. If you need extra time and request it, the unit staff will check if there is space available for you to go to the law library. But, if you are not using the time given appropriately, it will be denied because several people use the law

library on a daily basis. Since many court proceedings have
deadlines, you should plan ahead so you do not miss your deadlines.

Docket 122-9 at 6. The response was dated September 13, 2016. In his

affidavit Bieber stated, "There were times when Shaw was only allowed a

certain amount of time in the library because there were several inmates that

need access as well. Shaw did not receive any less time than any other inmate."

Docket 101 ¶ 9.

Shaw claims "a portion of a complaint" he prepared was dismissed "for

failure to meet a technical requirement" because Attorney Walter and paralegal

Binde failed to adequately advise Shaw. Docket 1 ¶ 189. If Shaw had access to

the law library or if attorney Walter and Binde would have helped Shaw

prepare his complaint, Shaw believes he would have won. *Id.* ¶ 190.

From 2001 to September 2017, Walter, along with paralegal Bidney,

provided legal services to inmates at the SDSP and MDSP. Docket 106 ¶¶ 2-3.

Together, they provided inmates legal forms, advised inmates regarding what

needed to be included in the legal documents, reviewed inmate's completed

documents before filing, and printed relevant case law and statutes. *Id.* ¶¶ 6-7.

Shaw utilized Walter's office seventy-three times. *Id.* ¶ 9. On March 9, 2016,

Shaw spoke with Walter about various financial issues with the prison. Docket

106-2 at 2. Walter then gave Shaw the small claims packet. *Id.* On May 31,

2016, someone in Walter's office talked briefly with Shaw about small claims

court and provided copies. *Id.* at 3.

Shaw claims these denials impeded his small claims court actions. On October 31, 2016, at 1:30 p.m., Shaw had a small claims court hearing on I.T.V. against Bieber and Young. Docket 1 ¶ 193. Attorney Schlimgen represented Bieber and Young. *Id.* Shaw claims he was unable to argue key elements of his small claims case because he was unable to send his response to defendant's answer to opposing counsel Schlimgen. *Id.* ¶ 186. [6] As a result, the judge would not allow Shaw to argue his due process claim. *Id.* Shaw's Statement of Small Claims against Young includes a due process argument. *See* Docket 107-2 at 1-2. Shaw's Statement of Small Claims against Bieber does not include a due process argument. *See* Docket 107-3. Both cases were dismissed with prejudice. Docket 107-2 at 7; Docket 107-3 at 6.

**Retaliation in Violation of the First and Fourteenth Amendments**

Shaw alleges Anderson retaliated against him after Shaw filed numerous grievances and a § 1983 action against Anderson in October of 2016. Docket 1 ¶ 197. Anderson caused Shaw's cell to be searched and Shaw's personal property and legal papers were taken. *Id.* ¶ 198. Anderson also took the table out of Shaw's cell to prevent Shaw from filing grievances and litigating. *Id.* ¶ 199. Shaw claims he was the only inmate in East Hall without a table in his cell. *Id.* ¶ 200.

---

[6] In both small claims cases, the case information sheet shows that the court received a Brief in Opposition to Defendant's Answer before the hearing was held. *See* Docket 107-2 at 5 and Docket 107-3 at 4.

Shaw alleges Bieber retaliated against him four ways after he filed grievances and lawsuits against Bieber. *Id.* ¶ 206. Bieber served as a Unit Manager for Unit B and East Hall, where Shaw was housed for a time. Docket 101 ¶ 3. First, on September 8, 2016, Shaw claims Bieber told Shaw that because he liked to file grievances he was being denied access to the law library. Docket 1 ¶ 203. Shaw claims Bieber told him that his officers could write Shaw up for everything and punishment would be no library, no computers, no legal work, or religious services. *Id.* ¶ 204. Bieber then said, "We can both go out of our way to cause problems." *Id.* ¶ 205. Bieber claims Shaw was given the same amount of time in the law library as other inmates and he never threatened Shaw. Docket 101 ¶ 9. Shaw disagrees. Docket 121 at 45.

Second, on April 29, 2016, Shaw claims that he gave Bieber thirty-one project applications. Docket 122-8 at 7. Shaw claims Bieber threw away those applications. Docket 1 ¶ 206. Bieber does not recall Shaw giving him these applications but claims he would not have thrown them away. Docket 101 ¶ 14. If an inmate submits a project application to his UM, the UM will sign it and give a copy to the inmate. Docket 109 ¶ 183. The UM then forwards the application to an Associate Warden. *Id.* The UM has no further involvement. *Id.*

Third, Shaw claims Bieber denied him ice and a pillow because Shaw filed grievances and a lawsuit against him. Docket 1 ¶ 208. This denial caused Shaw pain and suffering. *Id.* ¶ 209. Bieber claims these are medical decisions that are made by CHS. Docket 101 ¶ 17.

Fourth, Shaw claims Bieber placed mentally ill inmates and inmates of rival gang members in a cell with Shaw to cause physical and mental harm to Shaw. Docket 1 ¶ 210. Bieber does not comment on this allegation in his affidavit. *See* Docket 101.

Shaw makes four retaliation claims against Lentsch that occurred while Shaw lived in East Hall where Lentsch served as Unit Manager. Docket 1 ¶¶ 211-20; Docket 100 ¶ 160. First, Shaw claims Lentsch took Shaw's handicap cell status away and placed Shaw in a three-man cell to punish Shaw for refusing a transfer and filing grievances. *Id.* ¶ 211. Shaw claims this placement caused him extreme pain and suffering. *Id.* ¶ 212. Shaw could not sit up in bed. *Id.* Getting in and out of a three-man bunk bed was "an impossible task for a person with extreme low back pain and a person with no ACL's and extreme degenerative disease in his knees and low back." *Id.* Shaw was unable to use his head-of-bed wedge to elevate his upper body to prevent him from throwing up acid and vomiting in his sleep from acid reflux. *Id.* ¶ 213. If Shaw used his wedge, his head would be pressed against the middle bunk. *Id.* ¶ 214. Lentsch maintains that handicap cell status comes from CHS. Docket 100 ¶ 5. Additionally, there are no handicap cells in East Hall. *Id.* ¶ 6. Lentsch also claims Shaw could have requested a different cell. *Id.* ¶ 7. Shaw maintains that he made several requests to change cells. Docket 121 at 45.

Second, Shaw claims Lentsch denied him medical ice and a pillow to treat his swollen, bruised knees. Docket 1 ¶ 216. Lentsch maintains that orders for medical ice come from CHS. Docket 100 ¶ 8. If CHS had ordered ice,

Shaw would have received an ice bag from CHS and inmates can then fill their ice bag without assistance. *Id.* Lentsch claims he would have allowed Shaw an extra pillow if requested, with or without an order from CHS. *Id.* ¶ 9.

Third, Shaw also claims Lentsch forced Shaw to live with a black inmate knowing Shaw cannot live with other races or gang members due to his religion and knowing Shaw could be assaulted. *Id.* ¶ 217. When Shaw and the black inmate told Lentsch there was going to be a fight if they were forced to live together, Lentsch responded, " '[D]o what you gotta do[.]' " *Id.* ¶ 218. The DOC does not house inmates according to race or religion. Docket 109 ¶ 166. Additionally, inmates can report to staff if they believe living with a specific inmate would put him in danger. *Id.*

Fourth, Shaw also claims Lentsch took his personal property and legal work because Shaw attempted to file grievances and refused transfer from SDSP to MDSP. Docket 1 ¶ 219. Shaw claims Lentsch threatened, " 'I can take more of your legal work and your TV can jump off the locker box and break.' " *Id.* ¶ 220. Lentsch disputes ever taking Shaw's property in response to Shaw's grievances or refusing him a transfer. Docket 100 ¶ 12.

Shaw claims Madsen retaliated against him when Shaw was in the SHU where Madsen was UM. Docket 1 ¶ 221, Docket 111 ¶ 215. Shaw alleges that Madsen told Shaw " 'I've been waiting a long time to punish you.' " Docket 1 ¶ 221. Madsen then imposed an excessive sanction on Shaw. *Id.* The sanction consisted of ten days in the SHU and six months loss of recreation, visits, phone, commissary, and loss of care packages. *Id.* Madsen responded, " '[B]et

you won't sue me again.' " *Id.* ¶ 222. Shaw told Madsen that retaliation is illegal. *Id.* Madsen responded, " 'so sue me' and then he laughed" *Id.* ¶ 223.

When an inmate is sent to the SHU, the UM that sent an inmate proposes a disciplinary sanction that the inmate can accept or deny. Docket 109 ¶ 217. A written proposal is given to the SHU UM who communicates the offer to the inmate. *Id.* SHU UM does not decide the sanction. *Id.* Therefore, Lentsch made the proposal and Madsen served the proposal to Shaw who accepted. *Id.* ¶¶ 218, 220-21. Madsen disputes that he made the comments Shaw alleges. Docket 111 ¶ 222.

Shaw claims Perret retaliated against him on May 3, 2016 for filing grievances and litigating against him. Docket 1 ¶ 228. In Shaw's version of events, Shaw's mentally ill cellmate told Perret that Shaw refused to let him in the cell. *Id.* ¶ 229. Without investigating or asking Shaw if the allegations were true, Perret placed Shaw in the SHU for a major rule violation. *Id.* ¶ 230. Later that day, the mentally ill cellmate was placed in "special needs" because he was hallucinating. *Id.* ¶ 231. Perret used this incident to "rifle through" Shaw's property for three days. *Id.* ¶ 232. Normally, "pack-ups take less than an hour." *Id.* Perret took legal documents from Shaw. *Id.* ¶ 233. Shaw never received a DHO hearing and never pleaded guilty. *Id.* ¶ 234. But Shaw was convicted of the major rule violation. *Id.* Shaw approached Bieber about Perret. *Id.* ¶ 235. Bieber responded, " '[P]rove it.' " *Id.*

In Perrett's version of events, Shaw's cellmate told Perrett that Shaw had threatened him. Docket 103 ¶ 228. Lacking enough information, Perrett told

31

the cellmate to return to his cell. *Id.* Perrett then observed what appeared to be Shaw threatening the cellmate. *Id.* Perrett informed the Officer in Charge (OIC), who decides whether an inmate goes to the SHU. *Id.* The OIC ordered Shaw transferred to the SHU. *Id.* ¶ 6. While packing up Shaw's property, Perrett discovered a non-public DOC policy. Docket 103 ¶ 8. Possession of a non-policy is a major rule violation. *Id.* Perrett completed a write-up regarding this violation. *Id.*

## STANDARD OF REVIEW

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party

opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986).

**DISCUSSION**

## I.    RLUIPA

RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §§ 2000cc-1(a)(1)-(2). Section three protects inmates' religious

exercises "when the substantial burden is imposed in a program or activity that

receives Federal financial assistance." 42 U.S.C. §§ 2000cc-1(b).

To establish a prima facie case under RLUIPA, a plaintiff must show "1)

that he engaged in a religious exercise; and 2) that the religious exercise was

substantially burdened." *Smith v. Allen*, 502 F.3d 1255, 1276 (11th Cir. 2007)

(abrogated on other grounds by *Sossamon v. Texas*, 563 U.S. 277 (2011)); *see

also* 42 U.S.C. § 2000cc-1(a). If the plaintiff succeeds in making a prima facie

showing, the defendant bears the burden to prove that the challenged

regulation is the least restrictive means of furthering a compelling

governmental interest. *Smith*, 502 F.3d at 1276. If the plaintiff fails to put forth

a prima facie case, the court need not inquire further. *Midrash Sephardi, Inc. v.

Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004).

RLUIPA does not authorize individual capacity claims against prison officials. *Van Wyhe v. Reisch*, 581 F.3d 639, 655 (8th Cir. 2009). Thus, there is no qualified immunity determination on Shaw's RLUIPA claim. While RLUIPA allows official capacity claims against prison officials, it does not authorize monetary damages based on official capacity claims. *Id.*

**A. Religious Exercise**

Under RLUIPA, "[t]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Shaw identifies his system of religious belief as DC, which requires strict adherence with the NLDC. Docket 1 ¶ 53; Docket 2. Shaw also considers himself "a practitioner of a Wiccan Faith." Docket 1 ¶ 100.

Defendants argue that DC is not a religion because Shaw only has a self-authored declaration as the basis for his requested religious exercises. Docket 130 at 4. Defendants cite *Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025, 1027 (3rd Cir. 1981). In *Africa*, the Third Circuit defined three "useful indicia" of a religion:

> First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolate teaching. Third, a religion often can be recognized by presence of certain formal and external signs.

662 F.2d at 1032. In then applying the three indicia, the Third Circuit determined MOVE was not a religion because it was concerned with secular matters, lacked a comprehensive theology, and lacked almost all structural

characteristics of a traditional religion. *Id.* at 1036. Although the court rejected a "self-defining approach to the definition of religion problem," it did not find that MOVE was not a religion on this basis. *Id.* at 1035.

The Eighth Circuit relied on the three indicia from *Africa* in *Love v. Reed*, 216 F.3d 682, 687 (8th Cir. 2000). In *Love,* the court found that Love's self-proclaimed Hebrew religion was a religion. *Id.* at 688-89. The Eighth Circuit analysis focused on the similarities between Love's religion and Judaism. *Id.*

Here, it is undisputed that DC is a Wiccan religion. Docket 109 ¶ 9. Defendants do not dispute that Wicca is a religion protected by RLUIPA. DC shares similar theologies and celebrations to Wicca. Thus, the court finds that DC is a religious exercise under RLUIPA.

**B. Substantial Burden on the Exercise of Religion**

The Eighth Circuit Court of Appeals has announced various ways for an inmate to make RLUIPA's threshold showing:

> [T]o demonstrate a substantial burden on the exercise of religion, a government policy or action "must significantly inhibit or constrain [religious] conduct or [religious] expression . . . ; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion."

*Van Wyhe*, 581 F.3d at 656 (alterations in original) (quoting *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 n.7 (8th Cir. 2008)).

An inmate must present some evidence to show that there is a substantial burden on his ability to exercise his religion. *Patel*, 515 F.3d at 814 (reasoning that the inmate could not meet his threshold showing

because he offered only a "single, vague and unsupported statement" and "the record offer[ed] no evidence" regarding the inmate's claims). But whether an inmate "can establish the truth or sincerity of [his] belief is a matter to be decided at trial . . . ." *Van Wyhe*, 581 F.3d at 656. If an inmate asserts beliefs or aspects of his faith that may be substantially burdened by the prison's regulations, a trial is usually warranted. *See, e.g., Murphy v. Missouri Dep't. of Corrs.*, 372 F.3d 979, 988 (8th Cir. 2004) ("Whether Murphy can establish the truth of [his] allegations and the existence of a substantial burden on the exercise of his religion is a matter to be determined by the district court in the first instance following a trial on the merits on this issue.").

Before addressing Shaw's more specific claims, the court addresses Shaw's claim that his religious beliefs are substantially burdened by defendants' denial of accommodations separate from the Wiccan group. Docket 1 ¶¶ 62, 67. In *Wier v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997), the court held the prisoner's religious beliefs were not substantially burdened. The prisoner was a fundamentalist Protestant whose beliefs coincided in large part with the prison chaplain's fundamentalist Christian beliefs. *Id.* The prisoner, however, believed in "separatism," which required him to separate himself from religious leaders whose teachings offend fundamentalist precepts. *Id.* at 819. The prison chaplain did not share this belief in separatism. *Id.* at 820. The court held that the First Amendment did not require that a prisoner be provided with a religious leader whose beliefs were identical to his own. *Id.* Rather, the First Amendment is initially implicated only when "a prisoner's sole opportunity for group worship arises under

the guidance of someone whose beliefs are significantly different from his own." *Id.*
The court concluded the prisoner had failed to show a substantial burden on his
religious beliefs just because the prison chaplain did not share his belief in
separatism. *Id.*

Here, Shaw asserts two primary differences between DC and Wicca to
justify separate accommodations. Docket 121 at 3. First, Shaw states that not
everyone in the current Wiccan group believes or follows the NLDC. *Id.* Second,
Shaw believes the NLDC mandate that DC meetings are members only and
prohibits DC rituals or meetings with non-DC members or sex offenders. *Id.*

Shaw fails to show how sharing accommodations with the Wiccan group
substantially burdens his beliefs. Shaw refers to himself as a Wiccan
practitioner. Docket 1 ¶ 100. Shaw's explanation of DC makes frequent
references to Wicca. *See* Docket 2 at 6, 28, 72, 76, 84, 142. Shaw includes
articles of incorporation in which he names DC's organization "the
Incorporated Wiccan Church of the DC, Inc." Docket 2 ¶ 682. DC is reasonably
considered a sect of Wicca.

Shaw's belief in separatism likewise fails. This situation is not unlike
*Weir* where the prisoner had access to a worship service that was congruent with
his beliefs in all but a few aspects. *Weir*, 114 F.3d at 820. It is Shaw's burden to
show that denying him his own group worship service "significantly inhibit[s] or
constrain[s] conduct or expression that manifests some central tenet of [his]
religious beliefs" or that defendants "meaningfully curtail [his] ability to express
adherence to his . . . faith" or that defendants have denied him "reasonable

opportunities to engage in those activities that are fundamental to [his] religion."
*Patel*, 515 F.3d at 813 (citing *Murphy*, 372 F.3d at 988). Shaw fails to show a
substantial burden by defendants' denial of separate accommodations. Neither the
prison nor Shaw can control who attends religious groups if they identify with
that religion and signed up to attend the group meeting and ceremonies
pursuant to policy. Docket 109 ¶ 29. If non-members and sex offenders cannot
be excluded, regardless of separate accommodations, this burden is
unavoidable in the prison setting.

Defendants also provide a means for Shaw to establish a group separate
from DC by finding a volunteer. Docket 88 ¶ 21. Shaw's claim that this policy
is not followed because the Jewish and Messianic group are allowed separate
accommodations is unpersuasive. These are not two sects within the same
religion. Shaw does not show similar significant differences between DC and
Wicca.

Shaw makes several more specific burden claims. Shaw claims
Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, Allcock, Lentsch,
Mertens-Jones, Bieber, and Klemik imposed a substantial burden on Shaw's
religious exercise when defendants (1) required proof that his requests were
mandated by DC, (2) took away religion for rule infractions, (3) made Shaw wait
four months to consider project applications, (4) made Shaw wait a year to
celebrate a holiday, (5) provided only one day a week for worship, (6) failed to
prevent sex offenders and non-DC members from attending worship time, (7)
limited religious books, (8) denied Shaw ritual tools, (9) denied Shaw outdoor

space for nematon and vison mound, (10) denied his curriculum of study (11)

denied a religious diet, (13) denied Shaw all-natural herbal remedies, and (15)

forced Shaw to live and dine with non-DC members risking violence. Docket 1

¶¶ 62, 67.

First, Shaw argues that defendants required proof that requests are

mandated. Docket 1 ¶ 62(1). Doctrinal justification to support the desired

religious exercise is not required. *Van Wyhe*, 581 F.3d at 657. But this is

distinct from defendants inquiring about the basis of a request. The only

instance Shaw identifies when defendants asked why a request is mandated is

on the religious diet request form. Docket 122-1. Shaw does not identify any

requests defendants denied because Shaw lacked proof of a mandate. Shaw's

first claim fails to show a substantial burden.

Second, Shaw argues that defendants take away Shaw's religion for rule

violations. Docket 1 ¶ 62(b). Shaw shows that the DOC's attendance policy

automatically removes an inmate's name from the list and inmates cannot

sign-up to attend again for thirty days. *See* Docket 122-1 at 4. In *Meyer v.

Teslik,* the court found that denying a prisoner group services for three months

constituted a substantial burden. 411 F. Supp. 2d 983, 989 (W.D. Wis. Jan.

26, 2006). The court reasoned, "Unlike the First Amendment, RLUIPA protects

more than the right to practice one's faith; it protects the right to engage in

specific, meaningful acts of religious expression in the absence of a compelling

reason to limit the expression." *Id.* Although defendants did not deny Shaw his

ability to attend group service for three months, Shaw was denied the ability to

attend group services for a substantial period of time. Shaw's second claim shows a substantial burden.

Third, Shaw claims he waited four months for his project applications to be considered and often did not hear a response. Docket 1 ¶ 62(c). Shaw provided numerous project applications as exhibits, and all were returned in less than three months. *See* Docket 122-1. Shaw fails to identify any project applications that were never returned. Shaw's third claim fails to show a substantial burden.

Fourth, Shaw claims he waited a year to celebrate a holiday and he was denied the ability to celebrate with Ritual and Feast. Docket 1 ¶ 62(d). The undisputed facts show that the Wiccan group holds two annual ceremonial meals and celebrates other holidays with cake and ale at weekly meetings. Shaw does not show that he was unable to or prevented from attending these celebrations. Shaw's fourth claim fails to show a substantial burden.

Fifth, Shaw claims he is only allowed one day a week for group worship when he is mandated to meet three times a week with additional time for holidays. *Id.* ¶ 62(f). The undisputed facts show that the Wiccan group at SDSP meets twice a week for ninety minutes. "Where a government practice burdens one means of practicing a religion, but leaves open alternative means, an inmate must show that the alternative means are inadequate to establish that the government practice imposes a substantial burden." *Rust v. Neb. Dep't. of Corr. Servs. Religion Study Comm.*, No. 4:08CV3185, 2009 WL 3836544, at *8 (D. Neb. Nov. 12, 2009). In *Gladson v. Iowa Dep't. of Corrs.*, 551 F.3d 825 (8th

Cir. 2009), plaintiff desired an eight-hour period of time for celebration but failed to show inadequacy of the three hours provided for celebration. *Id.* 834. Shaw fails to provide a reason why two, ninety-minute meetings are an insufficient alternative to three meetings. Shaw's fifth claim fails to show a substantial burden.

Sixth, Shaw claims defendants forced him to allow two sex offenders and non-DC members attend the Wiccan meetings. Docket 1 ¶¶ 62(e), (g). As the court addressed above, Shaw's sixth claim fails to show a substantial burden.

Seventh, Shaw claims defendants limit him to two books when he needs access to thousands. *Id.* ¶¶ 62(h), 67(h). The Eighth Circuit has commented that similar requests were "outlandish." *Weir*, 144 F. 3d at 821-22. Here, undisputed facts show that Shaw currently has access to ninety-four books. Docket 121 at 11. Shaw fails to show how access to only ninety-four books is an inadequate alternative. Shaw's seventh claim fails to show a substantial burden.

Eighth, Shaw claims defendants have denied him an extensive list of ritual tools. Docket 1 ¶¶ 67(c), (f), (k), 88; Docket 2 ¶¶ 19, 234-97. The undisputed facts show defendants already permit access to many of these items. Docket 88-2. With this alternative, albeit more limited list of ritual tools, Shaw fails to show how the alternative means are inadequate. Shaw's eighth claim fails to show a substantial burden.

Ninth, Shaw claims Drieske and Stanwick-Klemik have denied Shaw the ability to build an outside nematon and vision mound. Docket 1 ¶ 87.

Defendants do not identify an alternative means for Shaw to construct a nematon and vision mound or worship outdoors. It is undisputed that Wicca is an earth-based religion and other religions can conduct religious exercises outdoors. Docket 121 at 22. Shaw's ninth claim shows a substantial burden.

Tenth, Shaw alleges that defendants denied him the ability take his mandated curriculum of study. Docket 1 ¶¶ 67(a), (i). Defendants will facilitate contact with groups outside the prison and request worship and study materials if Shaw makes such a request. Docket 109 ¶ 34. Shaw offers no reason why this alternative fail. Shaw's tenth claim fails to show a substantial burden.

Eleventh, Shaw alleges that defendants denied him the ability to comply with his religious diet. Defendants claim they offer a religious diet that complies with all religious group requirements. *Id.* ¶ 67. Defendants do not dispute that the food they provide is not all-natural. Shaw shows that the alternative diet provided by defendants fails to provide an adequate alternative. In *Patel*, plaintiff was provided the option to purchase halal food from commissary when kosher entrees were inadequate. 515 F.3d at 811-12, 814-15. Because plaintiff could afford to purchase halal food, plaintiff could not show that this alternative means was inadequate. *Id.* Shaw's case is distinguishable. Shaw alleges that *nothing* the CBM defendants offer him allows adherence to his religious diet. Docket 1 ¶ 109. In *Patel,* plaintiff had an alternative that allowed him to adhere to his religious diet. 515 F.3d at 815. Shaw's eleventh claim shows a substantial burden.

Twelfth, Shaw claims CHS employees and Drieske have denied him all-natural herbal remedies to replace his current pharmaceuticals. Docket 1 ¶¶ 75-76. Shaw has not identified what all-natural remedies he requests, nor does he show how the failure to provide such remedies results in a substantial burden on a religious exercise. Shaw's twelfth claim fails to show a substantial burden.

Thirteenth, Shaw claims he is forced to live and dine with non-believers knowing there is a high risk of confrontation. Docket 1 ¶ 77. The Eighth Circuit has noted that inherent dangers exist inside a prison due to the nature of its occupants. *Andrews v. Siegel*, 929 F.2d 1326, 1330 (8th Cir 1991) (citations omitted). Defendants allow inmates to request to live with a person. Docket 109 ¶ 51. Shaw fails to explain how this substantially burdens an exercise of his religion. Shaw's thirteenth claim fails to show a substantial burden.

The court finds that the religious group attendance policy, denial of outdoor worship space, and denial of religious diet place substantial burden Shaw's religious exercise.

### C. Compelling Governmental Interest

Even if an inmate's religious practice has been substantially burdened, summary judgment is still appropriate if the prison officials can establish that the policy at issue is "the least restrictive means to further a compelling interest." *Murphy*, 372 F.3d at 988. The "compelling governmental interest" standard recognizes that "RLUIPA does not 'elevate accommodation of religious observances over an institution's need to maintain order and safety.'" *Fegans*

43

*v. Norris*, 537 F.3d 897, 902 (8th Cir. 2008) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)). In passing RLUIPA, Congress was " 'mindful of the urgency of discipline, order, safety, and security in penal institutions.' " *Id.* (quoting *Cutter*, 544 U.S. at 723).

Even though Congress was mindful of an institution's right to maintain safety, " '[b]y enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims.' " *Gladson*, 551 F.3d at 832 (quoting *Murphy*, 372 F.3d at 987). Because "Congress has granted additional protection for religious exercise by institutionalized persons," *Fegans*, 537 F.3d at 902, the court applies a strict scrutiny test to RLUPIA claim if the plaintiff can show that his religious exercise has been substantially burdened. *Gladson*, 551 F.3d at 833.

Once the plaintiff's threshold showing has been met, the prison officials must show that its policy "was the least restrictive means to further a compelling interest." *Murphy*, 372 F.3d at 988. While the safety of a penal institution can be a compelling government interest, defendants "must do more than merely assert a security concern . . . they 'must do more than offer conclusory statements and post hoc rationalizations for their conduct.' " *Id.* (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1554 (8th Cir. 1996)). In *Murphy*, the prison officials prohibited inmates from holding group religious services for a religion that believed in white supremacy because the services would allegedly result in racial violence. *Id.* at 981-82. The district court granted

summary judgment on the inmates' RLUIPA claim and the appellate court reversed. *Id.* at 989. The Eighth Circuit reasoned that "to satisfy RLUIPA's higher standard of review, prison authorities must provide some basis for their concern that racial violence will result from any accommodation" of the inmates' request. *Id.* While the court did "not require evidence that racial violence has in fact occurred in the form of a riot" the court did "require some evidence that [defendants'] decision was the least restrictive means necessary to preserve its security interest." *Id.* (citing 42 U.S.C. § 2000cc-1(a)(2)); *cf. Singson v. Norris*, 553 F.3d 660, 663 (8th Cir. 2009) (reasoning that the prison officials could establish a compelling government interest because they produced expert testimony at trial that the prohibited religious conduct posed a security risk).

Here, defendants only offer several generalized reasons why they cannot comply with Shaw's requests. Docket 87 at 19. Defendants offer no evidence of a compelling interest in automatically removing an inmate from the list and then requiring thirty days to pass before an inmate can sign up again. As to outdoor worship space, defendants mention the limited amount of space outdoors. Docket 109 ¶ 55. This is just a conclusory allegation. The evidence shows that there is at least enough space to construct a temporary tent for sukkah. *See* Docket 130 at 5. As to the denial of Shaw's religious diet, defendants say it is cost prohibitive and logistically challenging. Docket 89 ¶ 3. It is likely true that providing Shaw an all-natural diet would increase costs and logistical challenges and that refusing to provide an all-natural diet may

45

further a compelling governmental interest. But defendants offer no more than Barthel's conclusion that it increases costs and causes logistical issues. *See* Docket 89 ¶ 3.

### D. Least Restrictive Means

Even if the court assumes that defendants have offered a compelling government interest, defendants did not choose the least restrictive means to further that compelling government interest. Prison officials must seriously consider other alternatives before implementing their chosen policy. *Murphy*, 372 F.3d at 989. Similarly, the district court must explore any possible least restrictive means to further the government's compelling interest. *See id.* (reversing the district court's grant of summary judgment on an RLUIPA claim and reasoning that the court did not explore any other least restrictive means); *see also Walker v. Iowa Dep't of Corrs.*, 298 F. App'x 535, 537 (8th Cir. 2008) (reversing the district court because it failed to "address whether [the prison's] denial of any daily kosher meal option is the least restrictive means to further a compelling interest." (citing 42 U.S.C. § 2000cc-1(a))). Defendants make no attempt to show that they have selected the least restrictive means to achieve a compelling government interest.

Summary judgment is denied on Shaw's RLUIPA claim because genuine issues of material fact exist on whether defendants' attendance policy, denial of outdoor worship space, and denial of religious diet substantially burden Shaw's religious exercise. Further, genuine issues of material fact exist on whether the state's policies are the least restrictive means to further a compelling interest.

## II.     Official Capacity Claims for Money Damages

Shaw sued all defendants in their official capacity under 42 U.S.C.
§ 1983 and RLUIPA. As the Supreme Court has stated, "a suit against a state
official in his or her official capacity is not a suit against the official but rather
is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S.
58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, it is a
suit against the state itself. *Id.*

While "[§] 1983 provides a federal forum to remedy many deprivations of
civil liberties . . . it does not provide a federal forum for litigants who seek a
remedy against a State for alleged deprivations of civil liberties." *Id.* at 66. The
Eleventh Amendment generally acts as a bar to suits against a state for money
damages unless the state has waived its sovereign immunity. *Id.*

Here, as part of Shaw's requested remedy, he seeks to recover money
damages. Docket 1 at 46-47. Because Shaw sued defendants in their official
capacity, Shaw has asserted a claim for money damages against the state of
South Dakota. The state of South Dakota has not waived its sovereign
immunity. Thus, the court finds that defendants are protected by sovereign
immunity and are entitled to judgment as a matter of law on Shaw's official
capacity claims for damages.

## III.     Declaratory and Injunctive Relief

Shaw seeks declaratory and injunctive relief. Claims for declaratory and
injunctive relief are rendered moot when a prisoner is released or transferred to
another facility. *See Smith v. Hundley*, 190 F.3d 852, 855 (8th Cir. 1999)

(discussing *Hickman v. Missouri*, 144 F.3d 1141, 1142 (8th Cir. 1998) and *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985)). This is true even if the prisoner argues he might, at some future time, be incarcerated at the same prison. *Smith*, 190 F.3d at 855. Shaw was transferred from MDSP to the SDSP. Therefore, his claims for declaratory and injunctive relief regarding MDSP are moot.

## IV. Qualified Immunity

Defendants, in their individual capacity, move for summary judgment based on qualified immunity. To show a prima facie case under 42 U.S.C. § 1983, Shaw must show that (1) defendants acted under color of state law and (2) "the alleged wrongful conduct deprived [him] of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citation omitted). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a government official is entitled to qualified immunity the court asks (1) whether the facts alleged, viewed in the light most favorable to plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may address the elements in any order and if either

of the elements is not met, then the official is entitled to qualified immunity.
*Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## A. Free Exercise

The First Amendment to the United States Constitution states in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. Const. amend. I. Inmates clearly retain their First Amendment rights, including the right to the free exercise of religion. *Cruz v. Beto*, 405 U.S. 319, 322 (1972). But limitations may be placed on the exercise of prisoners' constitutional rights in light of the needs of the penal system to deter crime, rehabilitate prisoners, and maintain institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Murphy*, 372 F.3d at 982. Constitutional claims that would receive strict scrutiny in any other setting are evaluated under a lesser standard of scrutiny in a prison setting. *Turner v. Safley*, 482 U.S. 78, 81 (1987). A prison regulation may restrict a prisoner's constitutional rights if it is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

The threshold question for any prisoner First Amendment free-exercise claim is whether prison officials have substantially burdened the plaintiff's sincerely held religious beliefs. *Gladson*, 551 F.3d at 833. "When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause . . . and RLUIPA." *Patel*, 515 F.3d at 813.

Once the plaintiff makes the threshold showing of a substantial burden, the court applies the *Turner* analysis to determine whether the regulation is reasonably related to a legitimate penological interest: (1) is there a valid, rational connection between the regulation and the governmental interest justifying it; (2) is there an alternative means available to the inmate to exercise the right; (3) would the accommodation have a significant ripple effect on the guards, other inmates, and prison resources; and (4) is there an alternative that fully accommodates the prisoner at *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 89-91.

The court determined that the religious group attendance policy, denial of outdoor worship space, and denial of religious diet place substantially burden Shaw's religious exercise. Shaw also makes two other claims.

Shaw claims Redmond denied Shaw the ability to use a law computer in the school at SDSP when trying to prepare this complaint and declaration. Docket 1 ¶ 100. The undisputed facts show that Shaw was banned from using the law library computers for a rule violation. Docket 92 ¶¶ 2-4; Docket 96 ¶¶ 7-10, Docket 93-1. Shaw does not explain how being banned from the law library computers for a rule violation substantially burdens his religious belief. The inability to use the law computer did not prevent Shaw from submitting project applications or this lawsuit. *See* Dockets 1, 2, and 122-2. Next, Shaw was denied employment in the school by Redmond. Docket 1 ¶ 102. Shaw fails to show how this burdens his religious beliefs. Thus, the court finds that Shaw made the necessary threshold showing as to only the religious group

attendance policy, denial of outdoor worship space, and denial of religious diet. The court next considers the *Turner* factors.

Defendants do not address their attendance policy. Defendants have the burden to show that this regulation bears a reasonable relationship to the legitimate penological interest put forward to justify it.

As to the outdoor space, Defendants claim there is limited outdoor space. Docket 87 at 23. The alternatives defendants provide are continued indoor worship and the ability to practice in one's cell. *Id.* 25. Next, defendants argue that Shaw's requests would require additional staff and outdoor space. *Id.* Finally, defendants claim, "There are no alternatives because Shaw claims that any deviation from his requests would automatically create a substantial burden on his religion." *Id.* Defendant's broad conclusory allegations do little to tip the scales in their favor. The undisputed facts show there is space enough for at least two other groups to worship outdoors. Docket 109 ¶ 55.

As to religious diet, defendants only comment that they provide the Wiccan group two annual holiday feasts. Docket 87 at 24. Defendants then claim Shaw has numerous other opportunities to practice his religion. *Id.* at 25. Defendants claim the cost of Shaw's request would be significant. *Id.* And finally, defendants again claim that no alternatives would be accepted by Shaw. The undisputed facts show that none of the food provided to Shaw allows him to adhere to his religious diet. The absence of any alternative weighs heavily against the defendants.

The court concludes that Shaw made the threshold showing that his sincerely held religious beliefs are substantially burdened by the religious group attendance policy, denial of outdoor worship space, and denial of religious diet.

Next, the court must consider whether the constitutional right was clearly established at the time of the alleged misconduct. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1987))). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Stanton*, 571 U.S. at 6. " 'Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.' " *Ambrose v. Young*, 474 F.3d 1070, 1077 (8th Cir. 2007) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 229 (1991)).

The law has long been clearly established that "when a prison regulation impinges on inmates' constitutional [First Amendment] rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. Because defendants have not put forth evidence to show that the regulation bears a reasonable relationship to the legitimate penological interest put forth to justify it, Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones are not entitled to qualified immunity on this issue.

Shaw makes no allegations that Lentsch and Bieber had any involvement in the religious group attendance policy, denial of outdoor worship space, and denial of religious diet. And the court has found no significant involvement by Lentsch or Bieber. So Lentsch and Bieber are entitled to summary judgment on this claim.

## B. Equal Protection

The Supreme Court stated, "We do not suggest . . . that every religious sect or group within a prison—however few in number—must have identical facilities be provided for every faith regardless of size, nor must a chaplain, priest, or minister be provided without regard to the extent of demand." *Cruz*, 405 U.S. at 322 n.2. In order to establish an equal protection claim, a prisoner must show that he is treated differently from similarly situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right. *Patel*, 515 F.3d at 815. To assert an equal protection claim based on religion, an inmate must show that he is "denied a reasonable opportunity to pursue [his] faith as compared to inmates of other religions." *Runningbird v. Weber*, 198 F. App'x 576, 578 (8th Cir. 2006). Shaw must also show that defendant's conduct was "motivated by intentional or purposeful discrimination." *Patel*, 515 F.3d at 816 (citing *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007); *Phillips v. Norris*, 320 F.3d 844, 848 (8th Cir. 2003)).

"[P]rison officials may restrict the religious practices of inmates only if such deprivation is necessary to further legitimate penological interests." *Rouse v. Benson*, 193 F.3d 936, 942 (8th Cir. 1999) (citations omitted). Nevertheless,

"in prison cases, courts will ordinarily defer to the expert judgment of prison authorities, due to the difficulty of running a prison and the commitment of the task to the responsibility of the legislative and executive branches." *Id.*

There is no material issue of fact regarding Shaw's ability to receive care packages from outside organizations. Docket 88 ¶ 5. Shaw also fails show a material issue of fact regarding his ability to order from Hy-Vee. Defendants show that all food orders go through CBM, including ordering food from Hy-Vee. *Id.* ¶ 69. Shaw alleges several instances when he believes certain religious groups were provided accommodations that Shaw was denied. But Shaw fails to present evidence that Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, or Mertens-Jones acted with any motivation of intentional or purposeful discrimination. Thus, the court finds that defendants did not violate Shaw's Equal Protection right. Because defendants did not violate Shaw's constitutional right, the court need not determine whether the right was clearly established. Defendants are entitled to qualified immunity on Shaw's Equal Protection claim.

### C. First Amendment Right to Receive Mail

Inmates have a First Amendment right to receive mail. *Weiler v. Purkett*, 46 F.3d 1137 (8th Cir. 1995). "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

An inmate can bring both a facial and as-applied First Amendment challenges to a prison regulation. *Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th

Cir. 2018). The Eighth Circuit instructed that "the lawfulness of the particular application of the [regulation] should ordinarily be decided first." *Id.* at 698 (citing *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989)). If an inmate is entitled to relief under the as-applied analysis, the inmate's claims "might be redressed without reaching the overbreadth issue." *Id.* at 698 (citing *Jacobsen v. Howard*, 109 F.3d 1268, 1274–75 (8th Cir. 1997)).

The Eighth Circuit provided instruction on how to complete this review in the context of qualified immunity. *See Payne v. Britten*, 749 F.3d 697, 701-02 (8th Cir. 2014). "A qualified immunity analysis will then require the district court to conduct an independent review of the evidence to determine if the officials have demonstrated an exaggerated response to those penological concerns in relation to a particular item of mail that has been confiscated." *Id.* at 702 (citing *Murphy*, 372 F.3d at 985-86). "In the absence of such evidence, the district court is bound to take the plaintiff's allegations as true and presume that the mail does not, in fact, contain material that runs afoul of any neutral and valid restrictions. As such, it would seem that if the content of the mail is contested, the district court cannot grant qualified immunity to the officials in this case without first reviewing the withheld mail." *Id.*

Shaw claims Drieske, Baker, Miller-Hunhoff, Reimann and Storevick rejected or refused to deliver over 200 magazines that were mailed to him. Docket 1 ¶ 131; Docket 122-3; Docket 122-4. Defendants do not provide any of the rejected magazines to allow the court to conduct an independent review. Defendants do provide an affidavit from Miller-Hunhoff, but the affidavit lacks

details about the photographs or otherwise allows the court to determine if the response was appropriate. *See* Docket 94 ¶¶ 4-7; Docket 88 ¶ 72. Of the twenty-seven rejection forms, Miller-Hunhoff only signed six rejections. *See* Docket 122-3 at 17, 24, 27, 29, 30; Docket 122-4 at 2. Shaw contests the content of the mail. He characterizes the magazines as art. Docket 1 ¶ 20. Because the content of the mail is contested, defendants' motion for summary judgment based on qualified immunity is denied.

### D. Due Process

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Inmates have a property interest in money received from outside sources. *Mahers v. Halford*, 76 F.3d 951, 954 (8th Cir. 1996). "Although the inmates' private interest in their personal funds is apparent, inmates are not entitled to complete control over their money while in prison." *Id.*

> Admittedly, prisoners do not shed all constitutional rights at the prison gate, but [l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.

*Sandin v. Conner*, 515 U.S. 472, 485 (1995) (internal quotation marks and citations omitted).

Defendants argue Shaw's claims are barred by collateral estoppel based on two previous state small claims court proceedings and a previous § 1983

action before this court. Docket 87 at 27.[7] Defendants argue Shaw cannot relitigate the claims already resolved against him. To establish collateral estoppel, a party must show: "(1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue." *Bechtold v. City of Rosemount*, 104 F.3d 1062, 1066–67 (8th Cir. 1997) (quotation omitted). There is a disputed issue of material fact as to whether Shaw was given an opportunity to argue his due process claim. *See* Docket ¶ 186. Shaw claims the judge did not allow him to argue his due process claim because he was unable to send his response to defendant's answer to opposing counsel Schlimglen. *Id.* In Shaw's previous § 1983 claim before this court, the court found that Shaw failed to make a retaliation claim, not due process. *See Shaw v. Ponto*, 4:15-cv-4121-KES, 2017 WL 4338671, *8 (D.S.D. Sept. 29, 2017). Shaw's due process claim is not barred by collateral estopped.

Shaw claims defendants deprived him of personal property and money without a pre-deprivation hearing. Docket 1 ¶¶ 139-52. It is undisputed that Shaw did not receive a pre-deprivation hearing before his property was taken. But Shaw does not show that a pre-deprivation hearing is necessary or constitutionally required. The United States Supreme Court has held that "an

---

[7] Defendants do not cite any legal authority showing that collateral estoppel applies to small claims actions in South Dakota.

unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). A meaningful post deprivation remedy includes state-common-law remedies. *Id.* Under South Dakota law, Shaw may bring a conversion action for the alleged deprivation of property.

Shaw alleges that defendant's policies allow up to 95% of his funds to be taken or held in a frozen account. Docket 1 ¶ 141. This is not just a DOC policy. SDCL § 24-2-29 states that disbursements shall be made from an inmate's institutional account to satisfy any obligation incurred while the inmate is under the jurisdiction of the Department of Corrections, "regardless of the source of the inmate's funds." *Id.*[8]

Shaw alleges that defendants take money for the cost of incarceration without his agreement. Docket 1 ¶ 151. SDCL § 24-2-28 states in part that "each inmate . . . is liable for the cost of the inmate's confinement which includes room and board; medical, dental, optometric, and psychiatric services charges; vocational education training; and alcoholism treatment charges." *Id.*

---

[8] SDCL § 24-2-29 states: Each inmate is liable for court-ordered fines, costs, fees, sanctions, and restitution and any obligation incurred while under the jurisdiction of the Department of Corrections including those provided for in §§ 24-2-28, 24-7-3, 24-8-9, 24-15-11, 24-15A-24, and 23A-35B-4 and any other charge owed to the state. Disbursement shall be made from an inmate's institutional account to defray the inmate's obligation, regardless of the source of the inmate's funds, including moneys in the inmate's institutional account pursuant to § 24-2-5 and wages earned by the inmate pursuant to §§ 24-4-9, 24-7-3(3), 24-7-6, and 24-8-8.

SDCL § 24-2-29 authorizes the DOC to collect Shaw's liability under SDCL § 24-2-28. This claim fails.

Shaw alleges that defendants' current policy forces Shaw to sign an inventory sheet forfeiting any missing property or refuse to sign the inventory and lose all property. Docket 1 ¶ 145. Shaw's allegations, however, do not rise to the level of a constitutional violation because there are adequate post-deprivation remedies available at the state level. The fact that Bieber was involved in both stages of the grievance process is of no constitutional significance. Shaw has not presented a situation in which a prison official has sat in judgment on his own complaint in a disciplinary proceeding. *Cf. Diercks v. Durham*, 959 F.2d 710 (8th Cir. 1992). The undisputed facts show that it is DOC policy to allow the named party to provide their recollection of events. Docket 101 ¶ 7.

Shaw fails to show a violation of his right to Due Process. Defendants are entitled to summary judgment based on qualified immunity.

## E. Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. Amend. VIII. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying

access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05.

"The plaintiffs must demonstrate (1) that they suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Dulany v. Carnahan*, 132 F.3d. 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). "[D]eliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious." *Dulany*, 132 F.3d. at 1239 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Dulany*, 132 F.3d. at 1239 (quoting *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).

"In determining whether the inmate has an objectively serious medical need, . . . the need or the deprivation alleged must be *either obvious to the layperson* or supported by medical evidence, like a physician's diagnosis." *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999) (internal citations omitted) (italics in original). The Eighth Circuit held a jury instruction was proper when it defined "a serious medical need" as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1992).

The material, undisputed facts show that Shaw has had ongoing medical issues with his lower back, both knees, and acid reflux during his incarceration at SDSP and MDSP. Docket 1 ¶¶ 172-179; Docket 109 ¶¶ 128-130; *see also* Docket 96 ¶ 9. CHS prescribed a no-stair order, a head of bed wedge, knee braces, and a low bunk order. Docket 122-5 at 6, 9.

Shaw claims defendants followed a policy that delegated medical decisions to non-medical personnel. Docket 1 ¶¶ 165-66; Docket 122-4. The evidence Shaw provided shows only a few decisions were delegated to DOC. First, DOC was left to determine whether to assign Shaw the low bunk in a two or three bunk stack. Second, DOC determined whether to provide Shaw an extra pillow and ice.

It is undisputed that CHS will prescribe a low bunk but will not specify whether that low bunk is in a two or three bunk stack. Docket 122-5. Thus, DOC determined whether Shaw was placed on the bottom bunk of a two or three bunk stock. *Id.* When on the bottom bunk of a three-person stack, Shaw is unable to use his medically prescribed head of bed wedge. Docket 121 at 45. Shaw alleges that he repeatedly asked Lentsch to be moved to a cell where he could use his head of bed wedge but was denied. *Id.* If true, a jury could find that Lentsch intentionally interfered with Shaw's prescribed treatment for acid reflux. *See Estelle*, 429 U.S. at 104-05. But it is not enough for Shaw to demonstrate that he was denied the ability to use his prescribed head of bed wedge. For Shaw's case to go forward, he must produce some "verifying medical evidence that the defendants ignored an acute or escalating situation or that

delays adversely affected the prognosis." *Dulany*, 132 F.3d at 1243. Shaw has not carried his burden.

As to an extra pillow and ice, defendants do not appear to agree on who orders these items. CHS claimed that these items are comfort care that is not necessary for good medical treatment and thus they are provided by DOC. *See* Docket 122-4; 122-5 at 1. Defendants' statement of undisputed facts states that orders for medical ice come from CHS and a pillow order may come from CHS but is not necessary for Shaw to have an extra pillow. Docket 109 ¶¶ 164-65. Although there is obvious ambiguity in defendants' current system, Shaw fails to show that he had a serious medical need that required an extra pillow and ice. Shaw has not shown that a denial of ice and extra pillow caused an excessive risk to his health. *See Dulany*, 132 F.3d. at 1239.

Next, Shaw claims defendants denied him his knee braces, medical shoes, and head of bed wedge when he was in the SHU because all his medical orders were removed. Docket 1 ¶ 178. Shaw again fails to show, that during the time he was in the SHU, the denial of his knee braces, medical shoes, and head of bed wedge caused an excessive risk to his health. *Dulany*, 132 F.3d. at 1239. Shaw "must substantiate his allegations with enough probative evidence to support a finding" that he had "an objectively serious medical need" and that the defendants were "deliberately indifferent to that need." *Jenkins v. Cty. of Hennepin*, 557 F.3d 628, 631 (8th Cir. 2009).

Finally, Shaw claims he was denied Synvisc knee injections by Dr. Adams because of a "list" of approved DOC treatments. Docket 1 ¶171. The

undisputed facts show that Dr. Carpenter approved a May 1, 2017 request for Synvisc knee injections. Docket 122-5 at 10; *see also* Docket 96 ¶ 9.

The court finds that Shaw failed to show a violation of his Eighth Amendment right against Kaemingk, Dooley, Young, Bieber, Lentsch, Klemik, Dr. Carpenter, Dr. Regier, Schreurs, Bowers and unknown CHS employees. Defendants are entitled to summary judgment based on qualified immunity on Shaw's Eighth Amendment claim.

### F. Access to Courts

It is well established "that prisoners have a constitutional right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 821 (1977). To prevail on an access to courts claim, a prisoner must establish that he has sustained "an actual injury." *Moore v. Plaster*, 266 F.3d 928, 933 (8th Cir. 2001) (citing *Klinger v. Dep't of Corrs.*, 107 F.3d 609, 617 (8th Cir.1997)). To demonstrate "actual injury," the prisoner must show " 'that a nonfrivolous legal claim had been frustrated or was being impeded.' " *Moore*, 266 F.3d at 933 (quoting *Johnson v. Missouri*, 142 F.3d 1087, 1089 (8th Cir. 1998)). As the Supreme Court explains:

> Because [precedent] did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his law library or legal assistance program is subpar in some theoretical sense . . . [T]he inmate must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim. He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered actionable harm that he wished to bring before the courts,

but was so stymied by the inadequacies of the law library that he
was unable to even file a complaint.

*Lewis v. Casey*, 518 U.S. 343, 351 (1996).

First, Shaw claims Alcock, Ponto, Bieber, Lentsch, Klemik, Effling, Maturan and Ulmer denied Shaw access to the courts by "(1) denying Plaintiff grievances, (2) refusing to take Plaintiff's grievances once aquired [sic], (3) not answering grievances placed in Defendant's boxes or placed under their doors, and (4) retaliating against Plaintiff for trying to grievance the conditions of his confinement by punishing Shaw." Docket 1 ¶ 180. The court separately addresses Shaw's retaliation claim in the next section.

Defendants failure to process Shaw's grievances, without more, is not actionable under § 1983. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993). In *Buckley*, the inmate brought a § 1983 lawsuit because prison officials refused to process his prison grievances. *Id.* at 495. The Eighth Circuit held that the prison officials' refusal to process Buckley's grievances did not state a cause of action because there is no constitutional right to a grievance procedure. *Id.* The court stated, "[a] prison grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment." *Id.* (citations omitted). *See also, King v. Houston*, 556 F. App'x 561, 563 (8th Cir. 2014) (citing *Buckley,* for the proposition that "prison officials' failure to process or investigate grievances, without more, is not actionable under § 1983.").

64

In *Moore v. Thurber*, 1997 WL 1855 (8th Cir. 1997), the court dismissed allegations that defendant jail officials continuously denied a prisoner's requests for grievance forms, that the jail director knew about this interference and did nothing, and that the investigating officer covered up the issue by "failing to investigate thoroughly." *Id.* at *1. The court affirmed the district court's dismissal of these claims as frivolous. *Id.* (citing *Buckley*, 997 F.2d at 495).

Second, Shaw claims he was denied access to the court because Bieber banned him from the law library and Walter provided inadequate legal services. Docket 1 ¶ 188. The right of access to the courts may be protected where prison officials either provide prisoners with adequate law libraries or provide them with assistance from persons trained in the law. *Bounds*, 430 U.S. at 828. Here, Shaw had access to both. The evidence shows that Bieber *limited* Shaw's access to the law library. Docket 101 ¶ 9; Docket 122-9 at 5-6. Additionally, Shaw frequently meet with Walter. *See* Docket 106 ¶ 9. Shaw claims a portion of a complaint he prepared "was dismissed for failure to meet a technical requirement" that he could have known about with proper assistance. But broad and conclusory statements unsupported by factual allegations are not enough. *Ellingburg v. King*, 490 F.2d 1270 (8th Cir. 1974). Shaw does not identify what complaint was dismissed or what technical requirement he missed.

Next, Shaw claims Effling and Baker denied Shaw sufficient legal paper and postage. Docket 1 ¶¶ 185-68. As a result, Shaw claims he was unable to

argue his non-frivolous due process claim in small claims court, because he could not send his response to defendant's answer to opposing counsel Schlimgen. *Id.* ¶ 186. The undisputed facts show that Effling and Baker knew Shaw was attempting to send out legal mail but neither allowed Shaw to send out legal mail. Docket 122-9.

At this stage in the qualified immunity analysis, the court must view the facts in the light most favorable to Shaw. *Saucier*, 533 U.S. at 201. Viewing the evidence in the light most favorable to Shaw, the court concludes that Shaw demonstrated that he pursued a nonfrivolous legal claim that was frustrated or impeded by Effling and Baker's actions.

Next, the court must consider whether Shaw's constitutional right was clearly established. The Supreme Court stated, "It is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." *Bounds*, 430 U.S. at 824-25. Because the right was clearly established and Shaw has met his burden to show that he was pursuing a nonfrivolous legal claim, the court finds that Effling and Baker are not entitled to qualified immunity on this issue and they are denied summary judgment.

### G. Retaliation

To establish a retaliation claim, Shaw must show "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the

protected activity." *Spencer v. Jackson Cty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). In order to succeed on a retaliation claim, a plaintiff must show that the "adverse action taken against him was 'motivated at least in part' by his protected activity . . . ." *Id.* (quoting *Revels*, 382 F.3d at 876). Although "[t]he causal connection is generally a jury question, . . . it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (quoting *Revels*, 382 F.3d at 876).

The Eighth Circuit has held that a retaliation claim fails " 'if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule[,]' " and a defendant shows " 'some evidence the inmate actually committed a rule violation.' " *Sanders v. Hobbs*, 773 F.3d 186, 190 (8th Cir. 2014) (quoting *Hartsfield v Nichols*, 511 F.3d 826, 829 (8th Cir. 2008)). According to the United States Supreme Court, the "some evidence" standard involves: " 'Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.' " *Id.* (quoting *Superintendent v. Hill*, 472 U.S. 445, 455–56 (1985)). " '[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as some evidence upon which to base a prison disciplinary violation, if the violation is found by an

impartial decisionmaker.' " *Id.* (quoting *Hartsfield*, 511 F. 3d at 831). Therefore, "the 'critical inquiry is not whether the prisoner alleges that prison officials retaliated against him for participating in constitutionally protected activity, but instead is whether the prison disciplinary committee ultimately found based upon some evidence that the prisoner committed the charged violation of the prison regulations.' " *Id.* (quoting *Cornell v. Woods*, 69 F. 3d 1383, 1389 (8th Cir. 1995)).

### 1. Anderson

Shaw was engaged in a protected activity when he filed grievances and a § 1983 action against Anderson. Docket 1 ¶ 197. Shaw claims Anderson then retaliated by searching Shaw's cell, taking Shaw's personal property and legal papers, and removing Shaw's cell table. *Id.* ¶¶ 197-99. Anderson argues that he is entitled to summary judgment because Shaw failed to show that Anderson's actions were motivated to prevent Shaw from exercising his constitutional rights. Docket 87 at 36. Anderson alleges that there is not a table available for each cell, so officers move the tables. Docket 104 ¶ 8. Anderson claims Shaw's table was only removed when Shaw was no longer assigned to the cell. *Id.* ¶ 4. And when Shaw returned, he was provided a table within a week. *Id.* ¶ 5. Anderson claims he did not cause Shaw's cell to be searched. *Id.* ¶ 11.

In response, Shaw claims that Anderson told him "he could have grabbed a table out of storage downstairs but 'I wanted yours.' " Docket 121 at 50-51. And Shaw walked every tier in East and Federal Hall and found that Shaw's cell was the only cell in East or Federal Hall that did not have a table. *Id.* Shaw

further claims that seventeen cells in Federal Hall and nine cells in East Hall had two tables in them. *Id.*

There is a material issue of fact as to whether Anderson's removal of the table and legal papers was motivated at least in part by Shaw filing grievances and civil rights complaint against Anderson. Shaw has set forth specific facts to challenge Anderson's non-retaliatory reason for removing the table. Shaw maintains that Anderson caused his cell to be searched and property removed. Shaw has set forth sufficient facts to demonstrate a constitutional deprivation.

But Shaw must demonstrate that Anderson took an adverse action *and* that the action "would chill a person of ordinary firmness from continuing in the [protected] activity." *Revels*, 382 F.3d at 876. "The ordinary-firmness test is well established in the case law, and is designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment." *Garcia v. City of Trenton*, 348 F.3d 726, 728 (8th Cir. 2003). The "ordinary-firmness" test is an "objective one, not subjective." *Id.* at 729. In determining whether threats of death would chill a prisoner of ordinary firmness from using the prison grievance process, "[t]he question is not whether [Santiago himself] was deterred, though how [Santiago] acted might be evidence of what a reasonable [prisoner] would have done." *Id.* Rather, the test is what a prisoner of ordinary firmness would have done in reaction to the death threats. *Id.* Shaw cannot show that denial of a table for ten days would chill a person of ordinary firmness from filing grievances. Anderson is entitled to qualified immunity on Shaw's retaliation claim.

### 2. Bieber

Shaw alleges he engaged in a protected activity when he filed grievances and a lawsuit against Bieber. Shaw claims Bieber retaliated against Shaw by banning him from the law library, throwing away Shaw's thirty-one project applications, and placing mentally ill inmates and inmates of rival gangs in a cell with Shaw to cause physical and mental harm to Shaw. *Id.* ¶ 210.

Shaw fails to provide any evidence that Bieber placed mentally ill inmates and inmates of rival gangs in a cell with Shaw to cause harm. In *Revels*, the Eighth Circuit found that the plaintiff failed to show the defendant took an adverse action because the plaintiff failed to produce any evidence and could not rest on bare allegations. 352 F.3d at 876-77.

Viewing the evidence in the light most favorable to Shaw, Bieber denied him at least some access to the law library and threw away Shaw's project applications. Docket 101 ¶ 9; Docket 122-9 at 5-6. Denial of access to the law library and throwing away project applications is sufficiently serious to chill a person of ordinary firmness from continuing to engage in an activity. *See Lewis v. Clark*, 577 F. App'x. 786, 799 (10th Cir. 2014); *see also Zimmerman v. Tribble*, 226 F.3d 568, 573–74 (7th Cir.2000) (reversing dismissal of claim that prison law librarian repeatedly denied prisoner access to the prison law library in retaliation for protected conduct). The court finds that there is a question of fact for the jury to determine whether Bieber retaliated against Shaw for exercising his constitutional right of access to the courts.

The court now considers whether the right was clearly established at the time of the deprivation. *See Saucier*, 533 U.S. at 201. Here, the law was clearly established prior to Bieber's actions. In *Revels*, 382 F.3d 870, an inmate showing that a prison official took adverse action against him because he engaged in protected speech (filing grievances in Revels), could establish a retaliation claim under 42 U.S.C. § 1983.

The court finds that Shaw has shown that the facts, viewed in the light most favorable to him, shows he was deprived of a constitutional right, and that the right was clearly established at the time of the deprivation. Summary judgment is inappropriate as to Anderson, and Anderson is not entitled to summary judgment based on qualified immunity as to Shaw's retaliation claim.

### 3. Lentsch

Shaw alleges he engaged in a protected activity by attempting to file grievances against Lentsch. *Id.* ¶ 219. Shaw then claims that Lentsch took away Shaw's handicap cell status, denied Shaw medical ice and pillow, forced Shaw to live with a black inmate, and took Shaw's personal property. *Id.* ¶¶ 211-20.

The undisputed facts show that CHS, not Lentsch, make the determination whether an inmate needs a handicap cell. *See* Docket 109 ¶ 148. Additionally, inmates have access to ice without assistance. Docket 100 ¶ 8. The undisputed facts also show that the DOC does not house inmates according to race or religion. Docket 109 ¶ 166. And Shaw does not identify what personal property or legal work Lentsch took. *See* Docket 1 ¶ 219. It appears this alleged incident happened at the same time Shaw was transferred to the SHU for the major rule

violation of refusing a transfer. And when an inmate is transferred to the SHU their property is packed up. Shaw has produced no evidence that would support a finding that Lentsch retaliated against Shaw by taking his property.

There remains a dispute of fact as to whether Lentsch denied Shaw a pillow. But Shaw must demonstrate that a Lentsch took an adverse action and that the action "would chill a person of ordinary firmness from continuing in the [protected] activity." *Revels*, 382 F.3d at 876. Shaw cannot show that denial of a pillow would chill a person of ordinary firmness from filing grievances. Lentsch is entitled to qualified immunity on Shaw's retaliation claim.

### 4. Madsen

Shaw alleges he engaged in a protected activity by suing Madsen. Shaw alleges Madsen retaliated by imposing excessive sanctions on Shaw after he refused transfer to MDSP. Docket 1 ¶ 221. Madsen allegedly responded, " '[B]et you won't sue me again." ' *Id.* ¶ 222. Shaw told Madsen retaliation is illegal. Madsen allegedly responded, " 'so sue me' and then he laughed." *Id.* ¶ 223. In *Revels*, the Eighth Circuit found that the plaintiff did not produce any evidence and could not rest on bare allegations. *Revels*, 382 F.3d at 876-77. Here, it is undisputed that Shaw committed an actual rule violation when he refused transfer. Shaw does not provide any evidence that the sanction was excessive or that Madsen selected the sanction. The standard policy is that the UM that sent an inmate to the SHU determines the sanction. Docket 109 ¶ 217. The UM for the SHU only gives the written proposal to the inmate. *Id.* Madsen is entitled to qualified immunity on Shaw's retaliation claim.

### 5. Perrett

Shaw alleges that he engaged in a protected activity of filing grievances and litigating against Perret. Docket 1 ¶ 228. Shaw alleges Perret retaliated against him by placing him in the SHU over uninvestigated allegations by Shaw's mentally ill cellmate. *Id.* ¶¶ 229-30. Shaw also claims Perrett used this incident to "rifle through" Shaw's property. *Id.* ¶ 232.

Perrett showed "some evidence that [Shaw] actually committed a rule violation.' " *See Sanders*, 773 F.3d at 190. After Perrett observed the situation between Shaw' and his cellmate, Perrett went to the Officer in Charge and explained what he witnessed. Docket 103 ¶ 4. The Officer in Charge then decides whether an inmate will go to the SHU. *Id.* The Special Investigations Unit, not Perrett, then conducts investigations. *Id.* ¶ 7. Because Shaw was transferred to the SHU, Perrett had to pack up his property. *Id.* ¶ 8. The evidence shows that the only adverse action Perrett took was in response to an actual rule violation. Perrett is entitled to qualified immunity on Shaw's retaliation claim.

## V.     Motion to Reconsider Order

Shaw moves the court to reconsider its order granting defendants' motion for a protection order. Docket 69. A district court's decision on a motion for reconsideration rests within its discretion. *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 413 (8th Cir. 1988). "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* at 414 (quotation omitted).

Shaw asks the court to reconsider its order staying discovery pending a determination of qualified immunity because the order was made before his responses to defendants' motions reached the court. Docket 69. Under Rule 26(c), "the court has discretion to stay discovery on other issues until the critical issue has been decided." Wright & Miller, *Federal Practice and Procedure*, § 2040 (3d ed. 2010). Here, the critical issue of qualified immunity had to be determined. The court has considered Shaw's responses (Dockets 70, 71, and 72) and denies his motion to reconsider.

## VI.     Motion for Order

Shaw moves the court to order attorney Jeff Tronvold to provide Shaw a copy of the discovery requests, interrogatories, and requests for admission to attorney Katelyn Cook and attorney Brenden Johnson. Docket 73. At the time Shaw filed this motion, discovery was stayed. *See* Docket 67. The court dismissed Brenden Johnson's client GTL from this case. *See* Docket 78. If Shaw wants to make discovery requests, interrogatories, and requests for admissions on PA Brad Adams, he should direct them to Adams's attorney Katelyn Cook. Shaw's motion (Docket 73) is denied.

## VII.     Motion for Sanction and Motion to Compel

Shaw moves the court for "an order compelling the defendants to fully and properly answer the Plaintiff's Requests for Admissions, answer Plaintiff's interrogatories, respond to Plaintiff's production requests . . ." Docket 74. Shaw further requests sanctions for defendants' alleged failure to comply with the scheduling order. *Id.* Because discovery was stayed at the time Shaw filed his

motion to compel, Shaw's motion is denied. *See* Docket 67. If Shaw would like to conduct discovery now that the determination of qualified immunity has been made, he should direct the requests to defendants' attorney. Shaw's motion for sanctions and motion to compel is denied (Docket 74) is denied.

## VIII.  Motion for Court Order

Shaw moves the court for an order instructing defendants to provide him paper. Docket 117. The court ordered defendants to respond and granted Shaw more time to file his response to defendants' motion for summary judgment. Docket 119. CBM defendants filed notice that they sent Shaw paper. Docket 124. Shaw also filed his response to defendants' motion for summary judgment on paper. Dockets 120 and 121. Thus, Shaw's motion for court order (Docket 117) is denied as moot.

## IV. Motion to Appoint Counsel

Shaw moves the court to appoint counsel for him. Docket 132. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). In determining whether to appoint counsel to a pro se litigant's civil case, the district court considers the complexity of the case, the ability of the indigent litigant to investigate the facts, the existence of conflicting testimony, and the indigent's ability to present his claim. *Id.* Shaw appears able to adequately present his RLUIPA and remaining § 1983 claims. Thus, his motion to appoint counsel is denied.

Thus, it is ORDERED

1. Defendants' motion for summary judgment (Docket 86) is granted on all claims as to all defendants except as follows:

    a. On Shaw's claim under RLUIPA regarding the attendance policy, outdoor worship space, and religious diet against Kaemingk, Dooley, and Young in their official capacity.

    b. On Shaw's First Amendment Free Exercise claim regarding the attendance policy, outdoor worship space, and religious diet against Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Mertens-Jones.

    c. On Shaw's First Amendment Right to Receive Mail claim against Drieske, Baker, Miller-Hunhoff, Reimann, and Storevick.

    d. On Shaw's First Amendment Access to the Courts claim regarding legal mail and paper against Effling and Baker.

    e. On Shaw's Retaliation claim regarding the law library and project applications against Bieber.

2. Shaw's motion to reconsider (Docket 69) is denied.

3. Shaw's motion for a court order (Docket 73) is denied.

4. Shaw's motion for sanctions (Docket 74) is denied.

5. Shaw's motion for court order (Docket 117) is denied as moot.

6. Shaw's motion to appoint counsel (Docket 132) is denied.

DATED March 29, 2019.

BY THE COURT:

/s/ *Karen E. Schreier*
_____
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE