UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES ELMER SHAW, | 4:17-CV-04116-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT |
| DENNIS KAEMINGK, Secretary of Corrections, in his individual and official capacity; ROBERT DOOLEY, Director of Prison Operations, in his individual and official capacity; DARIN YOUNG, Warden, in his individual and official capacity; JENNIFER DRIESKE, Deputy Warden, in her individual and official capacity; JENNIFER STANWICK-KLEMIK, Deputy Warden, in her individual and official capacity; DERRICK BIEBER, Unit Manager, in his individual and official capacity; TAMMI MERTINS-JONES, Cultural Activities Coordinator, in her individual and official capacity; ELIZABETH EFFLING, Unit Coordinator, in her individual and official capacity; STEVE BAKER, Major, in his individual and official capacity; LINDA MILLER-HUNHOFF, Mail Supervisory, in her individual and official capacity; SHARRON REIMANN, Mailroom Supervisory, in her individual and official capacity; JORDAN STOREVIK, Mailroom, in his/her individual and official capacity; JUDY JACOBS, Correctional Officer, in her individual and official capacity, and MARK | |

| BIDNEY, Contracted DOC Paralegal, in his individual and official capacity,[1]<br><br>Defendants. | |
|---|---|

Plaintiff, James Elmer Shaw, filed a pro se civil rights lawsuit under 42 U.S.C. § 1983. Docket 1. Pending before this court is defendants' second motion for summary judgment. Docket 225. Shaw opposes this motion. Dockets 247, 248, 249.

## FACTUAL BACKGROUND[2]

Viewing the evidence in the light most favorable to Shaw, as the non-moving party, the facts are: Shaw practices the religion of Dorcha Cosán, a form of Wicca. Docket 248 at 3. Shaw believes that he must adhere to the ethics mandated in the "Nine Laws of Dorcha Cosán" and that failure to adhere to these laws will break his "geise." *Id.* at 3-4. To break a geise "brings horrible misfortunes of divine retribution, even the possibility of death, usually inflicted by the deitie[s] who the vow was made [with]." *Id.* at 4.

Shaw claims that the Inmate Religious and Cultural Activities policy denies him his ability to attend religious activities for minor rule infractions. Docket 249 ¶ 4. Defendants' Inmate Religious and Cultural Activities policy

---

[1] Judy Jacobs and Mark Bidney were never served and therefore, are not parties to the action. Docket 14 at 4, 6, 10, 12; *see Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999) (An individual becomes a party to a civil action "only upon service of a summons . . . ."). The court dismisses Jacobs and Bidney from the case. *See* Fed. R. Civ. P. 4(m).

[2] Because defendants move for summary judgment, the court recites the facts in the light most favorable to Shaw. Where the facts are disputed, both parties' averments are included.

states that: "[i]f the institution requires inmates to sign up for activities and the inmate missed an activity 2 times in a row, their name may be put on the Removal List for 30 days. After 30 days, the inmate may request to be put back on the activity list." Docket 235 ¶ 5. If an inmate does not sign up for the religious activity or removes his name from the list, it does not count as a miss that places the inmate on the removal list. *Id.* ¶¶ 7-8. If an inmate receives a write-up for a minor rule infraction, he may be restricted to his cell. *Id.* ¶ 6. Cell restriction for a full week or longer still allows the inmate to attend one religious meeting per week. *Id.* If the cell restriction is for less than a full week, the inmate may not leave his cell. *Id.*

Shaw alleges that the policy could "in theory" take away his religious activities "indefinitely." Docket 249 ¶ 6. Shaw claims that "inmates are not allowed to attend religious activities while on cell restriction . . . [and this] allows Shaw's religious practice to be taken away from him, as a punishment, for up to 30 days for a minor rule infraction that has nothing to do with his religion." *Id.*

Defendants allege that in the three-years leading up to the present action, there were only five times that Shaw received multiple cell restrictions in a two-week period. Docket 235 ¶ 10. First, defendants claim Shaw was on cell restriction on April 1, 3, and 6, 2015, but Shaw attended Wicca Group meetings on April 14, 16, and 21, 2015. *Id.* ¶ 11. Shaw asserts that he received write-ups on March 4, 9, 14, 15, and 31, 2015, and April 1, 4, 10, and 18, 2015. Docket 249 ¶ 10.

Second, defendants claim Shaw was on cell restriction on June 10 and 19, 2015, but he attended group meetings on June 11, 16, 18, and 25, 2015. Docket 235 ¶ 12. He was not on the group list on June 23, 2015. *Id.* Shaw does not dispute the June write-up dates, but he provided additional write-up dates not included by defendants: September 3, 5, 14, and 19, 2016, and November 1, 19, and 24, 2016. Docket 249 ¶ 10.

Third, defendants allege that Shaw was placed on cell restriction on January 20 and 25, 2017. Docket 235 ¶ 13. Defendants claim that Shaw attended the Wicca Group on January 24, 26, and 31, 2017. *Id.* Shaw asserts that he received write-ups on January 10, 18, and 23, 2017. Docket 249 ¶ 10.

Fourth, defendants claim that Shaw was placed on two separate cell restrictions on February 22, 2017, and that he was not on the list for the Wicca group for February 23 and 28, 2017. Docket 235 ¶ 14. Shaw claims that he received write-ups on February 19, 20, 21, and 24, 2017. Docket 249 ¶ 10.

Fifth, defendants claim that Shaw was on cell restriction on April 13 and April 17, 2017, and that Shaw attended the Wicca group on April 18 and 24, 2017. Docket 235 ¶ 15.[3] Shaw claims he received write-ups on April 5, 8, 11, 14, 21, and 30, 2017. Docket 249 ¶ 10. Shaw also claims he received write-ups on May 2, 16, and 20, 2017. *Id.*

Shaw argues that the dates defendants use to show that he attended Wicca group only indicate that he was not on cell restriction for "two

---

[3] Shaw's name was crossed off from the Wicca group attendance for the meeting on April 13, 2017, and his name is marked "CR" on the April 24, 2017, meeting. Docket 235 ¶ 15.

consecutive Tuesday or Thursday meetings in a row" and that defendants do not deny that he has been removed for missing "two consecutive meetings due to minor write-ups." *Id.* ¶ 11. Shaw alleges that on September 20, 2018, he was taken off the Wicca group list because he was on cell restriction for one week and he missed one of the meetings. Docket 122 ¶ 71. Shaw claims that after his cell restriction, he was banned from Wicca for 30 days. *Id.* ¶ 72.

Shaw claims that defendants have substantially burdened the exercise of his religion under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the First Amendment because they have allegedly denied him his "outdoor sacred circle and vision mound." Docket 248 at 9-11, 24-27. A memorandum was issued on August 29, 2019, that allowed the Wicca and Asatru groups to have the opportunity to hold outdoor religious activities; before this memorandum, there was not an opportunity for outside religious activities for these groups. Docket 235 ¶¶ 17-19. Shaw agrees that a memorandum was issued but claims that the memorandum does not include opportunities for Dorcha Cosán. Docket 249 ¶¶ 17, 18.[4]

Defendants allege that the Asatura group has had outdoor events in the designated area but claim that Shaw and the Wicca group have not submitted a Project Application to hold a religious event outdoors. Docket 235 ¶¶ 19-20. Shaw claims that he has requested outdoor religious opportunities for Dorcha Cosán and that he was not informed that he needed to fill out a Project

---

[4] The memorandum issued on August 29, 2019, allows for the Wicca and Asatru groups to meet outside for their religious services when there is outside rec. Docket 215-1 at 29.

Application. Docket 249 ¶¶ 19, 20.[5] Shaw claims that on January 24, 2020, he filed a Project Application to practice his religion outside and it was denied. *Id.* ¶ 20 (citing Docket 250-2 at 89).

The only permanent outdoor structure that is used for religious activities at South Dakota Department of Corrections (SDDOC) facilities is the sweat lodge because sweats would be a fire hazard if conducted indoors. Docket 235 ¶¶ 21-22. The sweat lodge is approximately fifteen feet in diameter and stands approximately six feet and six inches at the center. *Id.* ¶ 23; *see also id.* ¶ 24. The Jewish group is allowed to set up a temporary vinyl tent to celebrate Sukkot, a religious holiday. *Id.* ¶¶ 25-26.

Shaw claims that defendants have substantially burdened his religious rights under RLUIPA and the First Amendment by denying him his "Before Christ Diet." *See* Docket 248 at 12. Shaw submitted a Project Application on October 31, 2016, that "all foods must meet the strict criteria of the 'Before Christ diet' " and that a "[a] member who has a geise is no longer able to consume anything w/chemical or artificial additives." Docket 235 ¶ 29. On about February 1, 2017, Shaw submitted a Request for Religious or Alternative

---

[5] Shaw cites to Docket 215-1 "(MRE 13-1 through 13-3);" this document shows that Shaw submitted an Informal Resolution Request on October 1, 2019, stating that Dorcha Cosán had not been permitted to conduct any outside worship time or space. Docket 215-1 at 30. Unit Coordinator responded,

> After review of your Informal Resolution Request and speaking with CAC Mertens-Jones, the group leaders were all sent the memo concerning outside worship. Once night rec ended, if you wanted to worship outside, you would need to move to the afternoon. No one from your group has asked to move their service to the afternoon.

Docket 215-1 at 32.

6

Diet form under SDDOC Policy 1.5.F.2. *Id.* ¶ 30. Under this policy, the request must be submitted to the facility's cultural activities coordinator or designee. *Id.* Mertens-Jones denied his request because CBM did not have the diet he was requesting. *Id.* ¶ 31. Shaw asserts that his religious diet was denied because he could not provide Mertens-Jones with " 'proof' of his religious diet commandments." Docket 249 ¶ 31.[6] When Mertens-Jones denied Shaw's Request for a Religious Diet Shaw was asked to "[e]xplain in detail how the diet relates to your religion, why it is mandated, and list the books or authorities that support your request." Docket 235 ¶ 35. Shaw responded, "I do not have to show books or authorities that support my request." *Id.* ¶ 36. Shaw's Request for Religious Diet form stated, "Law II of [his] religion mandates [he] purify [his] body be [sic] eating 'all natural' farm fresh, organic fruits and vegetables" and he is "unable to consume anything with chemical or artificial additives[.]" *Id.* ¶ 38. Shaw claims that he submitted two Religious Diet Requests and they were denied on August 19, 2016, and February 10, 2017. Docket 249 ¶ 37.

Defendants' policy states that the SDDOC will provide inmates with "reasonable and equitable opportunities to observe their essential religious dietary practices within facility budgetary and security constraints." Docket 235 ¶ 70. A dietary need or religious dietary request will not be granted if it

---

[6] Shaw cites to Docket 121 at 2-3, 10-12. Docket 121 is Shaw's response to defendants' first motion for summary judgment and the document consists of Shaw disputed facts. Shaw also cites to Docket 215 ¶ 36.

limits or detracts "from the need for security, safety, health and good order and the approved operation of a uniform food service program." *Id.* Defendants argue that the all-natural diet requested by Shaw is not within the budgetary and security constraints because organic fruits can be fermented to make alcohol, known as "hooch." Docket 235 ¶¶ 33-34. Shaw claims that this argument is a "feebleminded attempt to deceive the Court" that the SDSP "does not regularly/typically provide inmates with fresh fruit[.]" Docket 249 ¶ 34. Shaw claims that the vegan dessert has fruit and that the Kosher religious diet also includes fresh fruit daily. *Id.* ¶ 34.

Defendants argue that "[i]t is absurd for Shaw to suggest that his religious diet 'is a commandment [he] must adhere to and may not violate at peril of [his] soul' when his institutional file clearly shows that he continues to consume 'questionable foods' containing 'doubtful or questionable ingredients.' " Docket 235 ¶ 88. Shaw claims that he did not purchase food from the commissary in 2016 and 2017. Docket 249 ¶ 37. Defendants assert that Shaw, from the date of requesting his religious diet, has purchased "Ramen-Texas Beef, Glazed Honey Buns, Krunchers Jalepeno Chips, Nacho Doritos, Squatch pepperoni sticks, Baby Ruth candy bars, Cool Ranch Doritos, Snickers candy bars and Mike & Ike candy" from commissary. Docket 235 ¶ 38. Shaw claims he purchased this food for Chris Chipps and that he did not personally consume the food. Docket 249 ¶ 37. Shaw alleges that he allowed another inmate to deposit money into his account so he would no longer be indigent. *Id.*

Shaw's Project Applications have requested "pecan pie, apple crisp pie, meat/cheese platters, black berry pie, blue berry pie, cherry pie, whipped cream, sub-sandwiches, chips and cookies" and " 'Irish Pizza, a thick crust 3 cheese pizza' with Canadian bacon and pepperoni." Docket 235 ¶¶ 38-39. Shaw claims that every meal he has suggested "can be made using all natural ingredients and can be prepared by a Dorcha Cosán member in compliance with the strict dietary laws of Dorcha Cosán." Docket 249 ¶ 39.

All-natural foods are limited to canned tomato puree and shredded carrots by purchase through CBM. Docket 235 ¶ 58. Defendants claim that the shelf life for all-natural foods is very short and the cost to supply such a diet would be "significantly higher than the diets currently provided at the SDDOC." *Id.* ¶ 60. Shaw's October 31, 2016, Project Application stated that he was " 'unable to consume any beverages that are not fresh water from the spring (or boiled of impurities), all natural, organic herbal teas, whole 'organic' [milks] (goat or bovine), freshly squeezed fruit and vegetable beverages' and that he was 'unable to consume any liquids with chemical or artificial additives.' " *Id.* ¶ 86. Shaw has made commissary purchases that include Folgers and Hometown coffee. *Id.*

Defendants claim that after reviewing Shaw's institutional file, he did not file a grievance after his Request for Religious Diet form was denied; thus, Shaw has not exhausted his administrative remedies on this issue. *Id.* ¶¶ 102, 105. Shaw disputes this and claims that he has challenged the process of the Project Applications and that Maturan denied his grievances to prevent him

9

from getting to court. Docket 249 ¶ 101. Shaw claims that on December 25, 2016, he challenged not being able to consume a natural diet and that his grievance was not responded to. *Id.*; Docket 250-2 at 186.

Shaw alleges that over 200 magazines have been rejected by the SDDOC. Docket 249 ¶ 91. Shaw claims that he subscribed to 37 magazines and approximately 211 magazine issues were denied. *Id.* Defendants assert that Shaw has only provided twenty-seven rejection notices from March 15, 2015, to October 6, 2017. Docket 235 ¶ 91. Shaw provided 31 rejection notices that show defendants rejected 32 magazine issues. Docket 122-3 at 15-30; Docket 122-4 at 1-11, 75; Docket 250-2 at 184-85, 848. Shaw argues that defendants have refused to provide him all of the copies of the rejection notices. Docket 249 ¶ 91. Shaw also cites to an "Inter-Facility Publications Rejection Log" (Rejection Log) from 2013-2019 that lists over 900 books and magazines that have been rejected at the SDSP. *See* Docket 179 at 67- 86.

Defendants allege that the majority of the rejection notices were signed by individuals who were not named as defendants in this lawsuit (Reimann, Miller, Johnson, Moisan, and Jelsma). Docket 235 ¶ 92. The record shows that the rejection notices were signed by Molson, Johnson, Miller, Reimann, Miller-Hunhoff, Storevik, and Jelsma. Docket 122-3 at 15-30; Docket 122-4 at 1-11, 75; Docket 250-2 at 184-85, 848. Shaw claims that the record shows Drieske, Baker, and Miller-Hunhoff review and reject mail and that Dreiske and Baker answer the second stage of the grievance process. Docket 249 ¶ 91. Shaw provided documentation of the grievance process regarding some of the rejected

10

magazines. *See, e.g.*, Docket 122-4; Docket 250-2. Shaw alleges that he "personally questioned Miller, Johnson, Moisan and Jelsma who have all informed [him] that questionable mail is actually rejected per Drieske, Baker and/or Miller-Hunhoff." Docket 249 ¶ 93.

Defendants claim that Miller-Hunhoff only personally signed two of the rejection notices for magazines containing "hand gang signs." Docket 235 ¶ 93. SDDOC Policy 1.5.D.3 states, " 'Materials that depict gang activity, gang insignia or may be construed as pertaining to, initiating or furthering gang/security threat group activity, within the facility or outside the facility' are included among the list of prohibited items" for Inmate Correspondence. *Id.* ¶ 95. Shaw claims that this policy is "unconstitutional and that his magazines are rejected for exaggerated reasons." Docket 249 ¶ 94. Miller-Hunhoff rejected the November 2015 issue of Freshly Inked because there were "hand signs" that she believed depicted gang activity. Docket 235 ¶ 96. Miller-Hunhoff rejected the May 2016 issue of Urban Ink because she believed there were "gang hand signs" depicted. *Id.* ¶ 95. Miller-Hunhoff rejected the Winter 2015 issue of Rebel Ink due to images that she believed advocated violence (pages 84-85) and on page 87 an image that depicted a "woman wearing opaque under garments." *Id.* ¶¶ 97-98. Shaw states that these reasons asserted by Miller-Hunhoff were exaggerated. Docket 249 ¶¶ 94-99.

SDDOC Policy 1.3.C.8 prohibits pornography and nudity that is defined as "exposed female breasts and buttocks." Docket 235 ¶ 99. Defendants claim that Storevik rejected Fangoria #338 because on page 63 there was an "image

11

of a female whose breasts are clearly exposed." *Id.* ¶¶ 111-12. Shaw alleges that this was an exaggerated reason and that the picture was the size of a thumb print. Docket 249 ¶¶ 110-12. Storevik rejected the September 2016 issue of Urban Ink because numerous photos contained images of female breasts "uncovered and only the nipple covered by material" and "a female's buttocks." Docket 235 ¶¶ 113-15. Shaw alleges that the pictures did not depict nudity and that Storevik admits that the nipples were covered by material. Docket 249 ¶¶ 113-15. Shaw claims that the policy is a suppression of his First Amendment rights. *Id.* ¶ 116.

Shaw claims that Bieber has retaliated against him by denying Shaw access to the law library and throwing away Shaw's Project Applications because Shaw has tried to exercise his right to access the courts and the prison grievance system. Docket 1 ¶¶ 203, 206. Shaw claims that he has made "numerous allegations against Bieber" regarding retaliation. Docket 249 ¶ 122. Defendants assert that Bieber has not denied Shaw the ability to create and mail his legal documents. Docket 235 ¶ 121. Shaw disputes the alleged fact that Bieber had not denied him access to the courts. Docket 249 ¶ 121. Defendants also claim that Bieber has not denied Shaw access to the library and that "[t]here were times when [Shaw] was only allowed a certain amount of time in the library because there were several inmates that need[ed] access as well. Shaw did not receive any less time than any other inmate." Docket 235 ¶ 122. Shaw also claims that in April of 2016, Bieber threw away Shaw's 31 Project Applications in retaliation of Shaw filing grievances and a lawsuit

against Bieber. Docket 1 ¶ 206; Docket 215 ¶ 176(q). Bieber claims that he does not recall Shaw submitting 31 Project Applications, but if Shaw did, Bieber would not have thrown them away. Docket 234 at 64-65; Docket 101 ¶ 14.

Shaw claims that Effling and Bieber have violated his First Amendment right of access to the courts. Docket 1 ¶¶ 180, 185-86. Shaw alleges that Effling and Bieber prevented him from mailing out legal documents and withheld resources from him. Docket 249 ¶ 43. Shaw claims that because of Effling and Bieber's actions he was "unable to argue key elements of his case because he was denied the ability to send a copy of [his] Response to Defendant[']s Answer to Defendant[']s Attorney Schlimgen and the Judge would not allow Plaintiff [to] argue his due process claims." *Id.* An inmate can request indigent commissary and if he meets the criteria, among other things, the indigent inmate is provided with up to $10.00 per month for postage costs to send his legal work. Docket 235 ¶¶ 44, 45. Shaw argues that Bieber and Effling do not follow these policies regarding indigent inmates. Docket 249 ¶ 44. Defendants allege that for August of 2016, Shaw only used $8.16 of his legal mail postage budget as an indigent inmate to mail legal documents to "small claims." Docket 235 ¶ 46. Defendants also claim that for September of 2016, Shaw used only $2.46 and his mail was sent to the United States District Court. *Id.* ¶ 47. Shaw alleges that Effling knew that he needed to send out legal mail and specifically prevented him from doing so. *See* Docket 249 ¶¶ 52-55.

## LEGAL STANDARD

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no dispute of material fact or by showing that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). To avoid summary judgment, "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (internal quotation omitted). The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247-48 (emphasis omitted).

Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold

14

inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved . . . in favor of either party." *Id.* at 250. Prisoners who proceed pro se are entitled to the benefit of liberal construction at the pleading stage. *Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987). Nonetheless, the summary judgment standard set forth in Rule 56 of the Federal Rules of Civil Procedure remains applicable to prisoners proceeding pro se. *Id.* The district court is not required to "plumb the record in order to find a genuine issue of material fact." *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996).

Courts must remain sensitive, however, "to the special problems faced by prisoners attempting to proceed pro se in vindicating their constitutional rights, and [the Eighth Circuit does] not approve summary dismissal of such pro se claims without regard for these special problems." *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980). "[W]hen dealing with summary judgment procedures technical rigor is inappropriate where . . . uninformed prisoners are involved." *Ross v. Franzen*, 777 F.2d 1216, 1219 (7th Cir. 1985).

## DISCUSSION

Defendants argue that they are entitled to qualified immunity because their actions have not amounted to constitutional violations. Docket 234 at 2-6. To determine whether a government official is entitled to qualified immunity the court asks: (1) whether the facts alleged, viewed in the light most favorable to plaintiff, demonstrate the official's conduct violated a constitutional right, and (2) whether the constitutional right was clearly established at the time of

15

the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may address the elements in any order and if either of the elements is not met, then the official is entitled to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The court will view the facts alleged in the light most favorable to Shaw and discuss whether he has demonstrated that a genuine issue of material fact exists that needs to be resolved at trial.

## I.   Religious Land Use and Institutionalized Persons Act

This court denied defendants' first motion for summary judgment on Shaw's RLUIPA claims against Kaemingk, Dooley, and Young in their official capacity regarding the SDDOC's attendance policy, Shaw's request for a religious diet, and the outdoor worship space. Docket 139 at 76.

RLUIPA provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). To establish a prima facie claim against a state official under RLUIPA, an inmate "must show, as a threshold matter, that there is a substantial burden on his ability to exercise his religion." *Van Wyhe v. Reisch*, 581 F.3d 639, 655 (8th Cir. 2009) (quoting *Singson v. Norris*, 553 F.3d 660, 662 (8th Cir. 2009)). "Absent this showing, the state retains it's sovereign immunity." *Id.*

16

The Eighth Circuit Court of Appeals has stated various ways for an inmate to make RLUIPA's threshold showing:

> [T]o demonstrate a substantial burden on the exercise of religion, a government policy or action "must significantly inhibit or constrain [religious] conduct or [religious] expression . . . ; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion."

*Van Wyhe*, 581 F.3d at 656 (alterations in original) (quoting *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 & n.7 (8th Cir. 2008)).

An inmate must present some evidence to show that there is a substantial burden on his ability to exercise his religion. *Patel*, 515 F.3d at 814 (reasoning that the inmate could not meet his threshold showing because he offered only a "single, vague and unsupported statement" and "the record offer[ed] no evidence" regarding the inmate's claims). But whether an inmate "can establish the truth or sincerity of [his] belief is a matter to be decided at trial . . . ." *Van Wyhe*, 581 F.3d at 656.

## A.     Attendance Policy

Shaw claims that Kaemingk, Dooley, Young, Drieske, Stanwick-Klemik, and Merten-Jones created the Inmate Religious and Cultural Activities policy, which denies Shaw the ability to attend religious activities up to 30 days for minor rule infractions and that "he is denied religious activities while on cell restriction." Docket 1 ¶ 62(b); Docket 248 at 12; Docket 249 ¶¶ 4, 6. Shaw alleges that the policy could "in theory" take away his religious activities "indefinitely." Docket 249 ¶ 6. Shaw claims that he should be allowed to attend religious activities while on cell restriction. Docket 248 at 12. Defendants

contend that the record establishes that Shaw's claims are inaccurate because the records show that there was no time in the three years leading up to the filing of this case where Shaw's name was removed from the Wicca group meeting list for 30 days due to missing two meetings in a row. Docket 234 at 13-14.

The Inmate Religious and Cultural Activities policy states that if inmates are required to sign up for activities and the inmate missed an activity 2 times in a row, their name is removed from the activity list for 30 days. Docket 235 ¶ 5. If an inmate does not sign up for the religious activity or removes his name from the list, it does not count as a miss that places the inmate on the removal list. *Id.* ¶¶ 7-8. If an inmate receives a write-up for a minor rule infraction he may be restricted to his cell. *Id.* ¶ 6. Cell restriction for a full week or longer still allows the inmate to attend one religious meeting per week. *Id.* If the cell restriction is for less than a full week, the inmate may not leave his cell. *Id.*

Shaw contends that once he received minor infractions and was put on cell restriction for two consecutive weeks. Docket 121 at 4. Because he was on cell restriction, he missed all four Wicca group meetings and was put on the 30-day removal list. *Id.*

Defendants presented evidence that in the three-years leading up to the present action, there were only five times that Shaw received multiple cell restrictions in a two-week period. Docket 235 ¶ 10. First, Shaw was on cell restriction on April 1, 3, and 6, 2015, but Shaw attended Wicca group meetings on April 14, 16, and 21, 2015. *Id.* ¶ 11. Second, Shaw was on cell restriction on

18

June 11 and 19, 2015, but he attended group meetings on June 11, 16, 18, and 25, 2015. *Id.* ¶ 12. He was not on the group list on June 23, 2015. *Id.* Third, defendants allege that Shaw was placed on cell restriction on January 20 and 25, 2017, yet Shaw attended the Wicca group on January 24, 26, and 31, 2017. *Id.* ¶ 13. Fourth, defendants claim that Shaw was placed on two separate cell restrictions on February 22, 2017, and that he was not on the list for the Wicca group for February 23 and 28, 2017; but he attended March 2, 7, and 14, 2017. *Id.* ¶ 14. Lastly, defendants claim that Shaw was on cell restriction from April 13 and 17, 2017, and that Shaw attended Wicca group on April 18 and 24, 2017. *Id.* ¶ 15. Shaw challenges the completeness of defendants' alleged infraction dates. Docket 249 ¶ 10. Shaw alleges that he received write-ups on the following dates: March 2, 4, 9, 14, 15, 31, 2015; April 1, 4, 10, 18, 2015; September 3, 5, 14, 19, 2016; November 1, 19, 24, 2016; January 10, 18, 23, 2017; February 19, 20, 21, 24, 2017; April 5, 8, 11, 14, 21, 30, 2017; May 2, 16, 20, 2017. *Id.*; *see also* Docket 250-2 at 331-44.

While Shaw disputes the dates he received infractions, Shaw has not presented any evidence that contradicts defendants' evidence to raise a genuine issue of material fact that he was substantially burdened by the attendance policy. Shaw lists several dates he received infractions and was put on cell restriction, but he does not allege or present any evidence that he was not able to attend meetings or was put on the removal list. *See id.*; *see also* Docket 121 at 4. Shaw did provide evidence that shows he missed the Wicca group on September 8, 2016, because he was on cell restriction, but he does not allege

19

or present any evidence that he was put on the removal list based on this incident. Docket 122 ¶ 15; Docket 122-3 at 2, 4. Shaw also claims that he was taken off the Wicca group list for 30 days on September 20, 2018, because he was on cell restriction for one week and he missed one of the meetings. Docket 122 ¶¶ 71-72. But Shaw did not present any evidence to support this claim. Defendants and Shaw only provided the disciplinary history up to December of 2017. *See* Docket 226-17; Docket 250-2 at 331-48.

Overall, Shaw has not shown that the attendance policy and cell restriction significantly inhibited/constrained his religious conduct, meaningfully curtailed his ability to express adherence to his faith, or denied him reasonable opportunities to engage in activities fundamental to his religion. The undisputed evidence shows that even when Shaw had multiple cell infractions, he was still able to attend some Wicca meetings and thus must not have been placed on the removal list. Docket 235 ¶¶ 11-15. Shaw has not demonstrated a genuine issue of material fact that the attendance policy substantially burdened his First Amendment rights (attending his religious group). This court finds that defendants are entitled to summary judgment on this issue.

### B.     Outdoor Worship Space

Shaw claims that defendants Drieske and Stanwick-Klemik have denied him the ability to build an outside nematon and vision mound and to worship

20

outside. Docket 1 ¶ 87. Shaw claims that Dorcha Cosán requires a nematon, a 56-foot circular outdoor space, and vision mound. Docket 2 ¶¶ 342, 356.[7] Shaw claims that he has shown that he is mandated to worship outside, he has requested to worship outside, and there are areas available for worship outside. Docket 248 at 11. Shaw also contends that the record shows that Native Americans are allowed a similar sized area and that other religious organizations can worship outside. *Id.* at 10-11.

The court denied defendants' first motion for summary judgment on this issue, reasoning that if space was available for other religious groups to hold outdoor religious events, then there should be space for Shaw to hold outside worship or use a temporary structure. Docket 139 at 42. The court stated that defendants did not identify alternative means for Shaw to construct a nematon and vision mound or worship outdoors. *Id.*

"The prison must permit a reasonable opportunity for an inmate to engage in religious activities but need not provide unlimited opportunities." *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009). "Where a government practice burdens one means of practicing a religion, but leaves open alternative

---

[7] Shaw lists several items that are necessary for the construction of a nematon: seven foot staff of oak; skull of a stag with horns; four feet by six inches brick foundation at the four directional points; four feet by six inches wall of brick around the sides and back of firepit; a rack and spit for cooking; cast-iron cookware; 55 gallon cast iron cauldron and lid; ladle and other cooking utensils; water feature (five gallon buck with brick around it in the shape of a well); altar (three slabs of white marble—two pieces that are three feet by five feet and one piece that is four feet by four feet in a circular shape); three-tier garden with walls and base made out of brick; outlined stone path around garden; vision mound (like Native American sweat lodge). Docket 2 ¶¶ 342-53.

means, an inmate must show that the alternative means are inadequate to establish that the government practice imposes a substantial burden." *Rust v. Neb. Dep't. of Corr. Servs. Religion Study Comm.*, 2009 WL 3836544, at *8 (D. Neb. Nov. 12, 2009).

Since this court's first order denying summary judgment, defendants have identified alternative means for Shaw to possibly construct a temporary nematon and have permitted him to worship outdoors. Docket 235 ¶ 18; Docket 234 at 11. Defendants contend that the offered outdoor area is a reasonable accommodation to allow Shaw to practice his religion. Docket 234 at 12.

To support this position, defendants first argue that there is no other structure like Shaw's nematon at any SDDOC facility. *Id.* at 10. Defendants state that the only permanent outdoor religious structure is a sweat lodge used by Native American inmates. *Id.*; Docket 235 ¶ 21. Defendants note that the sweat lodge does not require the same amount of space or materials as Shaw's nematon. Docket 234 at 10. Shaw's nematon would be 56 feet in diameter and would require all the materials stated above. Docket 2 at 89; *id.* ¶¶ 342-53. Conversely, the sweat lodge uses thirty red willow branches and is fifteen feet in diameter and six feet and six inches tall at the center. Docket 235 ¶ 23.

Defendants acknowledge that there is a temporary structure used by Jewish inmates at SDDOC facilities. Docket 234 at 11; Docket 235 ¶ 25. The Jewish group can use the temporary facility for a maximum of two hours a day during the eight days of Sukkot. Docket 235 ¶ 26. Defendants state that they

would allow Shaw and Dorcha Cosán to erect a temporary structure similar to the Jewish group's temporary structure. Docket 234 at 11.

The undisputed facts show defendants have burdened one means of Shaw's religious practice by not allowing a permanent structure, but defendants do allow an alternative means with a temporary structure. To establish that defendants have imposed a substantial burden on Shaw's religion, Shaw must show that the alternative means are inadequate. *See Rust*, 2009 WL 3836544, at *8. Shaw has not done so. Shaw did not present any evidence or make any allegation that a temporary structure would restrict his ability to adequately practice his religion. The court finds that a temporary structure is a reasonable alternative to Shaw's permanent structure.

Second, defendants argue that the DOC made arrangements based on this court's previous ruling (Docket 139 at 42) to allow the Wicca group to hold outdoor worship. Docket 234 at 11. The DOC sent out a memorandum on August 29, 2019, that stated Wicca and Asatru groups were allowed to hold outdoor religious activities when there is outside rec. Docket 235 ¶ 18; Docket 230-6. Defendants state that Shaw and the Wicca group have not submitted a Project Application to utilize the outdoor worship area. Docket 234 at 11; Docket 230 ¶¶ 19-20. Shaw contends that the memorandum did not include any opportunities for Dorcha Cosán or Shaw. Docket 249 ¶ 18. Shaw is correct that the memorandum does not specifically mention Shaw or Dorcha Cosán, but the memorandum clearly states that the Wicca group can worship outside.

23

Docket 230-6. Thus, the undisputed facts show that defendants have created a reasonable opportunity for outside worship for Shaw.

Shaw also alleges that he has requested outdoor space, but still has not been allowed to use it. Docket 249 ¶ 20. Shaw states that at no time was he told he had to fill out a Project Application. *Id.* On October 1, 2019, Shaw filled out an IR, stating that Dorcha Cosán and the Wicca group have not been permitted to worship outside. Docket 215-1 at 30. The IR response stated that the Wicca group had to move its worship service to the afternoon because night rec was over, yet no one from the Wicca group had asked to move the service. Docket 215-1 at 32. Shaw submitted a Project Application in January of 2020. Docket 250-2 at 89. Shaw requested outside space to build Dorcha Cosán's sacred circle and vision mound. *Id.* Shaw's Project Application was denied because outside worship was already designated for Dorcha Cosán and a permanent structure was not allowed. *Id.*

Overall, Shaw has failed to offer any evidence that defendants' outside worship and option for a temporary structure "significantly inhibits or constrains [his] conduct or expression; meaningfully curtails [his] ability to express adherence to [his] faith; or denies [him] reasonable opportunities to engage in those activities that are fundamental to [his] religion." *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 834 (8th Cir. 2009). As a result, Shaw has not demonstrated a genuine issue of material fact that defendants substantially burdened his ability to practice Dorcha Cosán. The court finds that defendants are entitled to summary judgment on this issue.

24

### C.    Religious Diet

Shaw contends that defendants Drieske, Stanwick-Klemik, Mertens-Jones, CBM, unknown CBM employees, and Tweirweiller have "denied Shaw the ability to adhere to the commandment of Law II of DC that mandates Plaintiff adhere to his religious diet." Docket 1 ¶ 69. Shaw alleges that he must eat all natural, farm fresh, organic fruit and vegetables and grass fed, no growth hormone meats. Docket 2 ¶ 164. Shaw cannot eat any food with chemicals or artificial additives. *Id.* ¶ 165. Additionally, Shaw states that he can only consume beverages that have all-natural organic ingredients. *Id.* ¶¶ 168-69.

Defendants allege that Shaw did not exhaust his administrative remedies in connection with the denial of his Request for a Religious Diet form. Docket 234 at 16. Shaw disputes that he did not exhaust his administrative remedies. Docket 248 at 14.

The Prison Litigation Reform Act (PLRA) provides that an inmate must exhaust all available administrative remedies before bringing an action with respect to prison conditions under either § 1983 or any other federal law. 42 U.S.C. § 1997e(a); *Booth v. Churner*, 532 U.S. 731, 741 (2001). This mandatory exhaustion requirement applies broadly to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that

25

unexhausted claims cannot be brought in [federal] court."). The PLRA requires "immediate dismissal" of all unexhausted claims. *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005).

Before filing this action, Shaw was required to fully and properly exhaust his administrative remedies as to each claim in the complaint. *See Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003). In order to properly exhaust administrative remedies, Shaw must comply with the prison's procedures. *Woodford v. Ngo*, 548 U.S. 81, 102 (2006) ("[P]roper exhaustion" under the PLRA requires prisoners to comply with the prison's deadlines and procedures.). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

SDDOC has a two-step administrative remedy process for inmates: (1) informal resolution (Informal Resolution Request) and (2) formal resolution (a Request for Administrative Remedy). The Administrative Remedy for Inmates Policy provides that "[r]equests for informal resolution may be initiated by speaking with a staff member about the grievance and accepting the resolution offered by the staff member, or in writing, via a kite or completed Request for Informal Resolution form" (IR). SDDOC Policy 1.3.E.2(IV)(4)(B). Staff that respond to an inmate's informal resolution will "[p]repare a response . . . . The response/resolution may be verbal or written. If verbal, the outcome and response provided must be documented[.]" SDDOC Policy 1.3.E.2(IV)(4)(C)(5)(d).

26

Next, an inmate has ten days after receiving the response to the Informal

Resolution to submit a completed Request for Administrative Remedy (AR).

SDDOC Policy 1.3.E.2(5)(A).

Under the SDDOC's Inmate Religious and Alternative Diets policy, "An

inmate requesting a religious or alternative diet must complete a Request for

Religious or Alternative Diet form and submit the form to the facility's cultural

activities coordinator or designee[.]" SDDOC Policy 1.5.F.2(IV)(1)(B). On October

31, 2016, Shaw submitted two Project Applications, requesting a religious diet

of all-natural foods and beverages. Docket 122-1 at 7, 9. Both Project

Applications were denied. *Id.* Shaw filed an IR on December 25, 2016,

challenging defendants' denial of Shaw's Project Applications for an all-natural

diet. Docket 249 ¶ 100; Docket 250-2 at 186. Shaw claims that he did not

receive a response to his grievance. Docket 249 ¶ 100. Although Shaw appealed

the denial of his Project Applications, Shaw's request for a religious diet using

Project Applications did not follow the proper procedure to request a religious

diet as outlined in SDDOC Policy 1.5.F.2, which requires an inmate to submit a

Request for Religious Diet form.

On February 1, 2017, Shaw submitted a Request for Religious or

Alternative Diet form. Docket 122-1 at 2. This request was denied on February

10, 2017. Docket 235 ¶ 69. Defendants allege that in Shaw's institutional file

there is no record that Shaw filed a grievance within the time period allowed

following the denial of his Request for Religious Diet form. *Id.* ¶¶ 102, 105.

Shaw has not alleged that he appealed this denial or presented any other

27

evidence to show that he exhausted his administrative remedies regarding his February of 2017 Request for a Religious Diet.

Instead, Shaw points to an IR he submitted on July 25, 2016. Docket 248 at 14. But the IR Shaw relies on does not pertain to the denial of his Request for a Religious Diet; the IR challenges the Project Applications process in general and SDDOC's failure to recognize the Dorcha Cosán doctrine. Docket 122-3 at 7-11; *see also id.* at 12-14. And as discussed above, an IR is not the proper form to complete when requesting a religious diet under SDDOC Policy 1.5.F.2. Additionally, this sequence of grievances filed by Shaw occurred before Shaw even submitted his initial Request for a Religious Diet in February of 2017. *See* Docket 122-1 at 2; Docket 122-3 at 7-11.

Overall, Shaw only properly submitted one request for religious diet which was dated February 1, 2017, and he never appealed the denial of this Request for Religious Diet form. Because Shaw did not exhaust his administrative remedies on this issue, defendants are entitled to summary judgment.

## II.    First Amendment Free Exercise Claims

This court denied defendants' first motion for summary judgment regarding Shaw's First Amendment claims against Kaemingk, Dooley, Young, Drieske, Stanwick-Klimek, and Mertens-Jones regarding the SDDOC's attendance policy, outdoor worship space, and religious diet. Docket 139 at 39-40, 42, 43, 50, 76. The court previously found that "the religious group

28

attendance policy, denial of outdoor worship space, and denial of religious diet . . . substantially burden Shaw's religious exercise." *Id.* at 50.

The First Amendment to the United States Constitution states in relevant part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. Inmates clearly retain their First Amendment rights, including the right to the free exercise of religion. *Cruz v. Beto*, 405 U.S. 319, 322 (1972). But limitations may be placed on the exercise of prisoners' constitutional rights in light of the needs of the penal system to deter crime, rehabilitate prisoners, and maintain institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citation omitted); *Murphy v. Mo. Dept. of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004). Constitutional claims that would receive strict scrutiny in any other setting are evaluated under a lesser standard of scrutiny in a prison setting. *Turner v. Safley*, 482 U.S. 78, 81 (1987). A prison regulation may restrict a prisoner's constitutional rights if it is "reasonably related to legitimate penological interests." *Id.* at 89.

The threshold question for any prisoner First Amendment free-exercise claim is whether prison officials have substantially burdened the plaintiff's sincerely held religious beliefs. *Gladson*, 551 F.3d at 833. "When the significance of a religious belief is not at issue, the same definition of 'substantial burden' applies under the Free Exercise Clause . . . and RLUIPA." *Patel*, 515 F.3d at 813.

The court analyzed the threshold question of whether defendants have substantially burdened Shaw's religious beliefs above in its RLUIPA analysis. For Shaw's attendance policy claim, the court found that the undisputed facts showed that the attendance policy did not substantially burden Shaw from attending his religious group. For Shaw's outdoor worship claim, the court found that SDDOC's outdoor worship policy did not substantially burden Shaw's religious practice. Because the court already found that Shaw has not presented any evidence that defendants substantially burdened his practice of Dorcha Cosán, defendants are entitled to summary judgment on the attendance policy and outdoor worship claims as they relate to the First Amendment. As for the religious diet claim, the court found above that Shaw did not exhaust his administrative remedies. The same rationale applies here, and therefore, the court grants summary judgment in favor of defendants on Shaw's religious diet claim under the First Amendment.

## III.    **First Amendment Right to Receive Mail**

The court denied defendants' first motion for summary judgment on Shaw's First Amendment right to receive mail claim against Drieske, Baker, Miller-Hunhoff, Reimann, and Storevik. Docket 139 at 76. Shaw has contested the content of the mail, which he characterizes as art. Docket 1 ¶ 132. Shaw alleges that his magazines are necessary for his religion, which requires him to develop his artistic and magical mind. *Id.*; Docket 248 at 38. Shaw claims that the SDDOC mail policy is overexaggerated by the mailroom staff. Docket 1 ¶ 131.  Given the nature of Shaw's assertions, it seems he has made an as-

30

applied First Amendment challenge to a prison regulation. *See* Docket 139 at 54.

Shaw claims that defendants Drieske, Baker, Miller-Hunhoff, Reimann, and Storevik rejected and refused to deliver over 200 magazines that were mailed to Shaw. Docket 1 ¶ 131. Shaw listed 37 magazine titles and the number of issues per title that he is missing—for a total of 210 magazines. Docket 249 ¶ 91. Shaw listed the following titles and number of issues that he believes he is entitled to and defendants confiscated: American Curves (15), Art & Design (1), Art News (3), Artists (6), Drawing (3), Fangoria (14), Flex (1), Freshly Inked (6), Ink Fashion (3), Ink Slingers (2), Inked (25), Inked from the Pen (1), Inked Girls (13), Low Rider Arte (11), Maxim (17), Men's Fitness (2), Men's Health (7), Men's Journal (2), Muscle & Fitness (2), New Tattoos (1), Rebel Ink (15), Revolver (5), Skin & Ink (8), Skin Art (2), Skin Ink (2), Smooth (5), Southwest Art (7), Tabu Tattoo (1), Tattoo (15), Tattoo Collection (2), Tattoo Energy (2), Tattoo International (2), Tattoo Life (1), Tattoo Review (2), Tattoo Savage (2), Urban Ink (2),[8] and Wired (2). *Id.*

In support of his claim, Shaw provided 31 mailroom correspondence rejection notices from March 24, 2013, to October 6, 2017. Docket 122-3 at 15-30; Docket 122-4 at 1-11, 75; Docket 250-2 at 184-85, 848. The magazines contained in these rejection notices included the following titles and number of

---

[8] For Urban Ink, Shaw claims that he is missing two issues, yet he presented rejection notices for three issues. Docket 249 ¶ 91; Docket 122-3 at 20, 24, 27. In viewing the facts in a light most favorable to Shaw, the court will consider the extra Urban Ink, putting Shaw's total magazine claims at 211.

issues: Inked (11), Urban Inked (3), Freshly Inked (5), Tattoo (3) Tattoo International (1), Skin & Ink (3), Rebel Ink (1), Maxim (2), and Fangoria (3). Docket 122-3 at 15-30; Docket 122-4 at 1-11, 75; Docket 250-2 at 184-85, 848. The rejection notices were signed by Molson (1), Johnson (1), Miller (1), Reimann (20), Storevik (2), Miller-Hunhoff (5), and Jelsma (1).[9] Docket 122-3 at 15-30; Docket 122-4 at 1-11, 75; Docket 250-2 at 184-85, 848.

Shaw also submitted the Rejection Log, listing over 900 rejected magazines from January of 2013 to August of 2019. Docket 179 at 67-86. Shaw also provided numerous IRs, ARs, and Remedy Responses that discussed Shaw's missing magazines. Docket 122-4 at 12-74, 76.

Shaw alleges that he attempted to obtain all of the rejected magazines and any grievances related to the rejected magazines from defendants. Docket 248 at 34. Shaw contends that he only submitted 31 rejection notices to the court because defendants did not provide him with the rest of the rejection notices. *Id.* at 35-36. Defendants claim that they provided all the rejection notices to Shaw that were contained in his file. Docket 255 at 5; Docket 258 ¶ 2. Defendants argue that there is no evidence to support Shaw's allegation that he subscribed to the 37 titles he listed. Docket 255 at 5.

### A.   Magazines Returned to Shaw

---

[9] The numbers next to the name indicates the number of rejection notices signed by the individual.

Shaw submitted a rejection notice signed by Reimann for Tattoo January 2016. Docket 122-3 at 28. Reimann rejected this magazine because it contained a calendar. *Id.* Defendants claim that once calendars are removed from magazines, the magazines are returned to the inmate. Docket 228 ¶ 5; Docket 235 ¶ 110; *see also* Docket 122-3 at 28; Docket 234-1; Docket 234-2. Shaw disputes this statement but did not provide any evidence to support his position or allege that he did not receive the magazine after the calendar was removed. *See* Docket 249 ¶ 110. Because the undisputed facts show that Shaw received this magazine, defendants are entitled to summary judgment on this claim as it pertains to Tattoo January 2016 (Docket 122-3 at 28).

Additionally, Shaw submitted a rejection noticed signed by Reimann for Inked Vol. 5 Issue 2. Docket 122-4 at 7. The record shows that Shaw appealed the rejection notice. *Id.* at 27-28, 30. Baker was assigned to the AR, and he granted Shaw's AR and overturned the rejection notice. *Id.* at 7, 30; Docket 250-2 at 832. Defendants allege that the magazine was then provided to Shaw. Docket 234 at 46 n.7. Shaw does not dispute this fact. Therefore, defendants are entitled to summary judgment on this claim as it pertains to Inked Vol. 5 Issue 2 (Docket 122-4 at 7).

## B.   Reimann

Reimann signed 18 of the remaining rejection notices regarding Shaw's magazines. Docket 122-3 at 18-19, 21-23, 25-26; Docket 122-4 at 1, 3-6, 8-9; Docket 250-2 at 184-85, 848. Defendants argue that Reimann is not a proper defendant and any claims against her in her individual capacity should be

33

dismissed because the court does not have jurisdiction over Reimann. Docket 234 at 44-45. Defendants contend that Reimann was never properly served. *Id.* at 44 (citing Docket 87 at 1 n.1).

An individual becomes a party to a civil action "only upon service of a summons . . . ." *Murphy Bros.*, 526 U.S. at 350. "In the absence of service of process (or waiver of service by the defendant), a court ordinarily may not exercise power over a party the complaint names as defendant." *Id.*; *see also Bell v. Pulmosan Safety Equip. Corp.*, 906 F.3d 711, 714-15 (8th Cir. 2018) ("If a defendant is improperly served, a federal court lacks jurisdiction over the defendant." (quoting *Printed Media Servs., Inc. v. Solna Web, Inc.*, 11 F.3d 838, 843 (8th Cir. 1993)).

Here, Reimann's summons was returned as unserved on December 8, 2017. Docket 14 at 1. The server was advised that Reimann was deceased. *Id.* at 1, 3. Shaw is aware Reimann is deceased. Docket 248 at 36. Shaw did not move to substitute Reimann's estate. Because Reimann has not properly been served, the court does not have jurisdiction over her. Therefore, the court dismisses any claims against Reimann in her individual capacity without prejudice. *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.").

### C.   Individual Involvement

34

Defendants argue that Drieske, Baker, Miller-Hunhoff, and Storevik cannot be held liable for the rejection notices signed by parties not named as defendants because they were not involved in issuing the rejection notices, and therefore, there is no liability under § 1983 because there is no personal involvement. Docket 234 at 46. Shaw argues that Drieske, Baker, and Miller-Hunhoff are still the proper defendants regarding these rejection notices because although four individuals who are not defendants signed the rejection notices, questionable mail is actually rejected by Drieske, Baker, or Miller-Hunhoff. Docket 248 at 36; Docket 249 ¶ 93. Shaw alleges that Miller-Hunhoff answered the initial grievances filed by inmates regarding mail rejection. Docket 249 ¶ 91. Shaw contends that Drieske and Baker have denied grievances regarding the rejected magazines. *Id.*; Docket 248 at 33 (citing Docket 215 ¶ 132; Docket 1 ¶¶ 136-37).

Only state actors whose personal conduct caused the deprivation of a federal right are liable under § 1983. *Pulaski Cnty. Republican Comm. v. Pulaski Cnty. Bd. of Election Comm'rs.*, 956 F.2d 172, 174 (8th Cir. 1992) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Section "1983 liability requires personal involvement in or direct responsibility for actions resulting in [the] violation." *Carter v. Hassell*, 316 F. App'x 525, 525 (8th Cir. 2008) (citing *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985)); *see also Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993) (dismissing a § 1983 case where a prisoner claimed that prison officials inappropriately took away his rosary because "none of the prison officials sued by him [were] responsible for this confiscation"); *Marchant*

35

*v. City of Little Rock*, 741 F.2d 201, 204 (8th Cir. 1984) (citing *Colton v. Hutto*,

577 F.2d 453 (8th Cir. 1978) (dismissing a claim because the individual "had

no knowledge of or connection to" the alleged violation). "The supervisor must

know about the conduct and facilitate it, approve it, condone it, or turn a blind

eye for fear of what [he] might see." *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir.

1994) (alteration in original) (internal quotation omitted).

### 1. Rejection Notices Signed by Molson, Johnson, Miller, and Jelsma

Four rejection notices were signed by Molson, Johnson, Miller, and

Jelsma. Docket 122-3 at 15-17; Docket 122-4 at 11. The magazines denied in

the rejection notices were Inked September 2017 and three additional issues of

Inked (no specific issue listed). Docket 122-3 at 15-17; Docket 122-4 at 11.

Shaw did not name Molson, Johnson, Miller, and Jelsma as defendants.

The undisputed evidence shows that these four rejection notices were not

signed by Drieske, Baker, or Miller-Hunhoff. *See* Docket 122-3 at 15-17;

Docket 122-4 at 11. But Shaw claims that Drieske, Baker, and Miller-Hunhoff

were involved in the administrative appeal process regarding the rejected

magazines. Docket 248 at 33; Docket 249 ¶ 91. Shaw states that he questioned

Molson, Johnson, Miller, and Jelsma about the process of reviewing magazines.

*See* Docket 249 ¶ 93. Shaw, however, did not submit any testimony regarding

their answers or statements.

Shaw also did not present any documents of the administrative appeals

process showing Drieske, Baker, or Miller-Hunhoff's involvement. Shaw alleges

that he attempted to obtain all grievances related to the rejected magazines

from defendants and that defendants did not provide them. Docket 248 at 34. Because Shaw alleges that defendants have not provided him with the evidence necessary to prove these defendants' involvement, there is a genuine issue of material fact as to whether Drieske, Baker, or Miller-Hunhoff were personally involved in the administrative appeals process regarding the four rejection notices signed by these non-party individuals.[10] Additionally, if the defendants were involved, the court must conduct an independent review of the magazines to see if they were properly rejected under the challenged policy.

### 2.   Rejection Notices Signed by Reimann

As discussed above, the claims against Reimann in her individual capacity have been dismissed. Similar to the non-party individuals above, Shaw argues that the named defendants are still the proper parties regarding Reimann's rejection notices because Miller-Hunhoff, Baker, and Drieske made the decisions to reject the magazines and answered the administrative grievances. Docket 248 at 33, 36; Docket 249 ¶ 91.

For three of the rejection notices signed by Reimann regarding Tattoo November/December 2015, Inked March 2015, and Inked February 2017 (Docket 122-4 at 1, 8, 75), the evidence shows that none of the named defendants had personal involvement in the initial rejection notices or grievance process. Docket 122-4 at 24-26, 44, 54-56, 73-76. All the grievance documents were signed by non-defendants. *See id.* Therefore, the undisputed

---

[10] Shaw does not name Storevik as an individual involved in the administrative appeal process regarding the rejected magazines. Docket 248 at 33, 36; Docket 249 ¶ 91; *see also* Docket 215 ¶ 132; Docket 1 ¶¶ 136-37.

facts show that Drieske, Baker, and Miller-Hunhoff were not personally involved or directly responsible for the rejection of these three magazines. Therefore, the court finds that defendants are entitled to summary judgment on Shaw's right to receive mail claims regarding Tattoo November/December 2015, Inked February 2017, and Inked March 2017.

As for Baker, Shaw has presented evidence that Baker was personally involved in the confiscation of some of Shaw's magazines even though Reimann signed the rejection notices. Six of Shaw's ARs appealing Reimann's rejection notices were assigned to Baker to "investigate the issue, gather the facts and prepare a draft response (as directed), which will be forwarded to the administrative remedy coordinator." SDDOC Policy 1.3.E.2(IV)(9)(C); *see* Docket 122-4 at 13, 63, 67, 71; Docket 250-2 at 851-52, 884, 900. These ARs challenged Reimann's rejections of the following six magazines: Maxim February 2015, Inked April 2016, Freshly Inked Vol. 6 Issue 2, Inked October 2016, Inked November 2016, and Skin & Ink October 2015. Docket 122-3 at 18-19, 25-26; Docket 122-4 at 9, 13, 63, 67, 71; Docket 250-2 at 848, 851-52. Additionally, on a rejection notice signed by Reimann for Fangoria March 2014, the reasoning is listed as nudity "per Major Baker." Docket 250-2 at 184. Baker was also assigned two ARs where Shaw mentioned five magazines (Rebel Ink, Urban Ink, Skin & Ink, Inked, and Tattoo) that were rejected, then approved, and then lost. Docket 122-4 at 15-18. Baker denied Shaw's second AR

regarding these five magazines. *See* Docket 250-2 at 823-24.[11] Because Shaw presented evidence that Baker was personally involved in the confiscation of his magazines, the court must conduct an independent review of the magazines to see if they were properly rejected under the challenged policy.

Similar to Baker, Shaw has presented evidence that Drieske was involved in the grievance process regarding two AR responses to three rejection notices signed by Reimann. Docket 122-3 at 19; Docket 122-4 at 5-6, 39, 68. The rejected magazines were Inked October 2016, Tattoo August 2015, Tattoo International #28, and Skin & Ink August 2015. Docket 122-3 at 5; Docket 122-4 at 5-6, 39. In both his AR responses, Drieske upheld Reimann's rejection notices because the magazines violated SDDOC policies. Docket 122-4 at 39, 68. Additionally, Shaw submitted a rejection notice for Fangroia June 2014 signed by Reimann. Docket 250-2 at 185. Shaw claims that the notice states "per Drieske." Docket 250-1 at 1. In this court's review of the rejection notice, the writing on the copy is not clear. *See* Docket 250-2 at 185. In viewing the facts in a light most favorable to Shaw, the court will assume the writing says "per Drieske." Because Shaw presented evidence that Drieske was personally involved in the confiscation of his magazines, the court must conduct an independent review of the magazines to see if they were properly rejected under the challenged policy.

---

[11] The court cannot determine from the magazine titles listed in the IR and AR whether these five magazines are the ones listed in the 28 rejection notices.

As for the five remaining rejection notices signed by Reimann regarding Freshly Inked Queens Issue, Freshly Inked July 2016, Inked May 2016, Freshly Inked September 2015, and Maxim August 2015 (Docket 122-3 at 21-23; Docket 122-4 at 3-4), Shaw alleges that he attempted to obtain all of the grievances related to the rejected magazines from defendants and that defendants did not provide all of them. Docket 248 at 34. Therefore, questions of material fact exist as to whether the remaining named defendants were involved in the grievance process regarding Freshly Inked Queens Issue, Freshly Inked July 2016, Inked May 2016, Freshly Inked September 2015, and Maxim August 2015. The court must conduct an independent review of the magazines to see if they were properly rejected under the challenged policy.

### D.   As-Applied Challenge to Magazines in the Record

One of the most basic principles embodied in the First Amendment is that "[a]s a general matter . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011) (quoting *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002)). There are, however, exceptions to that principle. *Id.* The Supreme Court held in *Turner v. Safley,* 482 U.S. 78, 84 (1987), that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," including those protections offered by the First Amendment. But as the Eighth Circuit recently noted, "*Turner* acknowledged that 'courts are ill equipped to deal with the increasingly urgent

problems of prison administration and reform.' " *Sisney v. Kaemingk*, 886 F.3d 692, 697 (8th Cir. 2018) (quoting *Turner*, 482 U.S. at 84).

Cases dealing with the constitutional rights of prisoners "require courts to strike a balance between two competing principles." *Id.* When examining constitutional claims brought by people who are incarcerated, courts are instructed to exercise "a policy of judicial restraint" because "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 84-85. *Turner* counseled additional restraint where, as here, "a state penal system is involved[.]" *Id.* at 85 (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)). Given these interests, "a lesser standard of scrutiny is appropriate in determin[ing] the constitutionality of prison rules." *Id.* at 81.

*Turner's* ultimate holding was that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. There are four factors relevant to whether a prison regulation satisfies this test:

> (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; (4) and whether there exist alternatives to accommodate the prisoner with a *de minimis* cost.

41

*Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015) (quoting *Turner*, 482 U.S. at 89-91).

In the First Amendment context, prisoners may raise both as-applied and facial challenges to prison policies. *Sisney*, 886 F.3d at 697 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 403 (1989)). In an as-applied First Amendment challenge as is raised herein, the court is instructed to apply the *Turner* factors outlined above to "consider 'whether a ban on *these particular items* is reasonably related to a legitimate penological objective.' " *Murchison*, 779 F.3d at 887 (quoting *Williams v. Brimeyer*, 116 F.3d 351, 354 (8th Cir. 1997)).

Defendants submitted four magazine exhibits and one magazine excerpt exhibit to the court for review. Dockets 234-3, Docket 234-4; Docket 234-5; Docket 234-6; Docket 234-7. Three of the magazines were rejected because they contained sexually explicit material, and two of the magazines were rejected because they contained gang signs. Docket 229 ¶¶ 7, 10; Docket 228 ¶¶ 7-9, 12; Docket 122-4 at 2.

### 1.   **Sexually Explicit Materials**

Storevik, Baker, Drieske, and Miller-Hunhoff allege that they rejected Rebel Ink Winter 2015, Fangroia #338, and Urban Ink September 2016 because the magazines contained images with nudity. Docket 228 ¶¶ 6-7; Docket 229 ¶¶ 8-12; Docket 122-3 at 20. Storevik signed the initial rejection notices for Urban Ink September 2016 and Fangoria #338. Docket 122-3 at 20; Docket 122-4 at 10. Baker and Drieske were involved in the administrative appeal process regarding those two magazines. Docket 122-4 at 22, 67-68.

Miller-Hunhoff signed the rejection notice for Rebel Ink Winter 2015. Docket 122-3 at 30. The SDDOC Policy 1.3.C.8 prohibits pornography and nudity that is defined as "exposed female breasts and buttocks." Docket 235 ¶ 99.

This court conducted an independent review of Fangoria #338, Urban Ink September 2016, and Rebel Ink Winter 2015. *See generally Murchison*, 779 F.3d at 888 (holding that the court must conduct an independent review of the evidence to verify there has not been an exaggerated response to prison concerns); *see* Docket 234-5; Docket 234-6; Docket 234-7. Fangoria contains two drawings that depict topless women. Docket 234-6 at 63. In the first drawing, a woman's breasts, including the nipples, are completely exposed. *Id.* In the second drawing, the woman's breasts are exposed; blood and hair partially cover the woman's nipples. *Id.* Rebel Ink contained an advertisement for the magazine Skin & Ink. Docket 234-5 at 87. The advertisement displayed a cover of Skin & Ink showing a woman dressed in cream, lace lingerie. *Id.* The bra is partially see-through, and the shape and color of the woman's nipples are visible through the material. *Id.* Urban Ink contains several images of women in bikinis and thongs. Docket 234-7. On six pages, there are images of women wearing thongs and their buttocks are completely visible. *Id.* at 61, 75-76, 78-79, 82. There are also images of women in bikinis; the swimsuit tops cover the women's nipples, but a majority of the breasts are visible. *Id.* at 59, 62, 78-79, 82.

Because it has been determined that the content in Rebel Ink Winter 2015, Urban Ink September 2016, and Fangoria #338 magazines is

substantially similar, the court will treat these magazines as one in the same for the purposes of the as-applied analysis. In determining the reasonableness of the policy as it was applied to Shaw's tattoo magazines, the court must first consider "whether there is a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.' " *Murchison*, 779 F.3d at 887 (quoting *Turner*, 482 U.S. at 89). "[T]he governmental objective must be a legitimate and neutral one . . . without regard to the content of the expression," but "courts must be deferential to the prison officials' views of what material may be inflammatory." *Id.* (quoting *Turner*, 482 U.S. at 90).

Defendants argue that the prohibition of this particular type of magazine within the prison walls serves a number of valid objectives: "rehabilitation of inmates, maintenance of order and security within the institution by reducing the risk of sexual assaults among inmates and the prevention of sexual harassment of correctional staff." Docket 234 at 52 (quoting *Bell v. Young*, 2018 WL 314385, at *31 (D.S.D. June 27, 2018)); *see also id.* at 53. These are legitimate government objectives. *See Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993) (holding that security is a valid penological goal, and rehabilitation is a legitimate objective); *see also Thornburgh*, 490 U.S. at 415 (affirming that security is central to all other corrections goals). And with regard to the neutrality requirement, there is no evidence in the record to suggest that defendants' censorship of these three tattoo magazines was done for any other purpose than to serve the objectives described above. *Dawson*, 986 F.2d at 261

(holding neutrality requirement satisfied where policy furthers government interest unrelated to suppression of expression).

When the objectives underlying the policy are deemed legitimate and neutral as applied, the issue becomes whether censorship of these three tattoo magazines within the prison is rationally related to those objectives. This "does not require 'actual proof that a legitimate interest will be furthered by the challenged policy,' only that the interest being served and the policy have an 'objectively rational' connection." *Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024, 1027 (8th Cir. 2004) (quoting *Herlein v. Higgins*, 172 F.3d 1089, 1091 (8th Cir. 1999)). Given the sexually explicit images featured in the tattoo magazines, it was reasonable for defendants to believe banning the magazines would serve legitimate governmental interests.

The next question is whether there are alternative means for Shaw to exercise his asserted constitutional right. *Murchison*, 779 F.3d at 891. Here, "courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation," and " 'the right' in question must be viewed sensibly and expansively." *Id.* (quoting *Turner*, 482 U.S. at 90; *Thornburgh*, 490 U.S. at 417). The question is not whether Shaw has an available alternative to view and read these particular tattoo magazines, but whether there are similar means of expression adequately available to him. *Thornburgh*, 490 U.S. at 418.

Shaw contends that these tattoo magazines are "art magazines" that are necessary materials for his religion to develop Shaw's artistic and magical

mind. Docket 248 at 38. Defendants contend that Shaw can request art/religion books—that do not contain nudity—to be placed in the library for general inmate use. Docket 234 at 55. Giving proper deference to prison authority, the court finds there are ample alternative means of expression that are available to Shaw through the prison library.

Under the third *Turner* factor, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. Courts are instructed to "remember that 'prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of a prison.' " *Murchison*, 779 F.3d at 892 (quoting *Thornburgh*, 490 U.S. at 412).

Shaw contends that the policies already in place at SDDOC facilities would prevent any ripple effect if inmates were permitted art books, art magazines, or pornography. Docket 248 at 40. Shaw cites to the SDDOC's policies like the prohibition of sexual activity, special housing options, classifications, and punishments for rule violations. *Id.* at 40-41. If pornography was allowed, Shaw argues that there would be no need to change the policies. *Id.* at 41.

Defendants have pointed to numerous adverse effects on SDDOC facilities that could result from allowing Shaw to access these types of magazines. They suggest that similar such magazines have been known to be

46

sold, rented, or bartered by inmates in violation of other SDDOC policies. Docket 234 at 52-53. Defendants contend that these magazines would find their way to psychologically unfit inmates, which would interfere with efforts to rehabilitate the inmates. *Id.* at 52. They further allege that accommodation of Shaw's asserted right to view the magazines could increase the risk of sexual assault and harassment among inmates and against staff. *Id.* at 53. Giving deference to defendants, the court agrees that allowing publications that feature nudity into individual cells, "where they would likely be disseminated to other inmates, would substantially interfere with defendants' rehabilitation and security objectives." *Dawson*, 986 F.2d at 262.

The fourth and final *Turner* factor provides that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns . . . ." *Turner*, 482 U.S. at 90 (citing *Block v. Rutherford*, 468 U.S. 576, 587 (1984)). That is, where "an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. The *Turner* decision qualified, however, that "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90-91.

Shaw provides two alternatives that accommodate his right. Docket 248 at 41-42. First, Shaw argues that defendants could allow pornography to all

the inmates except the psychologically unfit inmates. *Id.* Shaw argues that when inmates are screened into SDDOC facilities, defendants can determine whether the inmates are permitted pornography. *Id.* If psychologically unfit inmates are found in possession of pornography, they will receive a punishment. *Id.* at 42. Additionally, defendants would have a list of inmates who are not allowed pornography that staff could use during cell searches for prohibited items and in the mailroom to reject any pornography being sent to the psychologically unfit inmates. *Id.* Second, Shaw contends that inmates could have access to pornography on the tablets that inmates already have access to. *Id.* Tablets are accessed with personalized log-in information, and psychologically unfit inmates would be prevented from accessing pornography on their personal tablets. *Id.*

The first alternative would significantly affect guards and resources by forcing prison officials to spend time individualizing cell searches and mail review based on which inmates are permitted pornography and which ones are not and would still present a substantial risk that harmful material would escape review. *See Herlein*, 172 F.3d at 1091. For both of Shaw's alternatives, if prisoners were allowed to possess sexually explicit magazines, it would run the risk of creating threats to the security of the prison. *See id.* If the problem is exposure to sexually explicit materials, then allowing certain inmates to have unlimited access to these materials via the mail or their tablets accomplishes very little. *See id.* These costs are more than *de minimis*.

In sum, the court believes that the ban on the possession of these three tattoo magazines that contain nudity is reasonably related to the legitimate penological objective of maintaining prison security. There is a rational connection between the policy and the government interest, Shaw has significant alternative means of exercising his asserted right, there are no alternative policies to accommodate Shaw that involve only a *de minimis* cost, and the proposed alternatives may present the threat of a significant ripple effect on guards, prisoners, and resources at SDDOC facilities. Thus, the court finds that defendants did not violate Shaw's First Amendment rights when they rejected Rebel Ink Winter 2015, Fangoria #338, and Urban Ink September 2016. The court finds that defendants are entitled to summary judgment for these three magazines.

### 2.    Materials Containing Gang Signs

Two of Shaw's magazines, Freshly Inked November 2015 and Urban Ink May 2016, were rejected by Miller-Hunhoff due to the magazines containing gang signs. Docket 122-3 at 24; Docket 122-4 at 2. SDDOC Policy 1.5.D.3 states, " 'Materials that depict gang activity, gang insignia or may be construed as pertaining to, initiating or furthering gang/security threat group activity, within the facility or outside the facility' are included among the list of prohibited items" for Inmate Correspondence. Docket 235 ¶ 94.

This court conducted an independent review of Freshly Inked November 2015 and Urban Ink May 2016. *See generally Murchison*, 779 F.3d at 888 (holding that the court must conduct an independent review of the evidence to

verify there has not been an exaggerated response to prison concerns); *see*
Dockets 234-3; Docket 234-4. Freshly Inked contained an image of an
individual displaying a W-shape hand sign; the individual's pinky and index
fingers were held up straight and his middle and ring finger were interlocked—
forming a W-shape with his four fingers. Docket 234-4 at 85. Urban Ink
contained an image of an individual holding up a similar W-shape hand sign.
Docket 234-3.

In applying the *Turner* factors to these two tattoo magazines, the court
finds that there is a valid rational connection between the regulation and
legitimate prison objectives. *See Murchison*, 779 F.3d at 887. Defendants argue
that regulation prohibiting materials that contain gang signs supports the
objective of maintaining institutional order, discipline, safety, and security.
Docket 234 at 46 n.7; *see Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir.
2005) (finding policy that prevent inmates from receiving materials that
contained gang signs "was reasonably related to the prison's goal of
maintaining security and order"). Given the gang signs featured in these tattoo
magazines, it was reasonable for defendants to believe banning the magazines
would serve legitimate governmental interests.

Second, Shaw has alternative means of exercising his right by viewing art
magazines and books from the prison library. *See Murchison*, 779 F.3d at 891.
Additionally, Shaw is entitled to order other publications that do not
contain gang signs, and therefore, maintains an alternative means of exercising
his First Amendment right. Third, allowing inmates to have access to any

50

incoming magazine could have significant adverse impacts because such materials may incite violence, which would have an undue impact on guards, other inmates, and prison resources. *See Turner*, 482 U.S. at 90; Docket 234 at 46 n.7. Finally, Shaw has not articulated any alternatives to prohibiting such publications, and there does not appear to be any. *See Turner*, 482 U.S. at 90. Thus, the court finds that defendants did not violate Shaw's First Amendment rights when they rejected Urban Ink May 2016 and Freshly Inked November 2015. The court grants summary judgment on these two magazines.

### E.    Magazines Not Provided to the Court

The court previously denied summary judgment on this issue because the court did not have any of the magazines to conduct a review. Docket 139 at 55-56. For the present motion for summary judgment, defendants only provided the court with five of the thirty-two magazines referenced in the rejection notices submitted by Shaw. Docket 234-3; Docket 234-4; Docket 234-5; Docket 234-6; Docket 234-7; Docket 122-3 at 15-30; Docket 122-4 at 1-11, 75; Docket 250-2 at 184-85, 848. The court granted summary judgment in favor of defendants for those five magazines. The court also granted summary judgment on three additional magazines because none of the named defendants were personally involved in the magazines' confiscation and on two magazines that were returned to Shaw.

As for the remaining 22 magazines listed in the rejection notices, the court cannot conduct an independent review of these magazines to verify there has not been an exaggerated response to prison concerns because the

magazines were not part of the record. *See generally Murchison*, 779 F.3d at 888. Thus, the court denies summary judgment regarding these 22 magazines because questions of material fact exist as to whether the magazines were actually prohibited under the policy. The following claims survive summary judgment:

1. Miller-Hunhoff's rejections of Urban Inked March 2016 and Skin & Ink Winter 2016. Docket 122-3 at 27, 29.

2. Baker's involvement in the rejection of Inked November 2016, Inked October 2016, Freshly Inked Vol. 6 Issue 2, Inked April 2016, Urban Inked March 2016, Maxim February 2015, Skin & Ink October 2015, and Fangoria March 2014. Docket 122-3 at 18-19, 25-27; Docket 122-4 at 9, 13, 63, 67, 71; Docket 250-2 at 184, 848, 851-52.

3. Drieske's involvement in the rejection of Inked October 2016, Tattoo August 2015, Tattoo International #28, Fangoria March 2014, and Skin & Ink August 2015. Docket 122-3 at 19; Docket 122-4 at 5-6, 36-39, 65-68; Docket 250-1 at 1; Docket 250-2 at 185.

4. The 9 rejection notices this court stated genuine issues of material fact existed as to whether Baker, Drieske, or Miller-Hunhoff were involved in the administrative process regarding 3 issues of Inked from 2017, Inked September 2017, Freshly Inked Queens Issue, Freshly Inked July 2016, Inked May 2016, Freshly Inked September 2015, and Maxim August 2015. Docket 122-3 at 15-17, 21-23; Docket 122-4 at 3-4, 11.

In addition to the 31 rejection notices, Shaw submitted the Rejection Log. Docket 179 at 67-86. Shaw only claims that he is entitled to 210 magazines that were confiscated/rejected by defendants.[12] Docket 249 ¶ 91. The court

---

[12] Shaw believes he is entitled to the following magazines issues: American Curves (15), Art & Design (1), Art News (3), Artists (6), Drawing (3), Fangoria (14), Flex (1), Freshly Inked (6), Ink Fashion (3), Ink Slingers (2), Inked (25), Inked from the Pen (1), Inked Girls (13), Low Rider Arte (11), Maxim (17), Men's Fitness (2), Men's Health (7), Men's Journal (2), Muscle & Fitness (2), New Tattoos (1), Rebel Ink (15), Revolver (5), Skin & Ink (8), Skin Art (2), Skin Ink (2), Smooth (5), Southwest Art (7), Tabu Tattoo (1), Tattoo (15), Tattoo

reviewed the Rejection Log. First, the court compared the magazines listed in the 31 rejection notices with the magazines listed in the Rejection Log. The rejection notices pertained to 9 different magazine titles and a total of 32 magazine issues.[13]

For Tattoo International, Shaw claims that he is missing two issues, but there is only evidence of one rejected issue in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 75. The issue listed in the Rejection Log appears to be the same issue contained in one of the rejection notices. Docket 122-4 at 5. Because there is no evidence of the second Tattoo International issue, defendants are entitled to summary judgment on that alleged missing magazine.

For Fangoria, Shaw claims that he is missing 14 issues, but the Rejection Log lists only 11 rejected magazines. Docket 179 at 67-68, 70-73. There were three rejection notices regarding issues of Fangoria, and two of these issues are listed in the Rejection Log. Docket 250-2 at 184, 185; Docket 179 at 72, 73. Shaw presented the rejection notice for Fangoria #338 (Docket 122-4 at 10), but this magazine is not listed in the Rejection Log. *See* Docket

---

Collection (2), Tattoo Energy (2), Tattoo International (2), Tattoo Life (1), Tattoo Review (2), Tattoo Savage (2), Urban Ink (2), and Wired (2). Docket 249 ¶ 91.
[13] Only nine magazines titles are discussed here because Shaw claims that he is missing two issues of Urban Ink. Docket 249 ¶ 91. Shaw, however, provided rejection notices for three issues of Urban Ink. Docket 122-3 at 20, 24, 27. Although there is a discrepancy between the number of issues Shaw claims he is missing and the number of issues in the rejection notices, there is not a discrepancy with Shaw's claims, the rejection notices, and the Rejection Log. The Rejection Log lists approximately ten rejected issues of Urban Ink. Docket 179 at 69-71, 73-74, 78. The court previously stated that it would view Urban Ink as three claims. *See supra* at 31 n.8.

179 at 72-75. Thus, there is evidence of ten additional Fangoria issues that are not accounted for in the rejection notices and therefore, there are genuine issues of material fact regarding these ten Fangoria issues. And because there is no evidence of the other claimed issue of Fangoria, defendants are entitled to summary judgment on that one issue.

For Rebel Ink, Shaw claims that he is missing 15 issues, but there are only six issues listed in the Rejection Log. Docket 179 at 69, 75, 77, 80. And one of those issues is Rebel Ink Winter 2015, which was contained in one of the rejection notices. Docket 122-3 at 30; Docket 179 at 77. Thus, there is only evidence of five issues of Rebel Ink that are not accounted for in the rejection notices and remain genuine issues of material fact. And because there is no evidence of the other nine claimed issues of Rebel Ink, defendants are entitled to summary on those nine issues.

For Freshly Inked, Shaw claims that he is missing six issues. Docket 249 ¶ 91. Shaw presented rejection notices regarding five issues of Freshly Inked. Docket 122-3 at 21, 22, 25; Docket 122-4 at 2, 3. In the Rejection Log, at least six issues were listed. Docket 179 at 69, 75-79. Freshly Inked July 2016 was not listed in the Rejection Log, but was listed in a rejection notice provided by Shaw. Docket 122-3 at 22; Docket 179 at 79. Thus, there is evidence of one additional issue of Freshly Inked that is not accounted for in the rejection notices and remains a question of material fact.

For Inked, Shaw claims he is missing 25 issues and submitted rejection notices for 11 issues. Docket 249 ¶ 91; Docket 122-3 at 15-19, 23, 26; Docket

54

122-4 at 7-8, 11, 75. Thus, 14 issues are unaccounted for in the provided rejection notices, but there are at least 25 issues of Inked listed in the Rejection Log. Docket 179 at 67-68, 70-74, 76-82, 84-86. Thus, questions of material fact exist regarding these additional 14 issues of Inked.

For Tattoo, Shaw claims that he is missing 15 issues, and he submitted rejection notices for three issues. Docket 249 ¶ 91; Docket 122-3 at 28; Docket 122-4 at 1, 5. Two of the issues listed in the Rejection Log are Tattoo January 2016 and Tattoo November/December 2015, which were contained in two rejection notices. Docket 122-3 at 28; Docket 122-4 at 1. Shaw provided a rejection notice for Tattoo August 2015, but this issue was not listed in the Rejection Log. Docket 122-4 at 5; *see* Docket 179 at 75. Thus, 12 issues are unaccounted for in the provided rejection notices, and there is evidence of at least 15 issues of Tattoo in the Rejection Log. Docket 179 at 68, 72-73, 77-78, 80, 82, 84-85. Therefore, questions of material fact exist regarding 12 issues of Tattoo.

For Maxim, Shaw claims he is missing 17 issues, and he provided rejection notices for two issues. Docket 249 ¶ 91; Docket 122-4 at 4, 9. The Rejection Log lists over 20 rejected issues of Maxim. Docket 179 at 67, 70, 72, 74-84. The two issues contained in the rejection notices are listed in the Rejection Log. Docket 122-4 at 4, 9; Docket 179 at 74, 76. Thus, 15 Maxim issues are unaccounted for with the rejection notices, but there is evidence of them in the Rejection Log. The court finds that questions of material fact exist regarding 15 issues of Maxim.

For Skin & Ink, Shaw claims he is missing eight issues, and he presented rejection notices for two issues. Docket 249 ¶ 91; Docket 122-3 at 29; Docket 122-4 at 6. Six issues are unaccounted for in the rejection notices, but there is evidence of over 12 rejected issues in the Rejection Log. Docket 179 at 67-68, 70, 74-75, 77, 82. The two issues from the rejection notices are listed in the Rejection Log. Docket 122-3 at 29; Docket 122-4 at 6; Docket 179 at 75, 77. Thus, questions of material fact exist regarding six issues of Skin & Ink.

For the 28 other titles that were not listed in the rejection notices, the court reviewed the Rejection Log and determined whether Shaw's claims for the number of missing magazines were supported by the number of rejected issues listed in the Rejection Log. The number of missing magazines Shaw claims and the number of rejected magazines listed in the Rejection Log did not match up for the following four magazine titles.

First, Shaw claims that he is missing 15 issues of American Curves, but the Rejection Log only has evidence of eight rejected issues. Docket 249 ¶ 91; Docket 179 at 67-69, 83. Therefore, the eight issues of American Curves listed in the Rejection Log are questions of material fact. And because there is no evidence of seven issues of American Curves, defendants are entitled to summary on those seven issues.

Second, Shaw alleges that he is missing 14 issues of Inked Girls but there is only evidence of four issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 67, 70, 71. The four issues of Inked Girls are questions of

material fact. The court grants summary judgment on the ten non-listed issues of Inked Girls.

Third, Shaw contends that he is missing 12 issues of Tattoo Collection. Docket 249 ¶ 91. The Rejection Log, however, only lists one issue. Docket 179 at 67. The one issue listed in the Rejection Log is a material question of fact, but the court grants summary judgment on the 11 non-listed issues.

Fourth, Shaw claims that he is missing two issues of Tattoo Savage, but there is no evidence of this magazine title in the log. Docket 249 ¶ 91; *see* Docket 179 at 67-86. Thus, defendants are entitled to summary judgment on the two issues of Tattoo Savage.

Unlike the four titles above, the following magazine titles had evidence in the Rejection Log that supported Shaw's claims:

- Shaw claims he is missing one issue of Art & Design; there is one issue listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 78.
- Shaw claims he is missing three issues of Art News; there are four issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 80, 81.
- Shaw claims he is missing six issues of Artists; there are nine issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 72-73, 75-76, 83-84.
- Shaw claims he is missing three issues of Drawing; there are three issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 72-74.
- Shaw claims he is missing three issues of Ink Fashion; there are three issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 67-68, 70.
- Shaw claims he is missing one issue of Flex; there are approximately two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 70-71.
- Shaw claims he is missing two issues of Ink Slingers; there are two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 68, 78.

- Shaw claims he is missing one issue of Inked from the Pen; there is one issue listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 75.
- Shaw claims he is missing 11 issues of Low Rider; there are at least 11 issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 67-68, 70-72, 74, 83.
- Shaw claims he is missing two issues of Men's Fitness; there are at least two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 70, 78-80.
- Shaw claims he is missing seven issues of Men's Health; there are at least seven issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 69, 74-75, 78-86.
- Shaw claims he is missing two issues of Men's Journal; there are at least two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 68, 71, 80, 84.
- Shaw claims he is missing two issues of Muscle & Fitness; there are two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 70, 75.
- Shaw claims he is missing one issue of New Tattoos; there is one issue listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 67.
- Shaw claims he is missing five issues of Revolver; there are at least five issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 68, 71, 77, 79, 82-84.
- Shaw claims he is missing two issues of Skin Art; there are two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 69, 70.
- Shaw claims he is missing two issues of Skin Ink; there are two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 74.
- Shaw claims he is missing five issues of Smooth; there are at least five issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 67-69, 71, 72, 74, 78, 81-82.
- Shaw claims he is missing seven issues of Southwest Art; there are at least seven issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 75, 77, 79, 81-82.
- Shaw claims he is missing one issue of Tabu Tattoo; there is at least one issue listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 69, 72.
- Shaw claims he is missing two issues of Tattoo Energy; there are at least two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 67, 69-70, 81.
- Shaw claims he is missing one issue of Tattoo Life; there is at least one issue listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 67, 81-82.

- Shaw claims he is missing two issues of Tattoo Review; there are two issues of Tattoo Revue listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 69, 71.
- Shaw claims he is missing two issues of Wired; there are at least two issues listed in the Rejection Log. Docket 249 ¶ 91; Docket 179 at 75-78.

Overall, of the 211 magazines Shaw claims he is missing, there is only evidence in the Rejection Log of 138 magazine issues that were confiscated by defendants and recorded as such in DOC records, not including the 32 magazines contained in the provided rejection notices. Defendants did not provide the court with any evidence regarding the rejection notices or administrative remedy documents for these 138 magazines. Defendants claim there is no evidence regarding the rejection of these magazines, but Shaw's Rejection Log raises genuine issues of material fact as to whether the named defendants were involved in the confiscation or rejection of these 138 magazines.

Additionally, defendants did not provide the court with any of these magazines. Thus, the court cannot conduct an independent review of these magazines to verify there has not been an exaggerated response to prison concerns. *See generally Murchison*, 779 F.3d at 888. Shaw has demonstrated a genuine issue of material fact that defendants violated his right to receive mail. The court denies summary judgment on this claim as it pertains to these 138 magazines Shaw claims he is missing and are recorded in the log, but not listed in the 31 rejection notices provided to this court. The court finds that

defendants are entitled to summary judgment on the 42 magazines Shaw claims are missing but are not listed in the Rejection Log.

## IV.    First Amendment Access to the Courts

This court denied defendants' motion for summary judgment regarding Shaw's First Amendment access to the courts claims against Effling and Baker. Docket 139 at 76. Shaw alleges he was unable to argue his "non-frivolous due process claim in small claims court, because he could not send his response to defendant's answer to opposing counsel." Docket 139 at 65-66; Docket 1 ¶ 186. Shaw also claims that Effling and Bieber denied Shaw sufficient legal paper and postage. Docket 1 ¶¶ 185-86.

"The Constitution guarantees prisoners a right to access the courts." *White v. Kautzky*, 494 F.3d 677, 679 (8th Cir. 2007). To succeed on a claim for denial of access to the courts, a plaintiff must show that he suffered actual injury as a result of the defendants' actions. *Lewis v. Casey*, 518 U.S. 343, 349 (1996). In order to satisfy the actual injury requirement, a plaintiff must "demonstrate that a nonfrivolous legal claim had been frustrated or was being impeded." *Johnson v. Missouri*, 142 F.3d 1087, 1089 (8th Cir. 1998) (quoting *Lewis*, 518 U.S. at 353).

"The right of access to the courts is satisfied if the prisoner has the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Zink v. Lombardi*, 783 F.3d 1089, 1108 (8th Cir. 2015) (internal quotation omitted). An actual injury cannot be established

if the law library or legal assistance program is "subpar," but rather the

inmate:

> must go one step further and demonstrate that the alleged
> shortcomings in the library or legal assistance program hindered his
> efforts to pursue a legal claim. He might show, for example, that a
> complaint he prepared was dismissed for failure to satisfy some
> technical requirement which, because of deficiencies in the prison's
> legal assistance facilities, he could not have known. Or that he had
> suffered arguably actionable harm that he wished to bring before
> the courts, but was so stymied by inadequacies of the law library
> that he was unable even to file a complaint.

*Lewis*, 518 U.S. at 351. The actual injury requirement "is not satisfied by just

any type of frustrated legal claim." *Id.* at 354. An inmate's constitutional right

to access to the courts:

> does not guarantee inmates the wherewithal to transform
> themselves into litigating engines capable of filing everything from
> shareholder derivative actions to slip-and-fall claims. The tools it
> requires to be provided are *those that the inmates need in order to
> attack their sentences, directly or collaterally, and in order to
> challenge the conditions of their confinement.*

*Id.* at 355 (emphasis added) (commenting on *Bounds v. Smith*, 430 U.S. 817,

828 (1977), where the court held that the constitutional right to access to the

courts "requires prison authorities to assist inmates in the preparation and

filing of meaningful legal papers by providing prisoners with adequate law

libraries or adequate assistance from persons trained in the law."). Thus, for an

access to the courts claim to survive summary judgment, the plaintiff must

raise a genuine issue of material fact that a legal claim regarding his conditions

of confinement or a legal claim attacking the legality of his

sentence/incarceration was impeded.

Shaw alleges that Effling knew that Shaw needed to send out legal mail and specifically prevented him from doing so. *See* Docket 249 ¶¶ 52-55. Defendants allege that an inmate can request indigent commissary and if he meets the criteria, among other things, the indigent inmate is provided with up to $10.00 per month for postage costs to mail his legal work. Docket 235 ¶¶ 44, 45. Shaw argues that Bieber and Effling do not follow these policies regarding indigent inmates. Docket 249 ¶ 44. Defendants allege that in August of 2016, Shaw used $8.16 of his legal mail postage budget as an indigent inmate. Docket 235 ¶ 46. Defendants assert that in September of 2016, Shaw used $2.46. *Id.* ¶ 47.

Here, Shaw relies on mere allegations that a non-frivolous legal issue was impeded by Effling and Bieber. He argues that they do not follow the policies, but defendants provide undisputed facts that Shaw has used the indigent legal mail money. *See id.* ¶¶ 46, 47. Shaw's allegation that defendants do not follow the policy is not enough to create a genuine issue for trial. *See Mosely*, 415 F.3d at 910 (citation omitted) (stating the "[t]he nonmoving party may not rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.").

Shaw alleges that his non-frivolous legal issues that were impeded by Effling and Bieber's actions were that he was "unable to argue key elements of his case because he was denied the ability to send a copy of [his] response to Defendant[']s Answer to Defendant[']s Attorney Schlimgen and the Judge would

not allow Plaintiff [to] argue his due process claims." Docket 249 ¶ 43.[14] Shaw never expands about what claim his case was about regarding his dealings with "Attorney Schlimgen." To support this allegation, Shaw cites to his complaint and to this court's order denying defendants' first motion for summary judgment. *Id.* His complaint alleges that he filed a "grievance" about conditions of confinement. *See* Docket 1 ¶ 184. The prison grievance policy is a part of the prison's administrative remedy process; also, this asserted claim is against Maturin, but his only access to the court claim is against Effling and Bieber. *See* Docket 139 at 76. This court relied on Shaw's allegation against Effling and Bieber for impeding a non-frivolous due process claim in small claims court. *See id.* at 66; Docket 1 ¶¶ 185-86. But Shaw's allegation was that "UC Vitetta denied Shaw the ability to send out legal mail, because of this denial Shaw was unable to argue key elements [of] . . . of his due process claims." Docket 1 ¶ 186. Further, he has not provided the court with a document or done anything other than merely assert that his due process claim in small claims court was impeded. Shaw has failed to raise a genuine issue of material fact that Effling and Bieber personally impeded a non-frivolous legal claim under *Lewis* (one that attacks his conditions of confinement or sentence). Because Shaw has not raised a genuine issue of

---

[14] Shaw cites to Docket 1 ¶¶ 184-85. This is Shaw's complaint where he alleges that when he filed a "grievance [about his] conditions of his confinement" he was denied his administrative remedies by Maturan to prevent him from getting to court. Shaw also cites to Docket 139 at 66. This is this court's order denying defendants' first motion for summary judgment.

material fact that a non-frivolous legal claim has been impeded or that Effling and Bieber have denied him his ability to send out legal mail, this court finds that Effling and Bieber are entitled to summary judgment on this issue.

## V.    Retaliation

This court denied defendants' first motion for summary judgment regarding Shaw's retaliation claim against Bieber. Docket 139 at 76. Shaw claims that Bieber limited his access to the law library and threw away Shaw's Project Applications in order to chill his protected activity of accessing the courts and prison grievance system. Docket 1 ¶¶ 203, 206.

To establish a retaliation claim, Shaw must show "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). In order to succeed on a retaliation claim, a plaintiff must show that the "adverse action taken against him was 'motivated at least in part' by his protected activity . . . ." *Id.* (quoting *Revels*, 382 F.3d at 876). Although "[t]he causal connection is generally a jury question, . . . it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012) (alteration in original) (quoting *Revels*, 382 F.3d at 876).

The Eighth Circuit has held that a retaliation claim fails "if the alleged retaliatory conduct violations were issued for the actual violation of a prison rule," and a defendant shows " 'some evidence' the inmate actually committed a rule violation." *Sanders v. Hobbs*, 773 F.3d 186, 190 (8th Cir. 2014) (quoting *Hartsfield v. Nichols*, 511 F.3d 826, 829 (8th Cir. 2008)). According to the United States Supreme Court, the "some evidence" standard involves: "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* (quoting *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985)). "[A] report from a correctional officer, even if disputed by the inmate and supported by no other evidence, legally suffices as some evidence upon which to base a prison disciplinary violation, if the violation is found by an impartial decisionmaker." *Id.* (alterations in original) (quoting *Hartsfield*, 511 F.3d at 831).

The Eighth Circuit has an established rule that "an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper." *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990) (quoting *Freeman v. Blair*, 793 F.2d 166, 178 (8th Cir. 1986)); *see also Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999) (finding inmate's allegation that staff shut off his water for five days and threatened his safety because the inmate used the

65

prison grievance system was sufficient to state a retaliation claim); *Sanders v. St. Louis Cnty.*, 724 F.2d 665, 666 (8th Cir. 1983) (prison officials may not impede access to courts through retaliation, such as threats, harassment, or less favorable treatment, for inmate's litigation activities). "[T]he alleged manifestations of defendants' retaliation (such as less favorable treatment) need not themselves amount to constitutional violations. The violation lies in the *intent* to impede access to the courts." *Madewell*, 909 F.2d at 1206-07 (citing *Sanders*, 726 F.2d at 666).

### A.   Access to the Law Library

On September 8, 2016, Shaw alleges that Bieber told Shaw that because Shaw likes to file grievances, Bieber was going to deny Shaw access to the law library. Docket 1 ¶ 203; Docket 215 ¶ 176(i); *see also* Docket 122 ¶ 58 (Shaw's Affidavit) (stating Bieber put Shaw on cell restriction to prevent Shaw from using law library and law computers). The parties dispute the second element of a retaliation claim: whether Bieber denied Shaw access to the law library. Docket 249 ¶¶ 121-22; Docket 235 ¶ 122.

Bieber claims that he never threatened Shaw that he would take away Shaw's law library time. Docket 235 ¶ 125. Bieber alleges that he did not deny Shaw access to the library. *Id.* ¶ 122. Bieber does admit that there were times when he would only allow Shaw a certain amount of time in the law library because other inmates needed access. *Id.* Bieber contends that Shaw did not receive any less time than other inmates. *Id.*

Shaw filed an IR, alleging that Bieber was retaliating against him because he filed grievances and lawsuits against Bieber. Docket 250-2 at 721. Shaw stated that Bieber told Shaw he was putting Shaw on cell restriction so Shaw could not go to the law library or use the computers to do legal work. *Id.*; *see also* Docket 122 ¶ 58. In the Response to IR, staff stated that Bieber denied Shaw extra time in the law library one time because Shaw was on the unit when he should have been in the library. Docket 250-2 at 722. But defendants did not provide any evidence of a disciplinary report regarding Shaw being in the wrong location.

Overall, the court cannot resolve this dispute on whether Bieber denied Shaw access to the law library because "such a credibility determination is inappropriate in ruling on a motion for summary judgment." *Madewell*, 909 F.2d at 1206 (reversing district court's decision because district court improperly resolved factual dispute by believing the defendant's affidavits over the plaintiff's affidavits); *see also Nei v. Dooley*, 372 F.3d 1003, 1007 (8th Cir. 2004) (holding district court properly denied summary judgment because inmates' allegations created a genuine issue of material fact about whether the officials retaliated against them).

Next, defendants argue that Shaw cannot meet his burden of showing that Shaw's filing of grievances was a motivating factor behind Bieber's action. Docket 234 at 64. But Shaw did present evidence of the third element of a retaliation claim. First, Shaw states that Bieber specifically said that because Shaw likes filing grievances, Bieber was not going to allow Shaw access to the

law library. Docket 1 ¶ 203. Second, Shaw claims that he has made numerous allegations against Bieber. Docket 249 ¶ 122. Shaw provided several grievances he filed against Bieber near the time Bieber allegedly prevented Shaw from going to the law library. *See* Docket 250-2 at 579-82, 584-87, 595-604, 712-14, 716. The causal connection between these grievances and Bieber's action is "generally a jury question[.]" *Beaulieu*, 690 F.3d at 1025 (quoting *Revels*, 382 F.3d at 876). And based on Shaw's evidence, the record is not "so free from doubt as to justify taking it from the jury." *Id.* (quoting *Revels*, 382 F.3d at 876).

Shaw demonstrated genuine issues of material fact that Bieber retaliated against him with limiting Shaw's access to the law library. Thus, the court denies summary judgment on this issue.

### B.    Project Applications

Shaw claims that Bieber threw away 31 of Shaw's Project Applications in retaliation of Shaw filing grievances and a lawsuit against Bieber. Docket 1 ¶ 206. The parties dispute the second and third elements of a retaliation claim.

First, the parties dispute whether Bieber engaged in an adverse action. In April of 2016, Shaw claims that Bieber threw away 31 Project Applications Shaw filled out in retaliation for Shaw filing grievances and a lawsuit against Bieber. *Id.* Defendants argue that besides Shaw's conclusory allegations, nothing in the record supports his claims. Docket 234 at 65. Defendants also argue that Shaw's allegation is speculation because he did not witness Bieber throwing away the Project Applications. Docket 255 at 6. Defendants point to

Shaw's IR where he wrote that he "believes Bieber" threw them away. Docket 255 at 6 (citing Docket 257-1 at 4).

In Shaw's declaration, Shaw declared that "Bieber threw away [31] project applications that Shaw gave to Bieber to forward to the Cultural Activities Coordinator." Docket 215 ¶ 176(q). Additionally, Shaw filed an IR on May 11, 2016, alleging that Shaw delivered 31 Project Applications to Bieber, but the Project Applications never made it to the Cultural Activities Coordinator. Docket 257-1 at 4. Shaw stated, "I believe UM Bieber threw my project [applications] away to retaliate against me . . . ." Docket 122-8 at 5. In an AR from May of 2016, Shaw claimed that there should be video evidence of Bieber receiving the Project Applications from Shaw on April 29, 2016. Docket 122-8 at 7. Bieber disputes this allegation. Docket 234 at 64. Bieber alleges that he does not recall Shaw submitting 31 Project Applications to him. Docket 101 ¶ 14. Bieber states that if Shaw did, he would not have thrown them away. *Id.*

Here, the parties dispute whether Shaw submitted the Project Applications to Bieber and whether Bieber threw them away. Thus, questions of material fact exist. And as stated above, this court cannot resolve a factual dispute because it requires a credibility determination, which is "inappropriate" at the summary judgment stage. *Madewell*, 909 F.2d at 1206.

Next, defendants argue that Shaw failed to show any causal connection between his claim and a retaliatory motive. Docket 234 at 65; Docket 255 at 7. Shaw, however, presented some evidence of a causal connection. In his

69

complaint, Shaw stated that Bieber retaliated against Shaw because Shaw filed grievances and a lawsuit against Bieber. Docket 1 ¶ 206. Shaw submitted evidence of several grievances he filed against Bieber around the time Shaw alleges Bieber threw away the Project Applications. Docket 250-2 at 579-82, 584. Additionally, Shaw filed his small claims action against Bieber in April of 2016. *Id.* at 605, 615. The causal connection between these grievances/lawsuit and Bieber's action is "generally a jury question[.]" *Beaulieu*, 690 F.3d at 1025 (quoting *Revels*, 382 F.3d at 876). Based on Shaw's evidence, the record here is not "so free from doubt as to justify taking it from the jury." *Id.* (quoting *Revels*, 382 F.3d at 876).

Overall, the court does not consider Shaw's claim to be speculative or conclusory. Shaw provides specific facts and evidence in the record to support his allegations. In viewing the facts in a light most favorable to Shaw, the court finds that Shaw has alleged sufficient facts to create a genuine issue of material fact regarding what Bieber did with these Project Applications and whether he did so with a retaliatory motive. The court denies summary judgment on Shaw's retaliation claim against Bieber regarding the Project Applications.

## CONCLUSION

Thus, it is ORDERED that Shaw's claims against Jacobs, Bidney, and Reimann are dismissed without prejudice.

IT IS FURTHER ORDERED that Shaw's RLUIPA and First Amendment Free Exercise claims for his religious diet are dismissed for failure to exhaust his administrative remedies.

IT IS FURTHER ORDERED that defendants' second motion for summary judgment (Docket 225) is granted with prejudice on all claims as to the following defendants: Effling, Kaemingk, Dooley, Young, Merten-Jones, and Stanwick-Klemik.

IT IS FURTHER ORDERED that defendants' second motion for summary judgment (Docket 225) is denied as to the following defendants on the following claims:

1.  On Shaw's right to receive mail claim:

    a.  Against Storevick, Drieske, Miller-Hunhoff, and Baker regarding the 138 magazines listed in the Rejection Log but not contained in the 31 rejection notices provided to the court.

    b.  Against Miller-Hunhoff regarding Inked March 2016 and Skin & Ink Winter 2016.

    c.  Against Baker regarding the following magazine issues: Inked November 2016, Inked October 2016, Freshly Inked Vol. 6 Issue 2, Inked April 2016, Urban Inked March 2016, Maxim February 2015, Skin & Ink October 2015, and Fangoria March 2014.

    d.  Against Drieske regarding the following magazine issues: Inked October 2016, Tattoo August 2015, Tattoo International #28, Fangoria March 2014, and Skin & Ink August 2015.

    e.  Against Miller-Hunhoff, Baker, and Drieske regarding the following magazines: 3 issues of Inked from 2017, Inked September 2017, Freshly Inked Queens Issue, Freshly Inked July 2016, Inked May 2016, Freshly Inked September 2015, and Maxim August 2015.

2.  Against Bieber on Shaw's retaliation claims regarding access to the law library and project applications.

Dated November 20, 2020.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE